1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION

3    UNITED STATES OF AMERICA,     )
          Plaintiff,               )
4                                  ) No. SA:16-CR-254-XR
          vs.                      )
5                                  ) San Antonio, Texas
     REYMUNDO VILLARREAL-ARELIS    ) June 12, 2017
6         Defendant.               )
     ------------------------------

7                           VOLUME 1

8                     TRANSCRIPT OF JURY TRIAL
9            BEFORE THE HONORABLE XAVIER RODRIGUEZ
                 UNITED STATES DISTRICT JUDGE
10
     A P P E A R A N C E S:
11
     FOR THE PLAINTIFF:
12
     United States Attorney's Office
13   Mark Frazier, Esquire
     Christopher Michael Blanton, Esquire
14   800 Franklin, Suite 280
     Waco, Texas 76701
15
     United States Attorney's Office
16   James Henry Sturgis, Esquire
     1701 West Highway 83, Suite 600
17   McAllen, Texas 78501

18   FOR THE DEFENDANT, REYMUNDO VILLARREAL-ARELIS:

19   Guy L. Womack, Esquire
     Attorney at Law
20   609 Heights Blvd.
     Houston, Texas 77007
21
     Hasdorff & Convery
22   John A. Convery, Esquire
     1005 South Alamo Street
23   San Antonio, Texas 78210

24

25

1    COURT REPORTER:

2    Karl H. Myers, CSR, RMR, CRR
     Official Court Reporter
3    655 E. Cesar Chavez Blvd., Rm. 315
     San Antonio, Texas 78206
4    Telephone:  (210) 286-8790

5    Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX

2          VOLUME 1 – JUNE 12, 2017

3     WITNESSES:

4     JESUS ENRIQUE REJON-AGUILAR:

5     Direct examination by Mr. Frazier --------------- 168
      Cross examination by Mr. Womack ----------------- 211

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              EXHIBIT INDEX

3       Government's Exhibits No. 1 through 806-B were admitted on
        Page 10, with the exception of Exhibits 38 and 39.
4
        Government's Exhibits 38 and 39 were admitted on Page 145.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (June 12, 2017.)

2          THE COURT:  Thank you.  Please be seated.

3     16-Civil-254, United States vs. Reymundo Villarreal.

4     Appearances, please.

5          MR. FRAZIER:  Mark Frasier, James Sturgis and Chris

6     Blanton for the United States.  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. WOMACK:  Good morning, Your Honor.  Guy Womack

9     and John Convery for Mr. Villarreal.  We have a third counsel

10    coming, Your Honor.  I don't know where she is at, but she is

11    a young attorney assisting us.  That is Miriam Olivares

12    O'Brien.  She is bilingual and she will be assisting us in

13    translating here at the table, so we can talk privately.

14         And, Your Honor, just -- I believe Your Honor said

15    it was 16 Civil.  It is actually --

16         THE COURT:  Pardon me.  16-CR.

17         MR. WOMACK:  Thank you, Your Honor.

18         THE COURT:  So we have a pending motion, second

19    motion in limine?

20         MR. WOMACK:  Yes, Your Honor.  I filed it late last

21    night.  I apologize for the late notice.

22         THE COURT:  What is the government's response?

23         MR. BLANTON:  Your Honor, several responses, the

24    first being that motion in limine seeks to exclude testimony

25    of direct fact witnesses.  They are going testify to the scope

1     of the conspiracy, the defendant's direct involvement in the

2     conspiracy to traffic in cocaine, possess with intent to

3     distribute, and also the different theories of money

4     laundering.  They are direct witnesses.  It is seeking to be

5     an exclusionary rule of our witnesses.  We are ready to

6     proceed on that, Your Honor.

7           MR. WOMACK:  And, Your Honor, the synopsis of facts

8     I put in here came directly out of the memorandums of

9     investigation that the government showed me Friday.  I was

10    there for four and a half hours reading all of it, and these

11    are directly from those reports.

12          And there are some witnesses who are direct

13    witnesses.  I didn't object to them.  But the ones I did

14    object to are the ones who said that they know that it is

15    common knowledge that the family is drug traffickers.  Well,

16    they can't say that, anymore than they can say it is common

17    knowledge that Lee Harvey Oswald assassinated President

18    Kennedy.  You can't bring that in.

19          And, of course, a couple of witnesses also, there

20    are two of them, who would talk about violence.  There are no

21    charges of violence.  And one of them, Carillo, said that he

22    was kidnapped, he thinks by the Zetas -- well, actually, by

23    Guatemalans at the direction of the Zetas.  He was held,

24    blindfolded and then they moved him somewhere else.

25          He said that he heard the voice of Gilberto

1    Villarreal, the lead -- defendant, I should say, who

2    negotiated his release.  And he said he heard another man, who

3    was unidentified, who said, "Kill him," but he didn't know who

4    that was.  And that was in 2013.  He made multiple statements

5    saying this.

6         Then in 2017, I believe it was March, and it is

7    cited in here, in talking to the government suddenly four

8    years later, he can say, "Oh, wait.  That person that said

9    kill me was Reymundo Villarreal."  And he doesn't even mention

10   his name, other than that.

11        And clearly, under 403, that kind of thing has no

12   place in this trial.  Now, it is one thing if we put on

13   evidence of character to say that this man has never said kill

14   someone, then they can try to rebut it, but even then -- we

15   are not doing it.

16        And so that is clearly barred under 403.  And then

17   there was another witness -- I forget his name.  He is one of

18   the last ones I cited -- who in his statements to the

19   government said that he believed Mr. Villarreal to be a

20   violent man.  Again, irrelevant and highly prejudicial.

21        MR. BLANTON:  Yes, Your Honor.  Two points.  The

22   kidnapping that he is speaking of, that was part of a drug

23   transaction.  That was in furtherance of the drug conspiracy.

24   The gentleman, we will put on evidence, was kidnapped because

25   of a lost drug load, and that was in furtherance of the drug

conspiracy.

He is going to further testify that the Villarreal family, specifically, defendant's business dealings transporting money across, back and forth, that is all part of the drug conspiracy.

The second point, Your Honor, and I would like to make in response to this motion in limine, the materials that we provided Mr. Womack, those were memorandums of interview written by agents regarding speaking with, debriefing defendants at the time.

Some of them are old. Some of them weren't specifically talking about the defendant. They are not Jencks material, and I would ask that the Court -- and we will object, but prohibit those being used in a Jencks-type fashion. They are agents' summaries of debriefs.

THE COURT: I will take up that objection when it gets lodged. With regard to the second motion in limine, the defendant is charged in Count 1 and 6 with conspiracy to distribute drugs and, on Count 6, conspiracy to launder monetary instruments, and so any of the witnesses' statements regarding the conspiracy would be admissible.

With that said, the motion in limine is denied. I will wait -- that is not a final evidentiary ruling, so you will need to make objections at the time that you believe it to be appropriate.

1         Anything else we need to take up before the jury

2    gets brought in?

3         MR. WOMACK:  Your Honor, does that include the

4    testimony about him being violent or saying, "Kill the man"?

5         THE COURT:  So the allegation, at least, made by the

6    government is that those statements are going to be statements

7    that were made in furtherance of the drug conspiracy.  If that

8    is the case, the 403 objection is denied, for purposes of this

9    limine motion.  Again --

10        MR. WOMACK:  Yes, Your Honor.

11        THE COURT:  -- it is not a final evidentiary ruling,

12   so you will need to make objections as you see fit whenever

13   you believe an improper question is raised.

14        MR. WOMACK:  Yes, Your Honor.  Thank you.

15        THE COURT:  Anything else we need to take up before

16   the jury gets brought in?

17        MR. BLANTON:  Yes, Your Honor.  Regarding the

18   Court's general order concerning authentication and

19   admissibility of exhibits, the government has provided its

20   exhibit list and all exhibits, with just very few additions on

21   June 1st; I would move to admit the government's exhibits at

22   this time.

23        MR. WOMACK:  No objection, Your Honor, except as to

24   relevance.  If and when they offer the exhibit, I am sure they

25   will lay a foundation for it.

1          THE COURT:  So --

2          MR. WOMACK:  But not as to authenticity.

3          THE COURT:  So at this point, do we have an

4    agreement as to the -- can I enter into evidence now without

5    the government having to prove up Exhibit Nos. 1 through 806-B

6    or not?

7          MR. WOMACK:  Your Honor, I think that includes the

8    drug lab result.  I think there were two of those.

9          THE COURT:  I am not sure which number that would

10   be.

11         MR. FRAZIER:  Your Honor, Mark Frazier for the

12   United States.  He is talking about Government's Exhibits No.

13   38 and 39, the lab reports.  To the extent we need to withhold

14   offering the lab reports, we have no objection to that, Judge,

15   but as to the other exhibits, we move for their full

16   admissibility at this time.

17         MR. WOMACK:  No objection, Your Honor.

18         THE COURT:  So all of the government's exhibits

19   indicated in its exhibit list, that in my latest copy, which

20   is June 11 -- is that the latest version?

21         MR. BLANTON:  Yes, Your Honor.

22         THE COURT:  Exhibits No. 1 through 806-B are

23   admitted, with the exception of Exhibits 38 and 39.

24         Anything else we need to take up at this time?

25         MR. BLANTON:  No, Your Honor.

1          THE COURT:  Anything from the defendant, Mr. Womack?

2          MR. WOMACK:  No, Your Honor.

3          THE COURT:  So the jury will be brought in.  The

4    spectators will need to move to the back of the courtroom.  If

5    you can flip your chairs around, face the panel.  Each side

6    will be given 30 minutes for voir dire after I conduct the

7    initial voir dire.

8          When I make the initial introductions I will

9    recognize the two lead counsel.  You are welcome to introduce

10   who is at your table, and be prepared to read to the panel

11   members any prospective witnesses you might think might appear

12   in this case.

13         Becky, let them know we are ready for the panel.

14         COURTROOM DEPUTY:  Yes, sir.

15         (Brief recess.)

16         (Jury panel enters courtroom.)

17         (Call to order.)

18         THE COURT:  Good morning, ladies and gentlemen, and

19   welcome to the federal courthouse here in San Antonio.  Again,

20   my name is Xavier Rodriguez and I am one of the district

21   judges here at this court.  On behalf of me and my colleagues,

22   I would like to thank you all for appearing here for jury

23   service and answering your call to service.

24         I know a number of you have traveled some distance.

25   We have a very large area that we serve here in San Antonio.

We have a 14-county division here, and so it is Comal,

Bandera, Gonzales, Guadalupe, Karnes, Kendall, Kerr, Medina,

Real, Wilson, Atascosa, so I know a number of you got up a bit

early this morning to travel out here, and so we are very

appreciative of your time.

We are going to be very respectful of your time here

today.  We are going to be selecting a jury for a criminal

case.  The case will last approximately a week, but rest

assured that if you are selected to be a juror in this case,

it will be a week that I believe will be educational,

informative for you and that you will feel at the end of the

week that your time was appropriately utilized.

I know a number of you have other things to do, and

I know a number of you have taken time away from work and your

other personal obligations, and some of you don't want to be

here.  I understand that.

With that said, you know, let's all put this in

perspective.  So we are going to be asking you some questions

this morning, and I will start off with an easy one.  How many

of you know somebody who serves in our military?  Since this

is San Antonio, virtually everybody knows somebody here.  How

many of you know someone who has served overseas in our latest

campaigns?  Virtually, again, half the hands or more always go

up.

You know, for those men and women who have been

1    serving in our armed forces –– and many of them are

2    reservists.  Many of them have been forced to take not just a

3    couple of days off of work.  They have been taking months and

4    years, doing one tour, two tours, three tours, four tours of

5    duty.

6            So to put this all in perspective, you are being

7    asked to do a very important form of service for a week, but,

8    you know, let's put this in perspective.  A lot of men and

9    women have been doing much more for us and so, you know, keep

10   that in mind.

11           Now, for those of you who have never served on a

12   jury panel before –– and let me figure out, who has never

13   served on a jury?  Whoa.  I am very surprised.  You know,

14   normally, we have people who have served on a jury at least in

15   the state courthouse.  So a number of you are brand new.

16           I am going to explain the process for you.  I will

17   be asking some questions first of you all.  If you would do us

18   the kind favor of standing up when it is time for you to

19   respond, because Karl Myers over here, our court reporter, is

20   taking down everything we say, and it would sure assist him if

21   you could stand up, give your juror number so we know who you

22   are, and speak as loudly as you can so we can capture your

23   comments.  That would be greatly appreciated.

24           There are no right answers and there are no wrong

25   answers this morning.  The only thing that the parties are

1   going to ask of you today is an honest answer, and so if you

2   could do that, that will help us in selecting the appropriate

3   jury for this case.

4           Most of my questions and most of the questions asked

5   by the lawyers will require just a simple yes or no.  If it

6   requires a little more intimate detail, personal explanation,

7   if you want to come up and speak with me at an appropriate

8   time with the attorneys up here at the bench, rather than in

9   front of your newfound 40 friends, I can appreciate that.  So

10  if there is anything a little sensitive that you would rather

11  not talk about out loud, just let me know and we will take up

12  that issue here at the bench a little more privately.

13          As I mentioned, we are going to select a jury for a

14  criminal case.  It is styled the United States of America vs.

15  Reymundo Villarreal-Arelis.  I am going to read to you now

16  portions of the indictment in this case.  The indictment is a

17  formal charge against the defendant, but it is not any

18  evidence of guilt.  The defendant is presumed by law to be

19  innocent.

20          I am going to read this indictment to you, however,

21  or at least portions of it, so you can get a sense of what

22  this case may be about and so we can determine whether or not

23  any of you might have some personal knowledge of this case or

24  whether or not this case may be inappropriate for you.

25          Count 1.  Conspiracy to distribute at least

five kilograms of cocaine and other substances.  Beginning at least January 1, 2000, the exact date unknown to the grand jury, and continuing until the date of this indictment in the Western District of Texas, the Southern District of Texas, and elsewhere, the defendant and others, both known and unknown to the grand jury, did unlawfully, intentionally and knowingly combine, conspire, confederate and agree together and with each other and others to possess with intent to distribute a controlled substance, which offense involves at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule 2 narcotic drug controlled substance; and with respect to the defendant, the controlled substances involved in this conspiracy attributable to him and as a result of his own conduct and the conduct of other conspirators reasonably foreseeable to him is at least five kilograms of a mixture and substance containing a detectable amount of cocaine.

Count 6.  Conspiracy to launder monetary instruments.  Beginning on or about January 1, 2000 and continuing until the date of this indictment and at various times material to this indictment, in the Western District of Texas, the Southern District of Texas and elsewhere, the defendant, together with others known and unknown to the grand jury, did unlawfully, intentionally and knowingly combine, conspire, confederate and agree among themselves and each

1   other to commit certain offenses against the United States as

2   follows:  Knowing that the property involved in a financial

3   transaction represented the proceeds of some form of unlawful

4   activity, did conduct and attempt to conduct such financial

5   transactions which, in fact, involved the proceeds of

6   specified unlawful activity, knowing that the transaction was

7   designed in whole or in part to conceal and disguise the

8   nature and location, the source and ownership and the control

9   of the proceeds of unspecified unlawful activity, and to avoid

10  the transaction reporting under state and federal law, did

11  transport, transmit and transfer and attempt to transport,

12  transmit and transfer a monetary instrument and funds from a

13  place in the United States to and through a place outside of

14  the United States, with the intent to promote the carrying on

15  of unlawful specified activity, did transport, transmit and

16  transfer and attempt to transport, transmit and transfer a

17  monetary instrument and funds to a place in the United States

18  from and through a place outside of the United States, knowing

19  that the monetary instrument and funds involved in the

20  transportation, transmission and transfer represented the

21  proceeds of some form of unlawful activity and knowing that

22  such transportation, transmission and transfer was designed in

23  whole or in part to conceal and disguise the nature, the

24  location, the source, the ownership and the control of the

25  proceeds of specified unlawful activity.

1          Now, I know that was a handful.  The attorneys will

2    do a more detailed explanation here in a little bit when they

3    start asking you questions about how this may or may not

4    apply.

5          But in the big picture, I wanted you to have an

6    understanding that this case involves two different types of

7    conspiracies.  One is to possess -- or pardon me.  One was a

8    conspiracy to distribute at least five kilograms of cocaine

9    and the other count is conspiracy to launder monetary

10   instruments.

11         With that said, let me start asking some more

12   questions of you all.  First, let's make sure no one knows

13   each other here in this courtroom.  Again, my name is Xavier

14   Rodriguez.  My courtroom deputy here is Becky Greenup.  She is

15   going to be taking down which documents are admitted into

16   evidence and the witness list and handling all of the

17   paperwork that is associated with the trial.  She also swears

18   in any witnesses.

19         Karl Myers here, I mentioned earlier, is the court

20   reporter.  He is taking down everything we say.

21         We have court security officers here who will take

22   care of whoever is selected as the jury in this case, making

23   sure you know how to get to which room they need to get to and

24   otherwise attending to your needs.

25         Patrick Plassio over here is my law clerk.  He is a

brand-new law graduate over from the University of Texas at Austin, and so he is sort of like in a mentorship program with me for a year. He also will help me with any legal research that might come up in this case.

And then hiding back over there, Charles Hoff and Cody Smith are law students serving as interns in my office and they are also UT Law School students.

Does anyone know me or any member of my staff? No hands. Good.

This is going to sound strange, but I told you, we have a very large geographic division that we take care of in San Antonio, and it is amazing how often this happens. Will you please take a look at one another? Does anyone recognize somebody else here in the panel as someone you go to church with, you have the same employer, you know in some capacity? Anybody here know one another in the panel?

Well, this is a unique one. I have had sometimes people sitting right next to each other. You know, 14 counties, and it turns out that they are right next to each other sitting down here and they know each other. And so this often happens with USAA and other of our large employers. No one knows anybody else here on this panel? No hands. Good.

Let me make some introductions of the parties here in this case. The United States in this case is represented by assistant U.S. Attorney Mark Frazier.

1        Will you please stand, Mr. Frazier.  Would you

2  introduce who is at your table.

3        MR. FRAZIER:  Yes, sir.  Do I need a microphone,

4  Judge?

5        THE COURT:  No.  Just project.

6        MR. FRAZIER:  Good morning, ladies and gentlemen.

7  As the Judge said, my name is Mark Frazier.  I am an assistant

8  United States Attorney.  Seated with me is Chris Blanton,

9  another assistant United States Attorney.  Steve Pennington,

10  an agent with the Internal Revenue Service, Criminal

11  Investigative Division, who is going to be my case agent.  And

12  at the end is James Sturgis, another assistant United States

13  Attorney.

14        THE COURT:  Thank you.

15        You can take a seat, gentlemen.

16        Does anyone know Mr. Frazier or anyone else sitting

17  at his table?  No hands.  Thank you.

18        Mr. Womack, if you would please stand.

19        MR. WOMACK:  Thank you, Your Honor.

20        THE COURT:  And this is Guy Womack.  He represents

21  the defendant, Mr. Villarreal.

22        Would you please introduce who is at your table?

23        MR. WOMACK:  Yes, Your Honor.  Thank you.

24        Again, I am Guy Womack.  I am the lead counsel on

25  this case.  You will hear from me more than anyone else.  You

1    will hear from all of us.

2         Next to me is Reymundo Villarreal-Arelis.  He is the

3    defendant named in this case.  On the other side of him is

4    Miriam Olivares O'Brien, an attorney who is assisting us on

5    the case, one of my co-counsel.  Next to her is John Convery,

6    another attorney, co-counsel in the case.

7         MR. CONVERY:  Good morning.

8         MR. WOMACK:  And together, we will be the defending

9    Mr. Villarreal-Arelis.

10        THE COURT:  Thank you, sir.

11        Does anyone here know Mr. Womack, the defendant,

12   Mr. Villarreal, or anyone else sitting at that table?  One

13   hand.  Yes, sir.

14        JUROR:  Chester Hewitt, number 17.  I know Mr.

15   Convery.

16        THE COURT:  Number 17.  And, Mr. Hewitt, how do you

17   know Mr. Convery?

18        JUROR:  I worked for the Federal Public Defenders

19   for 17 years, and I have seen him in court, and I worked on

20   litigation support.

21        THE COURT:  Thank you, Mr. Hewitt.  We might have

22   some questions of you in a little bit.

23        Anyone else know Mr. Womack, Mr. Convery or anybody

24   else, the defendant, anyone else sitting at that table?  Thank

25   you.

1      Now, ladies and gentlemen, a criminal case is

2 initiated by bringing a charge against the defendant, it is

3 called an indictment, and I read portions of that to you a

4 moment ago.

5      Now, an indictment in a criminal case is not

6 evidence and the jury is instructed that it must not consider

7 the indictment as evidence of guilt.  An indictment is sort of

8 similar to a civil petition in a civil case.  It is simply the

9 way to apprise the defendant of the nature and extent of the

10 charges against him and the means by which the case reaches

11 the Court.

12      But an indictment is not evidence, again, and it may

13 not be considered as evidence by the jury for any reason.  My

14 question to you:  Does anybody think that just because the

15 defendant has been charged by way of an indictment he must be

16 guilty?

17      And there are no right answers, no wrong answers,

18 just an honest answer.  Does anybody feel that way?  No hands.

19      The defendant is on trial now for only those

20 specified charges set out in the indictment and nothing else.

21 So if something comes up later in this trial and you think,

22 well, you know, he may not be guilty of this but he must be

23 guilty of something else, you can only charge -- or find guilt

24 based upon what is charged in the indictment.

25      Does everyone know first what I just said?  Does

anybody want me to repeat that?  Does anybody disagree with
that statement?  No hands.

Every defendant under the United States laws are
entitled to a presumption that they are innocent until the
jury unanimously agrees to the contrary beyond a reasonable
doubt.

A defendant is presumed to be innocent until his
guilt has been established to the satisfaction of the jury by
legal and competent evidence beyond a reasonable doubt.
Therefore, this defendant, although he is accused of a crime,
he begins this trial with a clean slate.

He is presumed innocent until the government has
discharged its burden of proving the guilt of the defendant to
each juror by competent legal evidence beyond a reasonable
doubt.

Now, my question to you here is this.  You know,
other systems around the world use a different framework of
law.  There are a lot of countries that the law, if you are
charged with something, you have to prove yourself innocent,
but here in the United States, we act under the presumption
that everyone who is charged is innocent until proven guilty.

Now, again, no right answer, no wrong answer, just
an honest answer, does anybody not -- you know, does anybody
think that we just got it wrong?  That we ought to be using a
different system more similar to other parts of the world?

1 Nothing wrong with that. It is just -- no right answer, no

2 wrong answer, just an honest answer. Does anybody think we

3 have it wrong?

4 Does anybody here think that we put too much of a

5 burden on the government to prove guilt? So they have to

6 prove beyond a reasonable doubt that someone is guilty. Does

7 anyone think that that burden is too high? Yes.

8 JUROR: I don't -- I think --

9 THE COURT: I am sorry. I can't read your number.

10 JUROR: Juror number 30.

11 THE COURT: Yes, ma'am.

12 JUROR: And --

13 THE COURT: That is Ms. Schoenert?

14 JUROR: Yes. I think the laws are a little too

15 flexible.

16 THE COURT: Thank you, ma'am. We will visit with

17 you in a little bit, and thank you for being brave enough to

18 stand up.

19 Anybody else feel the way Ms. Schoenert does? No

20 other hands.

21 The right to remain silent. Each defendant has a

22 privilege guaranteed by the Constitution of the United States

23 to remain silent. A defendant does not have to testify.

24 Now, in this case, I don't know whether Mr.

25 Villarreal is going to testify or not. He may or may not take

1   the witness stand.  If he elects not to testify, you are not

2   permitted to attach any significance to that fact or hold it

3   against him in any way.

4          Is there anyone here on the panel who thinks, "Oh,

5   no.  If he doesn't testify, I am going to hold that against

6   him.  I need to hear from him"?  Does anybody believe that?

7   And I know it is hard to stand up and put yourself out there.

8   There is no right answer.  There is no wrong answer.  It is

9   just an honest answer.  Anybody feel that way?

10          Ms. Schoenert, again.

11          JUROR:  Again, juror number 30.  I think if he is on

12   trial, he needs to be able to speak about it.

13          THE COURT:  Thank you, ma'am.  Anybody here feel the

14   way Ms. Schoenert does?  Thank you.

15          Anybody here, because of religious reasons or other

16   reasons, think that they can't make a decision in a case?

17   Whether it is civil or criminal, there are some people who

18   hold religious beliefs that they are not here to decide

19   against one or another person.  Does anybody hold that

20   religious belief or personal belief?  No hands.

21          You are going to be -- if you are selected as a

22   juror in this case, you are going to be, at the conclusion of

23   this case, given a charge of law, instructions by me.  And you

24   may or may not agree with the law as I announce it at the end

25   of the case, but it is your obligation, if you are chosen as a

1      juror, to follow that law even if you disagree with it.

2              I know this is sort of putting the cart before the

3      horse because we are not there yet, but does anyone think that

4      if you think I got it wrong in the law you think, well, I as a

5      juror should be able to disregard that law?  Does anybody feel

6      that way?  No hands.

7              Let me talk about or visit with you now about past

8      experiences perhaps as a victim of crime.  Unfortunately, I

9      know we have all been subject to break-ins and our cars have

10     been vandalized or something like that has happened, but I

11     want to focus sort of just on this case.

12             Has anybody been a victim of a crime related to drug

13     trafficking or money laundering in some fashion?  And let me

14     go down a little further.  Does anybody here -- and this may

15     be one of these kind of personal questions.  Has anybody here

16     ever had a personal drug use problem or a close family member,

17     your spouse, your brother, your sister, your mother, your

18     father, someone very close to you having a drug problem that

19     because of that issue you feel that this may not be the

20     appropriate case for you because this is involving drug

21     trafficking allegedly and you just feel that you would hold it

22     against the defendant in some form or fashion?  Anybody have

23     that kind of experience?

24             And a number of hands, and let's go through this.

25     Let me start down the row, if I can.  The first one is

1   Mr. Miller?

2         JUROR:  Yes, sir.  Juror number 2.

3         THE COURT:  Go ahead, if you feel comfortable.

4         JUROR:  Yes, sir.  My daughter has an addiction to

5   meth, and she spent several years at Bryant and I -- I have

6   strong feelings about that.

7         THE COURT:  Given that personal situation that you

8   are feeling, could you set that aside, listen just to the

9   facts and the evidence in this case and make a decision just

10   on the facts and evidence in this case or are your daughter's

11   problems going to be so imposing on you in this case?

12         JUROR:  Sir, I believe I will be influenced.

13         THE COURT:  Thank you, sir.

14         Who else on this row?  Yes, ma'am.  Number 5.

15   Ms. Biemer?

16         JUROR:  Yes.  Children, both of them, but -- and

17   then family members, so --

18         THE COURT:  Let me ask you the same question.  Do

19   you think you could set all of that aside and just listen to

20   the facts and evidence in this case or do you think it is

21   going to be so influencing on you that this is not the right

22   case for you?

23         JUROR:  No, I think I can -- I think so.

24         THE COURT:  You think you can hear this case?

25         JUROR:  Yes.

1          THE COURT:  Thank you, Ms. Biemer.

2          Was there Ms. Finley?

3          JUROR:  Yes.  My daughter also is a victim of drug

4  abuse, with her ex-husband, who is currently incarcerated in

5  federal prison for conspiracy to distribute illegal drugs.

6          THE COURT:  And that was your son-in-law?

7          JUROR:  It was.

8          THE COURT:  Yes.  Let me ask you the same question,

9  Ms. Finley.  Could you set aside those experiences and just

10  hear the case, this case on the facts and the evidence

11  presented in this case or are those experiences going to

12  influence you in this case?

13          JUROR:  I am honestly not sure.

14          THE COURT:  Okay.  We will explore some more with

15  you in a little bit.  Thank you, ma'am.

16          Anybody on that second row?  Let's begin with you,

17  sir.  I am sorry.  I can't see your numbers from here.

18          JUROR:  Juror number 10.

19          THE COURT:  Mr. Talamantez?

20          JUROR:  Yes.

21          THE COURT:  And, sir?

22          JUROR:  I have a daughter who was addicted to

23  cocaine.

24          THE COURT:  The same questions to you, Mr.

25  Talamantez.  Could you set aside that unfortunate experience,

just listen to the facts and the evidence in this case and

just make decisions and a verdict on this case based upon the

facts and evidence in this case, or is your daughter's

problems going to be too influencing on you?

JUROR:  I think I can stay --

THE COURT:  Thank you, Mr. Talamantez.

Anybody else in that row?  Yes, ma'am.  Ms.

Mitchell?

JUROR:  Yes, juror 11.  My sister is addicted, and I

lost my aunt to drugs.

THE COURT:  That was an overdose?

JUROR:  Yes.

THE COURT:  I am very sorry.  Ms. Mitchell, again,

same question.  Can you set that aside and just listen to the

facts and evidence in this case or is it going to be too

influencing on you?

JUROR:  I am actually not sure.  I can try really

hard, though.

THE COURT:  Okay.  We will visit with you in a

little bit.

Anybody else in that row?  Yes.

JUROR:  Juror number 12, ----- ------.  I have two

nephews that were addicted.

THE COURT:  Same question, Ms. ------.  Can you set

that aside or not?

1          JUROR:  Yes.

2          THE COURT:  You can?

3          JUROR:  Yes.

4          THE COURT:  Thank you, ma'am.

5          Anybody else on that row?  Yes, ma'am.

6          JUROR:  Number 14.

7          THE COURT:  Ms. Ochoa?

8          JUROR:  Yes.  My son was recently arrested for

9    possession of marijuana.  I am not sure how -- if I would be

10   influenced or not, I am not really sure.

11         THE COURT:  So you could almost cut both ways.

12   Could you be fair to both the government and the defendant?

13   Could you set that aside and just listen to the facts and

14   evidence in this case and render a verdict?

15         JUROR:  Probably.  I am sure -- I don't know which

16   way it would be influenced, in either direction.

17         THE COURT:  We will visit a little bit more.  Thank

18   you, ma'am.

19         Next row, anyone?  And is there a fourth row?

20         COURTROOM SECURITY OFFICER:  No.

21         THE COURT:  I am visually challenged here.

22         COURT SECURITY OFFICER:  Three rows, sir.

23         THE COURT:  Okay.  Thank you.

24         Anybody in this first row over here?  Yes, ma'am.

25         JUROR:  Number 26, Martha Wolf.  I also have two

nephews that have been addicted to drugs.  One of them is

currently living with me.  The other is in recovery.  But I do

think that his problem was mostly with opiates, the

prescription opiates, so I do think I could be impartial and

fair.

THE COURT:  Thank you, Ms. Wolf.

Anybody else in that row?  Next row?  And then the

last row?  Yes, ma'am.

JUROR:  Juror number 36.  I have a brother -- and a

granddaughter also.

THE COURT:  And so your brother and your

granddaughter are both in prison right now?

JUROR:  Yes.

THE COURT:  For drug-related offenses?

JUROR:  Yes.

THE COURT:  Now, Ms. Moreno, the same question to

you.  Can you set that aside, just listen to the facts and the

evidence in this case and be fair to both the government and

the defendant in this case and reach a verdict just in this

case or do you think those incarcerations are going to

influence you?

JUROR:  I think I can --

THE COURT:  You think you can do it?

JUROR:  Yes.

THE COURT:  Thank you, Ms. Moreno.

1            Anyone else now, after a little bit of reflection,

2    would like to talk to me about this?

3            Has anybody here on the panel ever been a witness in

4    a criminal case?  And, yes, ma'am.  Number 27.

5            JUROR:  Twenty-seven.  I testified in the punishment

6    phase about an extraneous --

7            THE COURT:  Okay.  What type of case was it, Ms.

8    Najera?

9            JUROR:  Child sexual assault.

10            THE COURT:  Thank you.

11            Anybody else ever been a witness in a criminal case?

12    Yes, sir.

13            JUROR:  Number 10.

14            THE COURT:  And what type of case was it?

15            JUROR:  Narcotics.

16            THE COURT:  And so was that in your role as a police

17    detective?

18            JUROR:  Yes.

19            THE COURT:  Okay.  Thank you, sir.

20            Anyone else a witness in a criminal case?

21            JUROR:  I am not sure.  We --

22            THE COURT:  And number 5, Ms. Biemer?

23            JUROR:  Yes.  Five, Biemer.  I don't know.  I mean,

24    I didn't go to trial.  You know, the police took --

25            THE COURT:  -- a statement from you?

1          JUROR:  Yes.  And they made sure, are you available

2     if -- I guess it never went to trial, so --

3          THE COURT:  Okay.  And do you remember what type of

4     case it was?

5          JUROR:  It was a drive-by shooting.

6          THE COURT:  A drive-by shooting?

7          JUROR:  Somebody's window, they drove by.

8          THE COURT:  Okay.  Was it involving your house or

9     your property or you just happened to overhear it?

10          JUROR:  We were there.  We just witnessed it --

11          THE COURT:  Okay.

12          JUROR:  -- and just gave a statement so, you know,

13     that's all I know.  But I wasn't sure --

14          THE COURT:  Thank you, Ms. Biemer.  And I appreciate

15     it, and you raise a good point.  If you are not sure about

16     answering my question, please just let me know, and I will let

17     you know whether we can move on or not, but it is better to

18     err on talking.  Okay?

19          Has anybody here ever written any books, any

20     articles, any editorials to the paper on crime or criminal

21     justice?  No one.

22          Before I read portions of the indictment today, had

23     anybody ever heard about this case before?  No hands.

24          So a number of you have not served on a jury.  Let

25     me figure out who has.  And I want to focus not on civil

cases, not on child custody cases, not on divorce cases,

anything like that, just a criminal case, has anyone ever

called the police saying that you were a victim of crime?

And number --

JUROR:  Juror 11.  My car was stolen and it became a

big issue.  So it was stolen by two people who were holding

people hostage for methamphetamines, and then they shot a

police officer.  It was in Nebraska, so --

THE COURT:  So, Ms. Mitchell, anything about that

experience, either how you were treated by law enforcement,

how you were treated by the prosecutors or by the defendant,

anything there that would cause you a problem being a fair and

impartial juror in this case?

JUROR:  No.

THE COURT:  Thank you, ma'am.

Anybody else?  Yes, ma'am.

JUROR:  Juror number 38, ------ ------.

THE COURT:  Yes, Ms. ------.

JUROR:  About 35 years ago, our home was burglarized

while we were gone.

THE COURT:  Okay.  Anything about that experience,

the way you were treated by law enforcement, the way you were

treated by the prosecutor or anything involving the defendant

in that case that would cause, you know, any problems for you

being a fair and impartial juror in this case?

```
1              JUROR:  No, Your Honor.

2              THE COURT:  Thank you, Ms. ------.

3              Anyone else?  Yes, ma'am.

4              JUROR:  Juror number 22.  I had my wallet stolen

5     while I was at work and we had to file it, and --

6              THE COURT:  And so, Ms. Carrington, the same

7     question to you:  Anything about how you were treated by law

8     enforcement, prosecutors or perhaps the defendant in that case

9     that would be a problem for you in this case?

10             JUROR:  No.

11             THE COURT:  Thank you, Ms. Carrington.

12             Yes, ma'am.

13             JUROR:  Juror number 34.  I once had my wallet

14    stolen at work and somebody came in, and the police did a good

15    job, so I am okay.

16             THE COURT:  You are okay.  Thank you, Ms. McGookey.

17    Did I say that right?

18             JUROR:  You did.

19             THE COURT:  Okay.  Good.

20             Anyone else?

21             Okay.  Has anyone here ever served on a grand jury?

22    And let me explain the difference between a jury like this and

23    the grand jury.  The grand jury normally meets like once a

24    month, either at the state courthouse or the federal

25    courthouse, and they decide who is going to get indicted.  And
```

1    so a prosecutor will appear before the grand jury and give

2    them some preliminary evidence and they decide whether or not

3    there is enough evidence to issue an indictment.

4            Has anybody ever served as a grand juror?  No hands.

5            Okay.  I want to focus just on criminal cases.  Has

6    anybody -- has anyone here ever served as a juror in a

7    criminal case, either in state court or federal court?  A

8    couple of hands.  Let's go row by row.  Ms. ------?

9            JUROR:  Yes.  Juror number 1.

10           THE COURT:  And was that in federal court, state

11   court?

12           JUROR:  I don't remember.  I think it was federal.

13   I was living in D.C. at the time.

14           THE COURT:  Okay.  And do you remember what type of

15   case it was?

16           JUROR:  It was a criminal case.  I don't recall --

17           THE COURT:  The details?

18           JUROR:  -- the details of it.  I think it was

19   something involving either theft or burglary of a car and --

20           THE COURT:  Yes.  In D.C., it becomes strange,

21   because it being the District of Columbia, U.S. Attorneys in

22   the federal actually try those cases, even though we would

23   consider that almost like state or minor matters, so you were

24   in a strange place.

25           My question to you now though is, did you actually

1    go to trial?

2          JUROR:  Yes.  And I was an alternate juror, so I

3    wasn't a part of the deliberation.

4          THE COURT:  Okay.  And so you already answered my

5    question.  I was going to ask you, did you serve as the

6    foreperson?  And you did not.

7          JUROR:  No.

8          THE COURT:  Thank you, Ms. ------.  Anybody else,

9    criminal jury experience?  First row?  Second row?  Yes,

10    ma'am.

11          JUROR:  Number 13.  It was like 25 years ago.  It

12    was a drug case in Hunt County, north, northeast Texas.

13          THE COURT:  Okay.  Did your jury reach a verdict?

14          JUROR:  Yes.

15          THE COURT:  Were you the foreperson?

16          JUROR:  No.

17          THE COURT:  Thank you, Ms. Holbrook.

18          Anybody else on that row?  Third row?  No one.

19    First row?  Yes, ma'am.

20          JUROR:  Number 25, ------.

21          THE COURT:  And do you remember if it was state,

22    federal?

23          JUROR:  It was state.  It was a DWI case.

24          THE COURT:  DWI?

25          JUROR:  (Indicating.)

1          THE COURT:  Did your jury reach a verdict?

2          JUROR:  We did.

3          THE COURT:  And were you the foreperson?

4          JUROR:  No.

5          THE COURT:  Thank you, Ms. ------.

6          Anybody else on that row?  Second row?  Last row?

7   Yes, ma'am.

8          JUROR:  Juror 38, ------ ------.

9          THE COURT:  State or federal?

10          JUROR:  I am not sure.

11          THE COURT:  Okay.  Do you remember the type of case?

12          JUROR:  Yes.  It involved a vehicle that was stolen

13   and also fraud.

14          THE COURT:  Okay.  Did your jury reach a verdict?

15          JUROR:  We did.

16          THE COURT:  Were you the foreperson?

17          JUROR:  No, sir.

18          THE COURT:  Thank you, Ms. ------.

19          JUROR:  Thank you.

20          THE COURT:  Anyone else?

21          Okay.  Anyone here ever been in law enforcement?

22   And let me use that term broadly.  Police officer, deputy

23   sheriff, military police, FBI, DEA, all of the other ABCs;

24   anybody here ever been in law enforcement?

25          And so first row?  Let me start with number 3, Mr.

```
1    ------?

2              JUROR:  ----- ------.

3              THE COURT:  ------.  I am sorry.

4              JUROR:  I was in the military MP.

5              THE COURT:  And how long were you in the MPs?

6              JUROR:  Two years.

7              THE COURT:  And Army?

8              JUROR:  Marine Corps.

9              THE COURT:  Marines.  And did you ever have to make

10   drug arrests?

11             JUROR:  No.

12             THE COURT:  Okay.  Thank you, Mr. ------.

13             JUROR:  I am sorry.  Number 5, Biemer.  I wasn't

14   sure.  I just worked for Child Protective Services for a

15   month.  Does that count?

16             THE COURT:  Thank you.  That is close.  And were any

17   of your cases involving children who were exposed to drugs, in

18   some form or fashion?

19             JUROR:  No.  No.

20             THE COURT:  Thank you, Ms. Biemer.

21             Anybody else on the first row?

22             JUROR:  Actually, yes.

23             THE COURT:  Yes?  Did you actually have to serve as

24   a witness in any kind of drug prosecution?

25             JUROR:  No.  I just heard about it.  I was just
```

1   there being trained.  That's all.

2           THE COURT:  Thank you, Ms. Biemer.

3           Second row, anybody?  Yes, sir.  And --

4           JUROR:  Number 10.

5           THE COURT:  Number 10.  So, Mr. Talamantez, you

6   worked where?

7           JUROR:  San Antonio Police.

8           THE COURT:  And how long did you work as a

9   detective?

10          JUROR:  As a detective, it was 18 years.

11          THE COURT:  And in total service?

12          JUROR:  Thirty.

13          THE COURT:  And did you ever work drug cases?

14          JUROR:  Yes, sir.

15          THE COURT:  Thank you, Mr. Talamantez.

16          Yes ma'am.

17          JUROR:  I am not sure, but I was a bail bondsman

18  agent for about two years.  I have been --

19          THE COURT:  Okay.

20          JUROR:  Lots of cases.

21          THE COURT:  Yes.  And so, Ms. Holbrook, let me ask

22  you this.  I mean, so you probably have seen a lot as a bail

23  bonds person.  Can you set aside the experiences of all of

24  your past clients and just look at this case and decide this

25  case --

1          JUROR:  Yes.

2          THE COURT:  -- impartially?

3          JUROR:  Yes.

4          THE COURT:  Thank you, ma'am.

5          Anybody else in that row?  Third row, law

6  enforcement?  None.  First row?  None.  Second row?  None.

7  Third row?  Yes, ma'am.

8          JUROR:  Juror 38, ------.  I am a civilian at the

9  SAPD.

10          THE COURT:  Are you still there?

11          JUROR:  Yes.

12          THE COURT:  And which department do you work in?

13          JUROR:  I work for uniform crime reporting.  I am

14  the manager over statistics.

15          THE COURT:  Thank you, Ms. ------.

16          And as opposed to being in law enforcement, let me

17  ask the question a little broader.  Is anybody here employed,

18  formerly employed or has a very close family member, your

19  spouse, your brother, your sister, your mom, your dad, working

20  for the DEA, the Drug Enforcement Agency, the FBI, anything

21  like that?  Anybody here fall into that category?

22          Yes, sir.

23          JUROR:  My son is SAPD, but I don't think that fits

24  your criteria, sir.

25          THE COURT:  Well, thank you for expanding it,

1    though.  What does he do?

2            JUROR:  He is a patrolman on the east side.

3            THE COURT:  Does he handle drug -- I guess he

4    handles drug cases, on occasion?

5            JUROR:  I think anything that comes his way.

6            THE COURT:  Does he talk extensively about his job

7    with you?

8            JUROR:  No, sir.

9            THE COURT:  Anything about your son being a police

10   officer that would cause you difficulty being fair and

11   impartial in this case?

12           JUROR:  No, sir.

13           THE COURT:  Thank you, Mr. Trevino.

14           Anybody here ever -- or, yes.

15           COURT SECURITY OFFICER:  One more hand, Your Honor.

16           THE COURT:  Thank you.

17           Yes, ma'am.

18           JUROR:  Juror number 39.  My husband is also SAPD.

19           THE COURT:  And, Ms. -----, so he is a police

20   sergeant where?

21           JUROR:  West side.

22           THE COURT:  San Antonio?

23           JUROR:  Uh-huh.

24           THE COURT:  Okay.  Anything about your husband being

25   a police officer that would cause you difficulty in being fair

1    and impartial in this case?

2          JUROR:  No.

3          THE COURT:  Thank you, Ms. -----.

4          Anyone else, close family member in law enforcement?

5    No other hands.

6          Anybody here a lawyer, recovering lawyer, anything

7    like that?  First row.  Yes, ma'am.

8          JUROR:  Juror 27.  I am a staff attorney at the

9    Fourth Court of Appeals.

10         THE COURT:  And so as a staff attorney there, do you

11    ever work the criminal cases?

12         JUROR:  Yes.  About half of the docket.

13         THE COURT:  Ms. Najera, anything about that

14    experience that would cause you difficulties serving as a fair

15    and impartial juror here?

16         JUROR:  No.

17         THE COURT:  By chance -- your husband, what does he

18    do?

19         JUROR:  He is a criminal defense attorney.

20         THE COURT:  He is a criminal defense attorney?

21         JUROR:  But he used to be a prosecutor for 15 years,

22    so --

23         THE COURT:  Thank you.

24         Anybody else here, a lawyer, paralegal, receive some

25    form of law training?  Yes, ma'am.

1          JUROR:  Criminal justice major, and I interned as a

2     probation officer at the probation office in Abilene, Texas.

3          THE COURT:  And you are Ms. Carrington?

4          JUROR:  Yes.

5          THE COURT:  And did you ever actually work for the

6     probation office?

7          JUROR:  No.  I interned.

8          THE COURT:  Okay.

9          JUROR:  But I was older, so I got to do some things

10    that some of the younger interns didn't.

11         THE COURT:  Okay.  Anything about that experience,

12    Ms. Carrington, that would cause you difficulties being fair

13    and impartial in this case?

14         JUROR:  No.

15         THE COURT:  Thank you, ma'am.

16         Yes, ma'am.

17         JUROR:  Juror 28.  I was also a criminal justice

18    major, but I never worked in criminal --

19         THE COURT:  In the field?

20         JUROR:  No.

21         THE COURT:  Okay.  Thank you, Ms. ------.

22         Anyone else?

23         This is kind of a loaded question in today's

24    environment, but, again, no right answers, no wrong answers,

25    just an honest answer.  Does anybody here have any issues with

1    the federal government, the IRS, anything here that would

2    cause you difficulty in serving as a juror in this case?  No

3    hands.

4           Has anyone here ever been investigated by any law

5    enforcement agency for potential drug crimes?  Again, if you

6    want to speak to me afterwards.  Just think about that and we

7    can talk about it privately up here later.

8           Anybody -- other than what we have already talked

9    about, anybody else have a very close family member, husband,

10   wife, brother, sister, mother, father, very close friend who

11   is currently being investigated or has been investigated for

12   drug crimes or has been incarcerated, other than what we have

13   already talked about?  Yes, ma'am.

14          JUROR:  Juror 15.  I have cousins that have been

15   tried.

16          THE COURT:  Were they convicted?

17          JUROR:  Yes.

18          THE COURT:  For drug crimes?

19          JUROR:  Yes.

20          THE COURT:  Ms. ---------, anything about what

21   happened there and the whole situation that would cause you

22   difficulty in being a fair and impartial juror in this case?

23          JUROR:  No.

24          THE COURT:  Thank you, Ms. ---------.

25          Yes, ma'am.

1          JUROR:  Number 9, Bernadette Thompson.  I have a

2   sister who is currently serving in the state of Texas for

3   aggravated assault and drug --

4          THE COURT:  Ms. Thompson, anything about that

5   circumstance that would cause you difficulty here?

6          JUROR:  Absolutely not, no.

7          THE COURT:  Thank you, ma'am.

8          Anyone else?  Yes, sir.

9          JUROR:  Juror number 32, John Hernandez.  Stepson

10  that was incarcerated for selling drugs.

11         THE REPORTER:  Who was that again?  I'm sorry.

12         THE COURT:  I didn't catch it either.  I am sorry,

13  Mr. Hernandez.  Who was it?

14         JUROR:  Stepson.

15         THE COURT:  Stepson.  Okay.  And is he currently

16  incarcerated?

17         JUROR:  No, he is not.

18         THE COURT:  He is out now.  Anything about that

19  whole experience that would cause you difficulty in serving as

20  a fair and impartial juror in this case?

21         JUROR:  No, sir.

22         THE COURT:  You could be okay to both the government

23  and the defendant?

24         JUROR:  Yes, sir.

25         THE COURT:  Thank you, sir.

1          Anyone else?  No hands.

2          And at this time, I am going to recognize the

3     lawyers for their questions.  We will begin with the

4     government.

5          THE REPORTER:  Your Honor, may I adjust the podium?

6          THE COURT:  Oh, yes.  Thank you.

7          Anybody want to stop and stretch, stand up?  Is

8     everybody okay?  Yes.  Go ahead and stand up and stretch, if

9     you need to.

10          We didn't lose a juror, or that was somebody else?

11     Okay.

12          Mr. Frazier.

13          MR. FRAZIER:  Thank you.  May it please the Court,

14     counsel, defendant.  Good morning, ladies and gentlemen.  My

15     name is Mark Frazier, as I told you earlier.  I am with the

16     U.S. Attorney's Office.  I have a few questions for you.

17          They are going to be -- I am going to try not to be

18     repetitive, first of all.  We are not going to try to cover

19     things the Judge already talked to you about, but I do want to

20     talk to you a little bit about the type of case that we have

21     and some of the legal principles that I anticipate you are

22     going to have to be exposed to at the end.

23          The way this works in a trial, generally, is if you

24     are sitting on the jury that sits over there and you evaluate

25     the facts, at the end of the trial, before you go deliberate,

the Judge is going to give you some jury instructions called the charge.

Those jury instructions basically contain all of the law you need to know to decide the case. You, being the jury, you are the finders of fact. So I don't -- I have an idea of what I think the Judge is going to submit, but ultimately, it is the Judge's decision to decide what charges, what the law is in terms of what you are going to be evaluating the facts on.

So I am going to talk about some of those legal principles, because we need to know if you can accept those. And, again, it is like the Judge said: There is no right answer. There is no wrong answer. There is only an honest answer.

If you have an opinion, everybody here wants to know it, and if I touch on something that may be too close to home and you want to approach the bench, or however the Court wishes to do it, we can do that too, but it is important that all of the parties, not just the government, but the defendant know your answer of what your answer is and it is an honest answer.

Will everybody agree to do that for me? Thank you very much. Okay. As the Judge told you, we are talking about two distinct charges, but they are conspiracies. A conspiracy in federal law is merely an agreement. That's it, an

1      agreement to commit an offense.

2              If the -- I anticipate what the Court will instruct

3      you is this, that the elements of a conspiracy are like this.

4      Number one, that two or more persons, either directly or

5      indirectly, came to an agreement to distribute a controlled

6      substance or -- or launder monetary instruments, money

7      laundering.

8              And number two, the defendant on trial, Mr.

9      Villarreal-Arelis, willfully -- knew of that agreement, joined

10     in that agreement with the intention of furthering it.  That's

11     all I have to prove.

12             On a drug case, the law does not require me to prove

13     that the defendant moved a single -- or distributed a single

14     gram of cocaine.  I just have to show that he participated in

15     a conspiracy to do that.

16             If my evidence was that he actually distributed

17     cocaine himself, that could be a separate charge.  It can also

18     form the basis of a conspiracy, but I don't have to prove

19     that.  All I have to prove is that the defendant participated

20     in an agreement, however he participated, whether it was

21     distributing drugs, storing drugs, collecting money, or even

22     something less than that, helping someone out in some way,

23     whatever it happens to be.

24             But if that is the charge that the Judge gives you

25     at the end, would everybody on the jury panel be able to

return a verdict of guilty if I prove to you beyond a

reasonable doubt that the defendant participated in a

conspiracy like that, and that's all he did, was participate

in the agreement?

I will take this row by row. On the first row here,

would everybody be able to follow that instruction, if that is

the instruction that is given to you? Second row? On the

third row? On the -- I will call this the fourth row over

here. The fifth row? And the sixth row? Does anyone have

any problem with that concept at all?

I don't have to prove that the conspiracy succeeded

or was successful. I don't have to prove that the defendant

did anything, in particular. I don't have to -- also, I don't

have to prove to you that the agreement was written down. No

one on this jury panel is going to be surprised to learn that

criminal agreements are normally not in writing, but they can

be just a tacit understanding among two individuals.

You know, an agreement sometimes, I guess a good

illustration is, if I were -- if somebody were to ask me at

the end of the day, "Hey, do you want to go to dinner

tonight?"

I said, "Sure. What time?"

"I will meet you in the lobby at 7:30." If I don't

show up, we don't have an agreement, but if I show up, there

is some evidence of an agreement, right? Okay. That is a

1   simple explanation of it.

2           Anyone have any problem with that concept at all?

3   Because at the end of the day, I think that is what -- I

4   anticipate that is what the Court is going to submit and you

5   are going to be asked to make a decision based on that charge.

6   Any questions about that at all?

7           THE REPORTER:  Counsel --

8           MR. FRAZIER:  Yes.

9           THE REPORTER:  -- you are hitting 300 words a

10  minute, and neither the interpreter nor I are certified at

11  that speed.

12          MR. FRAZIER:  I will slow down.

13          THE REPORTER:  Just to let you know.  Thank you.

14          That's a problem I have.  I apologize to everybody.

15          Money laundering, the Judge told you that -- it was

16  quite a bit of information when he read the money laundering

17  count.  There is -- actually, the defendant is charged with

18  committing money laundering violations basically in one of

19  four different ways.

20          There are four different allegations, ways in which

21  the defendant is charged with committing the offense of money

22  laundering.  You have your drug crime and then you have your

23  resulting money laundering crime.  What is money laundering?

24  Basically, money laundering is a way not just to spend the

25  money; it is not spending, but it is hiding, concealing or

doing something with the money to avoid currency transaction

recording requirements.

Let me talk to you about those things so you will

understand.  There are four different ways I told you the

defendant is charged.  One of them is this matter.  If the

property involved in a financial transaction is the proceeds

of some form of unlawful activity, meaning at the conclusion

of the evidence, you are convinced that you -- the evidence

showed that the defendant on trial knew that the property

involved in a financial transaction represented the proceeds

of some form of unlawful activity, not which, not drug

dealing, necessarily, but just some form of unlawful activity.

It could be drug dealing.  It doesn't have to be.

Two.  That there was an attempt or, actually, a

financial transaction was actually committed with the proceeds

of what is called a specified unlawful activity.  You will

hear that repeated when the Judge -- when the charge was read

to you, you heard the Judge say "specified unlawful activity."

The "specified unlawful activity" in this case is the same for

all of the different variations of money laundering, drug

dealing, proceeds of drug distribution.

So whenever you hear the words "specified unlawful

activity," it is going to be the proceeds of drug

distribution.

So property involved in the transaction of some form

1  of unlawful activity, conducting or attempting to conduct

2  financial transactions with the proceeds of drug dealing.

3  Number 3.  Knowing the transaction was designed in whole or in

4  part to conceal or disguise the nature, the location, the

5  source, the ownership or the control of the proceeds of drug

6  dealing.

7          Let me give you a simple example, because it is

8  still a mouthful.  I am a drug dealer.  I want to buy a new

9  car.  My problem is, I have got $50,000 cash I have earned

10  from drug distribution, but I know if I go down and buy that

11  car, there is going to be a car title issued and my name is

12  going to be on it.

13          If I am a drug dealer, that is not good, or it is

14  not smart, anyway, because that does two things.  It puts my

15  name out there, where someone can find out about it and maybe

16  they can link me then back to the fact that I have dealt drugs

17  before or someone I have dealt drugs with has told the police,

18  puts me in law enforcement's radar screen.

19          Okay?  The second thing is, it might get seized.

20  That asset could be seized by the police.  So if I want that

21  car, I go to my brother or I go to my father or I go to

22  somebody who is very close to me and say, "Hey, would you mind

23  getting this car for me?  And would you please put it in your

24  name?"

25          The person agrees to do that.  They may not know

that the money comes from drugs.  They know it comes from some

unlawful activity, but they may not know necessarily it is

drugs.  They may know it's drugs.  It doesn't matter.  They go

and buy the car.  You just committed the offense of what we

call concealment, money laundering.

Now, all I have to prove is that the defendant

entered into an agreement to do that.  I do not have to prove

to you that the defendant actually succeeded in his objectives

or the conspiracy's objectives of concealing assets.  I just

have to show the defendant entered into an agreement to do

that.

If I prove that to you beyond a reasonable doubt,

would you be able to convict the defendant of that offense?

First of all, let me ask you, does everyone stand

that?  First row, does anybody have any questions about that?

Second row, any questions?  Third row, any questions at all?

Fourth row, any questions?  Fifth row, any questions?  And

sixth row, any questions?

If you have any questions about understanding at

all, please now is the time so we can make sure we are clear.

You don't want to be in a situation at the end of the trial;

we won't have an opportunity to address those questions and

those concerns.  We have to deal with them now.  Anyone at

all?

So my second question is this:  Would everyone on

1    the jury panel be able to return a verdict of guilty if I

2    prove to you beyond a reasonable doubt that the defendant was

3    part of an agreement to conceal assets, drug proceeds with the

4    elements that I just described?

5            On the first row?  Second row?  Third row?  Fourth

6    row?  Fifth row?  Sixth row?  Thank you.

7            Is my speed better?

8            THE REPORTER:  Thank you.

9            MR. FRAZIER:  Second method.  Knowing the property

10    involved in a financial transaction is proceeds of some

11    unlawful activity.  That's the same element we just talked

12    about.  Conducting or attempting to conduct the financial

13    transaction with the proceeds of dealing drugs, knowing that

14    the transaction was designed in whole or in part to avoid a

15    transaction reporting requirement under state or federal law.

16            Let me give you an example.  You may know that banks

17    many times, if you come in and conduct a financial transaction

18    with a bank of over $10,000 in currency, there is a report

19    that the banks file called, that they are required by law to

20    file, called a currency transaction report.

21            So if I am a drug dealer and I come in and I bring

22    in over -- $10,000 or more in drug proceeds, deposit it in the

23    bank, a currency transaction report is generated.  That report

24    is then sent out and law enforcement can access that report,

25    and if they have got enough of these reports, they may say --

1   they may start an investigation on someone.

2           Does everybody understand what I am talking about?

3   A similar form is called a Form 8300 that is required to be

4   filed if you are engaged in certain businesses, like auto

5   dealerships, jewelers, auction houses, things of that nature;

6   that is required to be filed if someone comes in and conducts

7   a transaction of more than $10,000 in cash.

8           So if you go down to the jewelry store, go down to

9   the car lot, and you have got a car you want to buy, using the

10  same analogy, it is $50,000, and instead of the same -- using

11  that same example I gave you earlier, let's just suppose, for

12  instance, in this example, you don't care if it is in your

13  name or not.  You don't want that form filed, so you design a

14  transaction to basically avoid paying $10,000 currency.  So it

15  is like, how do I do that?

16          They break the transaction up.  They conduct

17  transactions in increments of less than $10,000 with the car

18  dealership.  They either come in and say:  Okay.  I am going

19  to -- they come in one day, deposit $8,000.  They come in the

20  next day and pay $9,000.  They come in another day and pay

21  $7,000.  They come in a fourth day and pay $5,000.  And they

22  basically do it in such a way to where the transaction is

23  broken up.

24          Does everybody understand what I am saying?  There

25  is no single transaction over $10,000 involving cash, so guess

what?  There is no Form 8300 that is filed.

Likewise, if you go to a bank and you decide:  You know, I can pay for that car with a cashier's check, but I can't deposit more than $10,000 at a time into that bank account.  So I go to my bank and I deposit 5,000 one day, 6,000 the second day.

You know, it is all done on a daily basis. Everything is done in a day.  As long as each transaction is less than $10,000, it is done at either different branches on the same day or done on different dates, so long as it is broken into increments of less than $10,000.  Then the person -- at the end, he has got 50,000 in his bank account, he can then get a cashier's check from the bank for $50,000, negotiate that with the car company and no Form 8300 or currency transaction report is generated, because there is no single transaction on any given day of more than $10,000. Does everyone understand that?

So if the defendant agreed to participate in an agreement in some form or fashion or knew of an agreement between two or more persons and he joined in that agreement on one occasion, where he knew the proceeds were from some unlawful activity, he conducted a financial transaction with the proceeds of drug dealing, whether he knew it was drug dealing or not, just knew it was some illegal source, it could be drug dealing, and knowing that the transaction is designed

1    in whole or in part to conceal or to avoid a currency

2    transaction reporting requirement, would everybody on the jury

3    panel be able to convict in that situation if I proved it to

4    you beyond a reasonable doubt?

5            First row?  Second row?  And by the way, does anyone

6    have any question about that, what I just explained?  Third

7    row, any question?  Fourth row, would you be able to convict?

8    I forgot to ask over here.  Would everyone on the third row be

9    able to convict if I prove it beyond a reasonable doubt?

10   Fifth row, would you be able to convict?  Does anyone have any

11   question about that?  Sixth row, would you be able to convict?

12           Does anyone have any question?

13           THE COURT:  Try slowing down.

14           MR. FRAZIER:  Yes, sir.  I will try.

15           The third method would be basically either

16   transporting or attempting to transport monetary instruments

17   or funds from a place in the United States to a place outside

18   of the United States with the intent to promote the carrying

19   on of drug dealing.

20           Basically, that is basically the international

21   movement of currency from the United States to a foreign

22   country, and that basically is done to promote the carrying on

23   of the drug crime, meaning the money is moved from the U.S. to

24   another country, whatever that country happens to be, and it

25   is done to basically continue the cycle of the drug business.

1    That is all that is required.

2           If I show you the defendant was involved in a

3    conspiracy to do that, an agreement, would you be able to

4    convict?  On the first row?  On the second row?  On the third

5    row?  On the fourth row?  Fifth row?  Sixth row?  Anyone have

6    any question about that?  Thank you.

7           Last one, I know you will be happy, is basically,

8    the fourth method is transporting or attempting to transport

9    monetary instruments or funds to a place in the United States

10   from a place outside the the United States -- just the reverse

11   of the previous example -- knowing that the monetary

12   instrument and funds involved represented the proceeds of some

13   form of unlawful activity; not necessarily drug dealing, just

14   knew it was from some unlawful activity; fourth, knowing that

15   the transaction was designed to conceal or disguise the

16   nature, the location, the source, the ownership or the control

17   of the proceeds of drug dealing.

18          Money has already been moved out to a foreign

19   country.  Let's say it is in an offshore account somewhere or

20   it's in a bank account in another country.  Now the

21   individuals involved want assets and they want them in the

22   United States, so the money is moved by either taking it out

23   of an account and wire transferring it, or whatever the case

24   may be, back into the United States, knowing that it is the

25   proceeds of some form of illegal activity and moving it back

1    in to obtain assets or -- that is an example I am using --

2    assets, to conceal and disguise who owns them, who controls

3    the proceeds.

4            Does that make sense?  Does anybody have any

5    question about that?  First row, would you be able to convict

6    if I prove beyond a reasonable doubt?  And when I use these

7    examples, my burden is, as the Court has told you, I have to

8    prove it beyond a reasonable doubt.  First row?  No problem.

9    Second row, could you convict?  Third row?  Fourth row?  Fifth

10   row?  Sixth row?

11           Okay.  Does anybody have any questions about any of

12   that?  Again, it is not my burden to prove that the defendant

13   actually succeeded.  As long as the jury can agree on one of

14   those four methods -- it doesn't matter which one, as long as

15   I prove at least one.  I don't have to prove all four.  I just

16   have to prove one.  If I prove one of those methods to you

17   beyond a reasonable doubt, would everyone on this jury be able

18   to convict Mr. Villarreal-Arelis for the crime of money

19   laundering conspiracy?

20           I need to talk about witnesses.  In this particular

21   case, ladies and gentlemen, I anticipate you are going to hear

22   from a number of witnesses who themselves are convicted of

23   drug crimes.  And as a part of their conviction of drug

24   crimes, you are going to hear about some very serious things,

25   very serious acts of violence, including homicides and murders

1   that they have committed.

2           Okay?  All of these folks have criminal convictions.

3   Some of them have multiple criminal convictions.  Some of the

4   folks you are going to hear from are cartel leaders.  Okay?

5   They have done some pretty serious things, and I anticipate

6   that they are going to testify about those things.

7           They may not be likable people, but I am not

8   putting them on the witness stand for you to evaluate whether

9   they are good people or not or whether they are likable

10  people.  I am going to ask that you evaluate them and evaluate

11  their credibility for truthfulness.  Does everybody understand

12  the distinction?

13          All witnesses, whether you are in state court or

14  federal court, always start out the same.  A police officer, a

15  federal agent gets no more credibility than someone who has

16  been convicted before when they start.  It is like a race.

17  Everyone starts at the starting point the same way.

18          You, as the jurors, will receive instructions from

19  the Court, I anticipate, that you will be allowed to take into

20  account the background of the witness in determining their

21  credibility, their believability.  You will certainly be

22  allowed to take that into account.  That is strictly within

23  your province.  That's one of the things you can and are

24  expected to do.

25          My question is this:  If I have a witness who is

going to take the stand who is going to basically tell you,

who is a cartel leader and is responsible for 20, 30 or more

people being killed, could you evaluate his testimony at the

start the same way you could any other witness?

On the first row? And if you have questions about

this, please ask now, because this will be your only

opportunity to bring these types of questions up. We won't

have another chance.

On the first row, would you be able to evaluate that

witness's credibility just like you would any other witness?

Is anybody going to automatically exclude that witness's

testimony simply because they have convictions for drugs or

committed serious acts of violence or murder?

On the first row, would anyone automatically exclude

believing a witness who has that type of background? Yes,

ma'am.

JUROR: I would.

MR. FRAZIER: Sure. I understand. You are

Ms. Carrington? Is that -- no. I am sorry. I have the wrong

list. Ms. Finley?

JUROR: Yes.

MR. FRAZIER: That's fair. That's what we want to

know. And you indicated you would have a problem with it. I

just want to make sure everybody heard your answer.

JUROR: Yes.

1          MR. FRAZIER:  That's what we want to hear.  This is

2   exactly the kind of answer we need to know.

3          Is there anyone else on the panel who agrees with

4   Ms. Finley?  And you are juror number 24?

5          JUROR:  (Nods head.)

6          MR. FRAZIER:  Anybody else?  Yes, ma'am.  Ms. --

7          JUROR:  Mitchell.  Juror 11.  I am just not sure.

8          MR. FRAZIER:  You are not sure.

9          Yes, ma'am.  I will start with juror 14.

10         JUROR:  I am not sure either.

11         MR. FRAZIER:  Not sure.

12         THE COURT:  Yes, ma'am.

13         JUROR:  17.

14         MR. FRAZIER:  Yes, sir.

15         JUROR:  I agree with her.

16         MR. FRAZIER:  Thank you.

17         Anybody else on this side that I may have missed?

18  Yes, ma'am.  You are Ms. -- is it Holbrook?

19         JUROR:  Holbrook.  I am not sure.  And my question

20  is, this is a 17-year-old case?  You said from 2000?

21         MR. FRAZIER:  It is a conspiracy, so it has a time

22  frame.  It started in 2000, the start date, and it goes up to

23  the time of the indictment.

24         JUROR:  Okay.  Just checking.

25         MR. FRAZIER:  2016.

1          JUROR:  But, you know, I could try to be impartial,

2     but there is no guarantee.

3          MR. FRAZIER:  And when you say that, you are

4     referring to whether or not you would automatically discredit

5     a witness because of their prior criminal history or whether

6     the fact they committed crimes of violence?

7          JUROR:  I don't know.  I really don't know.

8          MR. FRAZIER:  That's what we need to know.  I

9     appreciate that.  Thank you.

10          Is there anybody else on this side that hasn't

11     raised their hand yet?  On this side, we will take the first

12     row.  Juror number 28, Ms. ------?

13          JUROR:  I agree with them.

14          MR. FRAZIER:  That you would not be able to listen

15     to such a witness?

16          JUROR:  (Nods head.)

17          MR. FRAZIER:  Thank you, ma'am.  Appreciate it.  On

18     this first row, who else raised their hand?  I think, ma'am, I

19     already got yours when I talked to you earlier.

20          Anybody else on the first row?  On the second row?

21     Yes, sir.

22          JUROR:  I am not sure.

23          MR. FRAZIER:  Not sure.

24          THE COURT:  I am sorry.  What number is that?

25          JUROR:  Thirty-three.

1          MR. FRAZIER:  Anybody else on that row?  Yes.

2          JUROR:  Thirty-one.  I am not sure if I can either.

3          MR. FRAZIER:  And anybody else on that row?  And

4    then on the final row?  Yes, ma'am.  Ms. Moreno?

5          THE COURT:  I'm sorry.  Who was that again?

6          MR. FRAZIER:  Number 36.

7          JUROR:  Thirty-six.

8          THE COURT:  Ms. Moreno.  Thank you.

9          MR. FRAZIER:  Is there anybody else who I may have

10   already blown past the row and you thought about it some more?

11   Yes, sir.

12         JUROR:  Number 3.

13         MR. FRAZIER:  Yes, sir.

14         JUROR:  I am not sure I could either.

15         MR. FRAZIER:  Anyone else?  Yes, sir.  Mr. --

16         JUROR:  Number ten.

17         JUROR:  I am not sure, sir.  Thinking about it, I am

18   not sure.

19         MR. FRAZIER:  Number 16.

20         JUROR:  Sixteen, Randy Cochran.  I don't think so.

21         MR. FRAZIER:  You don't think so?  Okay.

22         Yes, ma'am.  Ms. Trevino?  No.  I am sorry.  I got

23   the wrong row.  Ms. ---------.

24         JUROR:  I don't think I could.

25         MR. FRAZIER:  You don't think you could?  Thank you,

1    ma'am.

2                   THE COURT:  I am sorry.  Your number again?

3                   JUROR:  Fifteen.

4                   THE COURT:  Fifteen.  Thank you, ma'am.

5                   COURTROOM SECURITY OFFICER:  Please stand and give

6    your number so the Judge and court reporter can hear you.

7                   MR. FRAZIER:  Anyone else before I continue?

8                   So for those who indicated they are not sure, which

9    was most of the panel, I know some of you -- first of all, I

10   appreciate your honesty.  That helps all of us here, and

11   that's exactly what we need to know.

12                  For those individuals who indicated they were not

13   sure, I want to -- and I have written down as we were going

14   through this.  Recall the example that I gave to you that the

15   Judge -- you know, you will be able to take into account their

16   backgrounds in determining whether they are believable or not

17   when they testify.

18                  Okay?  So with that, does that change anybody's

19   opinion as to whether or not that would make them more sure or

20   not?  In other words, you would be evaluating their

21   credibility as the witness testified, and at the end, you make

22   a determination whether they are believable or not.

23                  As to those people who indicated they are not sure,

24   does that change your opinion in any way?  Are you still not

25   sure whether you would be to do it or not?

1          JUROR MITCHELL:  So --

2          MR. FRAZIER:  Yes, ma'am.

3          JUROR MITCHELL:  I have a question.  So they would

4   be stating something and we are just basing our -- our opinion

5   is based what they are at that point --

6          MR. FRAZIER:  What you know about them.

7          JUROR MITCHELL:  So --

8          MR. FRAZIER:  You get to evaluate the witness's

9   believability based on what you know about them.

10          JUROR MITCHELL:  Oh.  Okay.

11          MR. FRAZIER:  Yes.

12          JUROR MITCHELL:  Then, yes, I think I can.

13          MR. FRAZIER:  You think you could do that?

14          Does that change anyone else?  We will start with

15   the first row.  Does that change anybody's opinion?  Second

16   row?  Ms. --

17          JUROR:  Holbrook.

18          MR. FRAZIER:  -- Holbrook.

19          JUROR:  Thirteen.

20          MR. FRAZIER:  Okay.  And you would be able to put it

21   aside?

22          JUROR:  As long as as I was able to -- as long as I

23   was able to, like you said, determine and, you know, you see

24   what the person's credibility looks like, you know, to me, or

25   my opinion.

1          MR. FRAZIER:  Sure.  Yes, ma'am.  Thank you.

2          On the fourth row?  Fifth row?  Does that change

3     anything for anybody?  Fourth row?  Excuse me.  Fifth row?

4     Change the opinion for anyone on the fifth row?  And the sixth

5     row, does it change anyone's opinion?

6          All right.  Now, I also anticipate that you will

7     receive some instructions at the end of the trial that if you

8     believe a witness beyond a reasonable doubt, even if it is a

9     witness who has been convicted before, that you can base your

10    verdict solely on that witness.

11         If the witness is believable and you believe the

12    witness beyond a reasonable doubt as to each and every element

13    that the defendant participated in an agreement to distribute

14    drugs or participate in a money laundering scheme, that that

15    would be sufficient.

16         Is there anyone who could not base their verdict on

17    such a witness if you believed them beyond a reasonable doubt?

18         JUROR NAJERA:  I have a question.

19         MR. FRAZIER:  Yes, ma'am.

20         JUROR NAJERA:  So are you saying like a codefendant

21    or a coconspirator, we can base the verdict solely on -- yes.

22    I couldn't do that.

23         MR. FRAZIER:  I anticipate -- I understand.  Thank

24    you.  I appreciate that.

25         JUROR NAJERA:  Oh, I am sorry.  Twenty-seven.

1          MR. FRAZIER:  Thank you, ma'am.  I appreciate that.

2          Did everyone hear what Ms. --

3          JUROR:  Najera.

4          MR. FRAZIER:  Najera?  Did everyone hear what she

5     said?  She basically said, she would not -- if it were a

6     coconspirator or codefendant, she would not be able to base

7     her verdict on --

8          JUROR:  Only on that.

9          MR. FRAZIER:  -- only on that, even if she believed

10    the witness was truthful.

11         JUROR:  Right.

12         MR. FRAZIER:  Does anyone else have that problem?

13         JUROR:  Number 14.

14         MR. FRAZIER:  Ms. Ochoa.  Thank you, ma'am.  I

15    appreciate it.  Thank you, ma'am too.

16         Anyone else on the jury panel could not base their

17    verdict solely on the word of a codefendant or coconspirator

18    if you believed the person beyond a reasonable doubt?  Anyone

19    else --

20         THE COURT:  One hand.

21         JUROR:  Juror 11.  May I ask a question?

22         MR. FRAZIER:  Yes, ma'am.

23         JUROR:  But there would be like other evidence,

24    right?

25         MR. FRAZIER:  Well, there can be other evidence.  I

am not saying there is not, but what I am saying is, suppose

we have a circumstance where a great majority of the evidence,

which I anticipate it may be in this particular case, comes

from the testimony of codefendants and coconspirators.  Okay?

JUROR:  Okay.

MR. FRAZIER:  Let's just say, for whatever

particular point that was necessary, let's say the formation

of the agreement or the defendant's participation in the

agreement, that was the only evidence.  Would you be able to

base a verdict, even if you believed the evidence beyond a

reasonable doubt?

JUROR:  Yes, I think so.

MR. FRAZIER:  You could?  All right.  Thank you.

Anyone else?  Anyone else?

THE COURT:  Two minutes remaining.

MR. FRAZIER:  Thank you very much, Judge.

Now, we live in a world, folks, unfortunately, we

have what we call sometimes the CSI effect.  We have jurors --

we have people who -- there are some great TV shows out there

about crime and crime fighting.  Unfortunately, the reality is

is that very -- I don't anticipate in this case there is going

to be any fingerprint evidence, there is going to be DNA

evidence.  There is not going to be any scientific evidence.

I anticipate the great majority of the evidence in this case

is going to be through testimony and through some exhibits

1    that you will see.

2           But is there anyone on the jury who believes that:

3    Hey, in order for me to convict I am going have to have a

4    fingerprint.  I will have to have DNA.  I am going to have to

5    have, you know, some type of scientific evidence in order for

6    me to convict the defendant for participating in an agreement?

7           Does everybody understand what I am saying?  This is

8    something I need to know now.  It is important.

9           On the first row, is there anybody who would require

10   me to put on that kind of evidence in order to convict?

11          Second row, anybody who would require me to put on

12   that type of evidence in order to convict?

13          Third row?  Yes, sir.  Mr. --

14          JUROR:  Hewitt, 17.

15          MR. FRAZIER:  Yes, sir.

16          JUROR:  Are you going to plan to put up any sort of

17   bank transactions or any things like that?

18          MR. FRAZIER:  There may be evidence like that, yes,

19   sir, but --

20          JUROR:  -- information, you know, I mean, any

21   transfers of funds or anything like that?

22          MR. FRAZIER:  Well, I can't at this point discuss

23   the evidence specifically.  All I am saying is, if there was a

24   lack of scientific evidence, would you --

25          JUROR:  No.

1          MR. FRAZIER:  You would not be able to convict?

2     Okay.  Even if you believed otherwise that the defendant had

3     committed the offense, if there is no scientific evidence, you

4     are telling, if I understand you correctly, you could not

5     convict?

6          JUROR:  Right.

7          MR. FRAZIER:  Thank you very much.  I appreciate

8     that.

9          Is there anybody -- the question I am talking about,

10    is there anybody else on the panel that believes that?  And if

11    you do, that is fine.  This is great.  This is what we all

12    need to know.  Anyone else?

13         Okay.  On this row, would everybody be able to

14    convict in the absence of scientific evidence, fingerprints,

15    those type of things?

16         The fifth row, would everyone be able to do that?

17    And the sixth row, everyone would be able to do that in the

18    absence of scientific evidence?

19         THE COURT:  Mr. Frazier --

20         MR. FRAZIER:  My time is up.  Yes.

21         THE COURT:  I neglected to ask you for your

22    witnesses.  Could you read the names of your potential

23    witnesses?

24         MR. FRAZIER:  Yes, sir.

25         I anticipate the following witnesses will be called.

 1    Jesus Enrique Rejon Aguilar.  His nickname is Mamito.

 2              Oscar Nava Valencia.

 3              Jason Gamez, with the Internal Revenue Service.

 4              Brook Tetzlaff, with the Internal Revenue Service.

 5              Robert De Los Santos, with the Internal Revenue

 6    Service.

 7              James Neff, with the Internal Revenue Service.

 8              Dan Fannin, with the Internal Revenue Service.

 9              Jeff Aguirre, who is with the McLennan County

10    Sheriff's Office.

11              Shannon Vernieuw, with the Internal Revenue Service.

12              Melanie Barnett, with the Internal Revenue Service.

13              Joe Ritchel, with the Internal Revenue Service.

14              Steve Junker, with the Irving Police Department.  He

15    is an IRS Task Force officer.

16              Emmanuel Sanchez.

17              Jose Villegas.

18              Avelino Villegas.

19              Denise Stone.

20              Anthony Lewis, with the Drug Enforcement

21    Administration.

22              Arturo Fuentes.

23              Lauro Bazan.

24              Carlos Nayen.

25              Fernando Garcia.

1          Diane Reed.

2          Jose Vega.

3          Kirby Culp.  He is an Internal Revenue Service Task

4   Force officer.

5          Denis Winn.

6          Tammy Canida, from the American Quarter Horse

7   Association.

8          Steve Pennington, the case agent with the Internal

9   Revenue Service.

10          Tim Sanford, from the Jefferson County Sheriff's

11   Department in Alabama.

12          Darren Gayne, with the Drug Enforcement

13   Administration.

14          Jean Paul Reneau, with Homeland Security

15   Investigation.

16          And Karen Hall, Drug Enforcement Administration

17   chemist.

18          Jaime Gutierrez-Garcia, also known as Chaparo.

19          Elisa Garcia.

20          Joey Garcia.

21          Billy Pemelton, with the Weslaco Police Department.

22          Virgilio Carrillo.

23          Rodney Roberts, with the Internal Revenue Service.

24          And Charlotte Balettie, with the Internal Revenue

25   Service.

```
1              THE COURT:  Ladies and gentlemen, does anybody

2    recognize any of those names, want a name repeated, want a

3    little more explanation on any given name?  Does anybody

4    have -- does a name that has been read out ring a bell with

5    anybody that you want further explanation?

6              We need to know that now, because I would hate for a

7    witness to take the stand and all of a sudden you say, "Oh, I

8    know that person."

9              JUROR BIEMER:  I know a name, but it is a very

10   common name.

11             THE COURT:  SO what name are you thinking about,

12   ma'am?

13             JUROR BIEMER:  Karen Hall.  It is just someone I

14   know.

15             MR. FRAZIER:  She is a chemist with the DEA Crime

16   Lab.

17             JUROR BIEMER:  Yes.  This one is not a chemist.

18             THE COURT:  Thank you for doing that.

19             Anybody else want another name read out?  Yes,

20   ma'am.

21             JUROR:  Thirty-six.  My daughter is Villegas, and

22   those names sound familiar, but I am not sure if they are --

23             THE COURT:  Can you give an explanation of those

24   names?

25             MR. FRAZIER:  Which names were those?
```

1          JUROR:  Villegas.

2          MR. FRAZIER:  Oh.  Villegas.  They are from this

3     area.  They are both incarcerated for drug --

4          JUROR:  What does that mean?

5          MR. FRAZIER:  They are in BOP.  They are in federal

6     custody.  They have been convicted and they are serving time.

7          JUROR:  I am not sure.  My daughter is a Villegas

8     and -- they sound familiar, but I am not --

9          MR. FRAZIER:  They are Jose Villegas and Avelino

10    Villegas are the names.

11         JUROR:  I have heard a lot of conversations.

12         THE COURT:  Okay.  We will talk about this in a

13    little bit.  I am sorry.  Your number again, ma'am?  It is

14    Ms. Moreno?

15         JUROR:  Thirty-six, yes.

16         THE COURT:  Thank you.

17         Anybody else?

18         JUROR:  Juror number 30.  Tammy, I heard a

19    name Tammy --

20         MR. FRAZIER:  Canida?  Yes, there is a Tammy Canida.

21    It is spelled C-a-n-i-d-a.  She is from Lubbock, Texas.

22         JUROR:  No.

23         THE COURT:  Thank you.

24         Anybody else?  Thank you.

25         Thank you, Mr. Frazier.

1          MR. FRAZIER:  Yes, sir.

2          THE COURT:  Mr. Womack.

3          MR. WOMACK:  Thank you, Your Honor.

4     I am a retired Marine, so I trip over stuff and

5 break lots of things, so excuse that.  It wasn't the

6 government putting those wires there, I don't think.

7     Mine will be pretty brief, because I am going to cut

8 out -- many of the questions I was going to ask His Honor has

9 already asked or Mr. Frazier has asked, so I will try not to

10 duplicate any of that, but there are a couple of things I will

11 go over that you have been asked.  I will go at it from a

12 little different angle, because it is very important to us.

13     First of all, with regards to any relationship you

14 have or any experience you have with people in law

15 enforcement, a number of us have friends that are police

16 officers or used to be.

17     There are CPS workers.  They work in some law

18 enforcement capacity; maybe we ourselves.  It doesn't

19 necessarily mean that you would not like law enforcement.  The

20 question His Honor asked, when he said would that affect your

21 ability to listen to that testimony, it is very important to

22 us, just like you are going to consider the testimony of a

23 murderer, a drug dealer that the government may call, you also

24 need to be able to consider the testimony of law enforcement

25 officers, IRS agents, whoever it might be.

And as Mr. Frazier has said, correctly, they all start out from the starting line and the starter's gun is when they take an oath swearing to tell the truth in this court.

Is there anyone who because of their relationship with law enforcement, husbands, sons, friends, that it would cause you necessarily to believe the testimony of an agent just because they are police officers?  A negative response from all of you.

As Mr. Frazier also mentioned, if I ask any question that it would be embarrassing to answer, His Honor will let you probably come forward and we will talk about that individually.  So just raise your hand if something applies that you would like to talk about privately with the lawyers and the Judge, rather than talking out loud here.

And it may not be embarrassing to you.  It may be something that you think might influence other jurors or potential jurors.  So if there is anything you want to talk about privately, just raise your hand and we will accomplish that in a few minutes.

His Honor went over this a little bit, but I want to make sure it is understood and agreed to.  The burden of proof in this case, as His Honor is going to instruct you -- and he will give you the correct instruction.  If anything I say differs with what the Judge says, or that the government says, if it differs with the Judge, the Judge is giving you the real

1    law, so you will disregard whatever the attorneys have told

2    you the law is and you will go by what the Judge says.

3         Does anyone disagree with that?  Okay.  Thank you.

4         With regards to the burden of proof, at all times

5    during this trial, from the start to the finish, the burden of

6    proving that Mr. Villarreal committed a crime rests on the

7    government.

8         They will present their case and they will rest.

9    When they rest, does the burden of prove shift over to the

10   defense table?  No.  The defense never has a burden of proving

11   that Mr. Villarreal is innocent or not guilty.  We have no

12   burden at any time during the trial.  The burden of proof is

13   always on the government alone.

14        Does anyone disagree with that premise, other than

15   Ms. Schoenert, who already spoke about it?  Anyone else

16   disagree with this legal principle that we are founded on that

17   the burden of proof is always on the government?  Anyone

18   disagree with that?  Thank you.

19        And that burden of proof is a stiff one.  It is

20   proof beyond a reasonable doubt.  Other than those that have

21   already said so, does anyone else disagree with that legal

22   principle that the burden of proof is beyond a reasonable

23   doubt?  Anyone disagree with that?

24        If the government introduces evidence that tells you

25   that Mr. Villarreal may have done something wrong, it is

1    entirely possible that he did something wrong, but it doesn't

2    prove to you beyond a reasonable doubt that he did do

3    something wrong.  Could everyone hear find him not guilty of

4    that offense?

5            First row, is there anyone who could not find him

6    not guilty if the government fails to prove his guilt beyond a

7    reasonable doubt?  Anyone have a problem with that?  How about

8    the second row?  Would anyone have a problem acquitting, which

9    means finding not guilty, Mr. Villarreal if you think he might

10   have done something wrong but the government couldn't prove it

11   beyond a reasonable doubt?  Would anyone have a problem

12   acquitting him on that?

13           Third row?  Fourth row?  Fifth row?  And the sixth

14   row?

15           As you can tell from Mr. Frazier's questions, when

16   it gets to a conspiracy, although he said that basically it is

17   an illegal agreement, and attorneys are comfortable with that,

18   when it get especially into money laundering and different

19   theories of the case, I am not going to go over those with you

20   at all, because I think you are already confused.  I want you

21   to hear that from the Judge.

22           Is there anyone who will not be able to listen to

23   the Judge's instructions on all of the law?  If you can't

24   listen, raise your hand.

25           When the Judge goes over the instructions, he will

1    read them to you very clearly.  He may even give you a copy to

2    take back to look at or to read with him.  If you have any

3    questions about the instructions, if you don't understand the

4    elements of an offense, like money laundering, is there anyone

5    here who would be afraid to ask the Judge for a clarification?

6    Anyone who would be afraid to ask the Judge to clarify

7    something?  Thank you.

8            With regards to a conspiracy, I expect that the

9    Judge will tell you that the government has to prove that

10   Mr. Villarreal knowingly joined in the conspiracy and

11   committed whatever acts are alleged, at least one of them in

12   the indictment.

13           Now, I expect he will tell you that mere presence at

14   the scene where a crime is committed is not evidence that

15   someone has joined a conspiracy.  They are also going to have

16   to prove beyond a reasonable doubt that Mr. Villarreal knew of

17   a conspiracy and intentionally joined into it; not just that

18   he saw it happen, but that he intentionally participated or

19   intended to participate in some way.

20           Would anyone have a problem listening to such an

21   instruction if the Judge gives that instruction?  Negative

22   response.

23           As the government has already told you, we expect

24   some of their witnesses have been convicted of crimes,

25   murdered dozens of people and other things.  Some are pending

1    sentencing at this time, and I expect that you will see that

2    all or most of those have some kind of an agreement in writing

3    with the government saying that in exchange for their

4    testimony, they may receive some kind of benefit, perhaps

5    leniency in sentencing or something.

6          And if the evidence raises that, if that actually

7    happens, if such people testify, I expect that His Honor will

8    give you special instructions on evaluating the testimony of

9    that kind of witness.

10          The Judge will give you instructions automatically

11    on judging the credibility of witnesses.  It is going to be

12    common sense things.  You know, how do they look?  Do they

13    seem sure or unsure about their testimony?  Have they said

14    things inconsistently before than they do now?  Whatever it

15    will be, do they have an interest in the outcome of the case?

16          But with regards to witnesses who have deals with

17    the government or who are accomplices to a crime or who are

18    paid informants or in any way have some interest, a vested

19    interest in the outcome, and they have criminal records, the

20    Judge, if that is raised, will give you instructions on that.

21          The Judge, I expect, will tell you that you can

22    consider such evidence, and if you find it believable, you

23    could actually convict someone based on the testimony of such

24    witnesses, like the government was trying to get you to agree

25    to, but you have to take their testimony with great caution.

1     Would anyone have a problem following His Honor's

2  instructions, if the Judge gives you such an instruction, on

3  that kind of -- would anyone have a problem with following his

4  instructions?  A negative response from all of you.

5     Does everyone understand why we have such an

6  instruction with regards to those classes of witnesses?  Does

7  anyone not understand or find it unreasonable to give a

8  special instruction about being wary of the testimony of such

9  a witness?  Does anyone find that unreasonable?  A negative

10  response from all.

11     Does anyone have either a conscientious objection or

12  a religious belief or anything in your personal life that

13  would make you unable to render a verdict in this case,

14  whether it is guilty or not guilty?

15     Does anyone have any personal reason that they just

16  couldn't do that in a case like this?  A negative response

17  from all of you.

18     And lastly, is there any reason that any of you can

19  think of why Mr. Villarreal-Arelis would not want you to sit

20  in judgment in his case?  If there is, raise your hand.  Any

21  reason about you that you think, you know, Mr.

22  Villarreal-Arelis, if he knew me, he would not want me as a

23  juror in his case?  Does anyone feel that way?  Thank you.  A

24  negative response.

25     Your Honor, I am not announcing any witnesses at

1    this time.

2           THE COURT:  You do not wish to or --

3           MR. WOMACK:  I am not going to, no.

4           THE COURT:  Thank you.

5           MR. WOMACK:  And those are all my questions.

6           THE COURT:  Thank you, Mr. Womack.

7           Let me have the lawyers come up to the bench,

8    please.

9           Ladies and gentlemen, if you need to stand up and

10   stretch, feel free to do so.

11          THE REPORTER:  If you would please speak slowly and

12   clearly at the bench toward the microphone, that would be of

13   assistance.

14          (Bench conference, as follows:)

15          THE COURT:  Why don't you guys move a little more

16   this way so Mr. Womack can get in.  I am not sure if we have

17   enough here.  Do you want to start calling people up one by

18   one?

19          Let's take the first five.  Does anybody want to

20   call up any of the first five to the bench?  Or does anyone

21   want to make a motion on any of the first five?

22          MR. FRAZIER:  Judge --

23          THE COURT:  I am on the first five right now.

24   Number 1, 2, 3, 4 or 5, to put it another way.

25          MR. FRAZIER:  Sorry, Judge.

1          THE COURT:  Anything from the government?

2          MR. FRAZIER:  Judge, number 2 --

3          THE COURT:  Do you want to call her up or do you

4    want to make a motion?

5          MR. FRAZIER:  We will will make a motion --

6          THE COURT:  So number 2, you will make a motion on

7    Mr. Miller for because of what?  Because of the daughter's

8    methamphetamine?

9          MR. FRAZIER:  I believe, Judge, he stated that he

10   could not be impartial.

11         MR. FRAZIER:  Do you oppose?

12         MR. WOMACK:  I join.

13         THE COURT:  You join?  No opposition to that, so

14   number 2 is stricken.

15         Anybody else?  Number 1, 3, 4, 5?

16         MR. FRAZIER:  (Shakes head.)

17         THE COURT:  Mr. Womack?

18         MR. WOMACK:  Number 5, Ms. Biemer, she talked

19   about -- family.  She is extremely emotional, just like number

20   2.  I think she said, "I think I will be okay" --

21         THE REPORTER:  Mr. Womack, if you will perhaps scoot

22   down a little bit --

23         MR. WOMACK:  Number 5, Ms. Biemer, when she was

24   questioned about her daughter, whether she would be a proper

25   juror, she said that, yes, she has children, family members

that are addicted to drugs.  She became very emotional, just

like number 2.  And then she said, "But I think I will be

okay."  She can't assure us of that.

THE COURT:  Number 5?

MR. WOMACK:  She is too dangerous, so we challenge

her for cause.

MR. FRAZIER:  We cannot agree, because she did say,

I recall her saying positively that she could set that aside.

THE COURT:  Is she still here?

Ms. Biemer, can you come up, please?

JUROR:  Yes, sir.

THE COURT:  Hi.  Careful on the step up, Ms. Biemer.

You mentioned that you had children who've got some drug

problems and that you worked for CPS for a little bit.

JUROR:  Yes.

THE COURT:  You have heard a little more about what

this case may or may not be about now.  What is your opinion?

Can you be fair and impartial to both sides in this case or

not?

JUROR:  I caught them with marijuana.  They are 20

and 24.  I guess I might -- I mean, I would -- I mean, I

wish -- I wish it wasn't illegal so I wouldn't have to worry

about whether they get caught, you know, so I guess I might be

impartial in that I might be, you know --

THE COURT:  So let me ask the question --

1          JUROR:  -- I would like it to be legalized so that I

2     don't have to worry about them getting arrested.

3          THE COURT:  This case doesn't involve, to my

4     knowledge, any allegations of marijuana, so it is just going

5     to be an allegation of cocaine.

6          JUROR:  Yeah.

7          THE COURT:  Is there going to be marijuana as well?

8          MR. WOMACK:  There is marijuana --

9          THE COURT:  There will be marijuana allegations as

10    well.

11         JUROR:  Yes.

12         THE COURT:  So can you set aside all of that and

13    just listen to the facts and evidence here?

14         JUROR:  I think so.

15         THE COURT:  You think so?

16         JUROR:  Yes.

17         THE COURT:  What is causing you hesitation?

18         JUROR:  Worrying whether -- I kind of feel in my

19    heart, I think that at least marijuana, because as far as I

20    know, that is all I know they are doing.  Hopefully, that's

21    it.  I mean, obviously, I believe -- the thought that I

22    believe it should be legalized, simply because I can't get

23    them to listen to me, basically.

24         THE COURT:  Okay.  Can you set aside your

25    thoughts --

1          JUROR:  I think nso.

2          THE COURT:  -- about the legalization of marijuana

3    too and just listen to the facts, the evidence and the law I

4    give you?

5          JUROR:  I do.  I think so.

6          THE COURT:  Mr. Womack, do you have any questions?

7          MR. WOMACK:  You told us you worked at least one

8    drug case at CPS, a child --

9          JUROR:  I was just in training just for a month, and

10   I sat across the table from a mother whose -- they were going

11   to take -- deciding if they were going to take the child away,

12   because she had failed -- she had done a test and -- and I

13   don't remember what drugs it was, but she, you know, tested

14   positive for using, so they were taking the children away.

15         MR. WOMACK:  So you have seen the consequences to

16   families because of drug use?

17         JUROR:  Yes.

18         MR. WOMACK:  And, of course, your own experience

19   from having children, that you are afraid they might get in

20   trouble for using drugs?

21         JUROR:  Uh-huh.

22         MR. WOMACK:  And, again, we want to make sure that

23   jurors can absolutely put aside anything that they have, any

24   of their kind of background, that sort of feelings.  It is

25   making such an important decision in this case for both sides,

certainly for Mr. Villarreal, and if you have any hesitancy
about your ability to sit impartially as a juror, we will ask
that you not sit.

JUROR:  Yes.  I think that I can.  I think I can
separate everything, I believe.

MR. WOMACK:  Every time you say that, you say you
believe it; you are not sure that you can?

JUROR:  I guess not, if I am sitting here saying I
believe.

MR. WOMACK:  That's the strongest you can say, is
that you believe, but you have doubt yourself?

JUROR:  I think that I can, though.  I mean, I think
I can separate between -- you are saying whether proof
beyond -- you know, did he intend to do this, based on
evidence; I think that I can.

THE COURT:  That's all I need, Ms. Biemer.  Thank
you.

MR. WOMACK:  I challenge for cause.

THE COURT:  The challenge for cause for Ms. Biemer
is denied.  She states she believes she can listen to this
case and objectively decide on the merits and the facts and
the evidence, so that is denied.

Let's turn to the next page.  Six, 7, 8, 9 and 10,
any challenges for cause?

MR. FRAZIER:  Your Honor, from the government,

number 7.  Ms. Pena I believe stated she could not listen to the testimony or could not accept the testimony of a witness who engaged in acts of violence or convictions, even if she believed the witness beyond a reasonable doubt.

THE COURT:  Mr. Womack, what is your position?

MR. WOMACK:  I disagree, Your Honor.  I think what she said was -- well, she said if it is complete; she said if that is the only evidence.

THE COURT:  Let me call her up.

Ms. Finley.

Hi, ma'am.  How are you?  Don't worry.  It is not being called to the principal's office.  You have that look.  You have the look of fear.

JUROR:  I am freezing.

THE COURT:  It is cold in here today.  There are only two temperatures, on and off, in this building, and so I am fearful of calling them complaining because I know what the consequences of that is going to be.

Ms. Finley, so earlier, you answered a question about the types of witnesses that may be called here to the stand.  And so I anticipate that there are going to be two types.  Well, more than two types, but these are the ones I am interested in.

One type of witness will be cooperators.  They are either codefendants or they are alleged conspirators of this

1    alleged conspiracy.  And the second type of witness in this

2    case may be -- they may not be codefendants or conspirators,

3    but they may have in their own personal history a number of

4    convictions for criminal acts.

5         With regard to both of those types of witnesses, if

6    the government calls those type of witnesses and you judge

7    them, you look at them, you judge the believability or their

8    credibility, you size them up for yourself, can you do all of

9    that?  Or the fact that they have those kind of histories,

10   that is a no go with you?

11        JUROR:  To be -- it would be very difficult for me

12   to believe someone who has got that kind of criminal

13   background, that they could tell the truth.  Just in my

14   opinion, someone who has no problem with taking someone else's

15   life has no problem with lying for whatever means, you know,

16   for whatever end that they -- whatever is in it for them.  For

17   that reason, I just think that just because they have taken an

18   oath doesn't mean they are going to, you know --

19        THE COURT:  Mr. Frazier, any questions?

20        MR. FRAZIER:  No.  I don't believe so, Judge.

21        THE COURT:  Mr. Womack, any questions?

22        MR. WOMACK:  If you hear such witnesses, and you

23   hear any other evidence or see any other evidence from other

24   witnesses who don't have those prior histories, maybe police

25   officers that support that testimony, would you be able to

consider the testimony then?  We heard if that is the only

witness you heard, but if there are other witnesses who do not

have this background, would you then be able to consider their

testimony?

JUROR:  Well, that is such a hard thing to say when

you are not in the situation.

MR. WOMACK:  Sure.  And you have not heard any

witnesses say any -- we understand that.

JUROR:  I think it still would be difficult to

believe, you know.

THE COURT:  Thank you, Ms. Finley.

The government's motion to strike for cause is

granted.  Ms. Finley is struck.

Any other motions on 8, 9 or 10?

MR. FRAZIER:  Number 10 for the same issue.

THE COURT:  Mr. Womack, any response?

MR. WOMACK:  No objection to 10.

THE COURT:  No objection --

MR. WOMACK:  No objection.

THE COURT:  -- to striking?  Just so I am clear.

Mr. Womack?  I want to make sure I am clear.  You have no

objection to striking?

MR. WOMACK:  No objection.

THE COURT:  Ten is stricken.

Number 11, 12, 13, 14 or 15.

MR. FRAZIER:  Your Honor, the government has number

11 for the same reason, that they could not listen to the

testimony -- it is going to be the same reason as Ms. Finley,

Your Honor.

THE COURT:  Mr. Womack, your response?

MR. WOMACK:  Number 11?

MR. FRAZIER:  Number 11.

MR. WOMACK:  No objection to striking.

THE COURT:  Stricken.

Number 12.

MR. FRAZIER:  The only other one being number 14 --

the next one being number 14.

THE COURT:  Number 14.

MR. FRAZIER:  Natalie Sullivan Ochoa, who also

agreed with --

THE COURT:  Mr. Womack, your response on 14?

MR. WOMACK:  Have we jumped ahead of 12 --

THE COURT:  Well, let me go back.  Number 11 was

stricken.  Do you have anything on 12, 13 --

MR. WOMACK:  Your Honor, on 14, I am not sure --

THE COURT:  She was unsure about -- she was unsure

about witnesses with criminal history, but then my notes

indicate she cannot believe coconspirators.  I will bring her

up here, if you want me to.

MR. WOMACK:  Your Honor, I think it was just she was

1    not sure.  Again, they are doing this in a vacuum.

2              THE COURT:  Right.  I will bring her up.

3              Before I do that, any objections on number 12?  Any

4    motions on number 12?

5              MR. FRAZIER:  No motion on 12.

6              THE COURT:  Mr. Womack?

7              MR. WOMACK:  No, Your Honor.

8              THE COURT:  Any motions on 13?

9              MR. FRAZIER:  None.

10             THE COURT:  Mr. Womack?

11             MR. WOMACK:  I think 13 is okay, Your Honor.

12             THE COURT:  Okay.  So, Ms. Ochoa, number 14.  If you

13   can let her squeeze in, please.

14             Hi, Ms. Ochoa.  Ms. Ochoa, I anticipate -- there are

15   going to be several types of witnesses in here, but I am more

16   curious about two types right now.  One type will have past

17   criminal history, and so that will get disclosed.  You can

18   size up those people.  You judge the believability or their

19   credibility, and the other type of witnesses that I am

20   interested in hearing and talking to you about will be

21   codefendants in this case or coconspirators in this case.

22             And so with regard to both of those type of

23   defendants, you will hear their testimony.  You will judge the

24   credibility or their believability.  You will hear the

25   allegations that they were either coconspirators or

1    codefendants, if they pled guilty in this case or any other

2    case.

3              You would hear about that.  You would hear about

4    whatever cooperating agreements they may have entered into.

5    You will get to judge all of that.  So given all of that

6    together, if those type of witnesses got presented, could you

7    size them up and judge them?  Or do you believe, you know:  I

8    just can't take that kind of evidence.  These people can't be

9    believed?

10             JUROR:  I guess it really depends.  It would be

11   situational.  I would be a little bit concerned about my

12   safety.

13             THE COURT:  Okay.

14             JUROR:  I know that is a totally different issue,

15   but --

16             THE COURT:  Yes.

17             JUROR:  And I don't know if it would be or not, but

18   that does concern me slightly.

19             THE COURT:  Yes.  Let me try to put everybody's mind

20   at ease, because I am sure everybody is worried about that.

21   You know, I have been doing this now for 14 years, and none of

22   the jurors I have ever had have ever had any kind of issues,

23   and so you don't have to worry about that.

24             JUROR:  My thoughts and the reason I really raised

25   my hand is because I feel that if the person that is

testifying against the defendant and is already incarcerated,
I don't know if they are doing it out of anger, like they are
just angry that somebody else is not going to jail, that they
have been accused and they want this one to go down with them.

I mean, that is really where -- and, you know,
certainly if they testify that they have murdered somebody or
have been in trouble before, but are they still -- are they
telling the truth?  I don't know.

THE COURT:  Yes.  And ultimately, you, as one of the
jurors, will need to judge their believability and
credibility.

JUROR:  Sure.

THE COURT:  Mr. Frazier.

MR. FRAZIER:  So I understand the question -- when I
asked the question earlier, I want to make sure I understood
your response.  If a witness has been participating in these
acts of violence, homicides, murders, in addition to drugs and
things of that nature, would you be able to give that witness
the same level of credibility at the beginning as you would
give any witness and then evaluate that witness's testimony?
Or could you just not accept the testimony of someone like
that?

JUROR:  I don't -- I don't -- I think that -- I
guess it would depend on if they are the only one that is
going to put this one away.

1          MR. FRAZIER:  But assuming it is, where it is that

2    circumstance?

3          JUROR:  Would I -- I wouldn't judge that he is a

4    criminal already.

5          MR. FRAZIER:  Right.  That's what we talked about.

6    It has to do with their believability.  But if they have those

7    types of things, you know in advance, it is like:  Well, I am

8    sorry.  I can't listen to the testimony --

9          JUROR:  I could listen.

10         MR. FRAZIER:  Could you evaluate that witness's

11   testimony?

12         JUROR:  (Nods head.)

13         MR. FRAZIER:  Because this is a little different

14   than what you told us earlier, so we want to make sure we are

15   right, because you are the only one ultimately who knows.

16         JUROR:  Right.

17         MR. FRAZIER:  Once you are in the jury box --

18         JUROR:  And I am not sure, I guess is the best

19   answer.  I really don't know how I would feel.

20         THE COURT:  But at this stage, you are not going to

21   say "no" right off the bat?

22         JUROR:  No.  I think that I could listen and -- and

23   I don't know if I would be too judgmental, I guess, if that is

24   the right word.  Like would I judge -- am I judging them

25   before I know them?  Probably, absolutely.  If they are a

1   murderer, they are convicted, I will have an opinion.  Will it

2   change how I -- what they say, will I be able to figure out

3   their truths?  (Indicating.)

4          MR. FRAZIER:  So if you believed them beyond a

5   reasonable doubt, would you be able to convict the defendant,

6   if he satisfied all of the elements that the Judge said we are

7   required to prove?

8          JUROR:  Only if he was not the sole person that

9   would send him away.

10         MR. FRAZIER:  That's the question.  What if he is?

11         JUROR:  No.

12         MR. FRAZIER:  Couldn't do it?

13         JUROR:  I don't think so.

14         MR. WOMACK:  Now, keep in mind --

15         JUROR:  And I don't even know if I am confusing

16   everything or not.

17         MR. WOMACK:  Keep in mind, you have not had a chance

18   to look at that witness.

19         JUROR:  Right.

20         MR. WOMACK:  You don't know how he is going to

21   testify.  You don't know if there are -- there will be other

22   facts to support him, if he is the only witness.  I expect His

23   Honor will tell you that you judge each witness and their

24   credibility by itself, and regardless of their background.

25         JUROR:  Right.

1          MR. WOMACK:  And I think the Judge will tell you

2     that when it comes to witnesses with backgrounds that we are

3     talking about, that you can convict someone based solely on

4     witness testimony if you found him credible, if you believed

5     it beyond a reasonable doubt.

6          On the other hand, if because of, you know, your

7     judgment and the credibility, the fact they may have a reason

8     to -- you may hold that against them, but you don't know any

9     of that yet.

10         JUROR:  Until I listen, I am actually there.

11         MR. WOMACK:  We are asking you -- can you assure us

12    that you will listen to their testimony?

13         JUROR:  Yes.

14         MR. WOMACK:  And try to judge their credibility

15    using all of the factors that the Judge will tell you, and

16    then at the appropriate time, when you are asked to make a

17    decision, then if you really believed that witness beyond a

18    reasonable doubt, can you convict someone based on that, on

19    the fact that you really believed that witness beyond a

20    reasonable doubt?

21         JUROR:  Yes, I suppose.

22         MR. WOMACK:  No further questions.

23         THE COURT:  Thank you.  You can step back.

24         Yes.  Ms. Ochoa can still keep an open mind here, I

25    think, so that is denied.

1          MR. FRAZIER:  Judge, can we go back on one real

2     quick?  We may have miscounted.  When we talked earlier about

3     number 10 -- we may have picked the wrong number.  We may have

4     been talking about Mr. Talamantez, who is number -- we don't

5     necessarily move for cause on Ms. Mitchell.  All she said was

6     she wasn't sure, and I think we may have had the wrong number.

7          MR. WOMACK:  She is the one that also said that she

8     has a sister --

9          THE COURT:  Let's just bring her back up, then.

10    This is my notes on 11.  Her sister has a drug problem.  Her

11    aunt died from an overdose.  At first, she said that she would

12    not be able to hear individuals with previous criminal

13    histories and then she changed her mind.

14         MR. FRAZIER:  Right.

15         THE COURT:  And then she said finally, though, that

16    coconspirators, she could hear their testimony.

17         MR. FRAZIER:  Correct.

18         THE COURT:  That's what my notes said.

19         MR. FRAZIER:  And that's why I think I may have --

20         MR. WOMACK:  So we would challenge for cause because

21    of the --

22         THE COURT:  Let me bring her up.

23         Ms. Mitchell, number 11.

24         Hi.  How are you?

25         JUROR:  I am good, thank you.

THE COURT:  Ms. Mitchell, we are trying to figure
out -- so earlier, you were asked some questions about
witnesses, and so, you know, there are going to be a number of
witnesses here, but I am more concerned about two types of
witnesses right now.

Some witnesses might have past criminal history that
has nothing to do with this case necessarily and the evidence
of their past criminal misconduct will come to light.  And
then another type of witness will be codefendants and
coconspirators in this case, who may be testifying in order
to -- in hope of a better plea bargaining position or better
sentence, something like that.

The jury and the jurors are going to be asked to
judge the believability and the credibility of the witnesses'
testimony.  And so knowing that you are going to be able to
size up the juror, knowing that you are going to hear whatever
past or whatever association they may have with this case,
could you listen to that witness's testimony, and if you find
it credible and believable beyond a reasonable doubt, could
you accept that or you couldn't accept it?

JUROR:  So can I ask a question?

THE COURT:  Yes, ma'am.

JUROR:  Okay.  So would they be like people who are
convicted of similar things or people who are being convicted
like him or --

1          THE COURT:  So some of them will probably -- I mean,

2    they know their witnesses better than I do.  Some of them will

3    probably have drug trafficking crime offenses in their past.

4          JUROR:  Okay.

5          THE COURT:  And then some of them would have been --

6    do we have codefendants testifying in this case?

7          MR. FRAZIER:  Yes, we do have codefendants

8    testifying.

9          THE COURT:  So others would be members, I believe,

10   of the family in this case who have already pled.

11         MR. FRAZIER:  There wouldn't be any other family --

12         THE COURT:  It would not be the family.

13         MR. FRAZIER:  Two other --

14         THE COURT:  So two other codefendants in this case

15   who have already pled.

16         JUROR:  Okay.

17         THE COURT:  So those are the type of witnesses we

18   are likely to have here.

19         JUROR:  So, well, I want to be very unbiased, you

20   know, but I just -- I don't know.  I am sorry.

21         THE COURT:  That's fine.  But, you know, what I am

22   trying to figure out is, do you discount them right off the

23   bat or would you at least listen to --

24         JUROR:  I would listen, but I just -- I don't know,

25   like -- because how much drugs impacted my family, I don't

```
1    know.
2            THE COURT:  And so, you know, your aunt,
3    unfortunately, passed away and you said your sister --
4            JUROR:  Yes, but it was actually more than that.  I
5    had like to cut ties with almost my whole family.  I just
6    didn't want to say that out there.
7            THE COURT:  Well, I mean, so now given all of the
8    situation that we talked about, the witness testimony and your
9    family's problems with drugs --
10           JUROR:  I just --
11           THE COURT:  -- is this the right case for you or
12   not?
13           JUROR:  Honestly, I don't think so, because here is
14   my thing, like I want to do my civic duty, but if I was in his
15   seat --
16           THE COURT:  If you were in the defendant's seat?
17           JUROR:  I wouldn't want to be impartial to him just
18   because of things, but --
19           THE COURT:  Now you are getting me confused.  Are
20   you going to be -- is it the government that is going to have
21   some issues with you or the defendant?
22           JUROR:  The defendant.
23           THE COURT:  Okay.
24           JUROR:  Because drugs have destroyed so many parts
25   of my family, and so I want to be an impartial person, I
```

really do, but I am not sure that I truly could be, and I feel
bad for that.

THE COURT: You know, again, there are no right
answers or wrong answers. Just honest answers, and you have
given us an honest answer, so thank you, ma'am.

JUROR: I am sorry. Can I go?

THE COURT: Yes.

MR. WOMACK: Challenge for cause.

THE COURT: Yes. She was tearing up at the end
here. Ms. Mitchell is stricken.

MR. WOMACK: And number 12, did you say number 12
was a challenge?

MR. FRAZIER: No, we didn't.

THE COURT: Let's just go down the list one by one
so there is no confusion here. Does anybody have a motion on
number 12? The government?

MR. FRAZIER: No, sir.

THE COURT: Mr. Womack?

MR. WOMACK: No.

THE COURT: Number 13, does anybody want to bring a
motion?

MR. FRAZIER: No, sir.

THE COURT: Mr. Womack?

MR. WOMACK: No, Your Honor.

THE COURT: Number 14, does the government bring a

1   motion.

2          MR. FRAZIER:  No, Your Honor.  We have already had

3   Ms. Ochoa --

4          THE COURT:  That's right.  I am sorry.  You are

5   right.

6          Number 15, does anybody want to bring a motion?

7          MR. FRAZIER:  We will, Your Honor.  She also

8   indicated that she could not accept the testimony of a

9   cooperating witness.

10          THE COURT:  Ms. ---------, number 15.

11          COURTROOM DEPUTY:  Number 18 needs to be brought up

12   to talk to you.

13          THE COURT:  Hi.  How are you, ma'am?

14          JUROR:  I am good.

15          THE COURT:  Good.  I will be asking you some

16   thoughts of yours on witnesses.  And so we are going to have a

17   number of different types of witnesses in this case, but I am

18   interested in your thoughts right now about two particular

19   types of witnesses.

20          One witness that might come up in this case, or

21   there might be many of them that actually testify, have past

22   criminal misconduct.  Another type of case -- another type of

23   witness, rather, would be individuals who are either

24   codefendants in this case or coconspirators in this case.

25          And so either one of them may be testifying,

hopefully truthfully, but probably also hoping that they are going to get some benefit by testifying, a reduced plea or a reduced sentence or something like that.

My question to you is, can you listen to that testimony from that witness and judge the credibility and believability of that witness, or are you going to say:  No, I can't hear him?

JUROR:  I can listen and I can hear what they have to say and then based on what they say, I mean, I can make a decision.  I mean, I can't say yes and I can't say no --

THE COURT:  Right.

JUROR:  -- but I can listen.

MR. FRAZIER:  And would that include witnesses who have got like crimes of violence that we talked about in their past --

JUROR:  Yes.

MR. FRAZIER:  -- including if they killed people; would you be able to treat them the same way you would any other witness in evaluating their credibility?

JUROR:  And this is just based on what they say, correct?

MR. FRAZIER:  Correct.  You are allowed as a juror to take whatever information you know about that person, their background in determining whether they are believable or not, but would you at least give that witness the same

consideration you would, say, a police officer or anyone else
at the beginning, when they come on the witness stand?  Or
would you totally just not want to -- you could not consider
their testimony at all?

JUROR:  Well, at first, I was going to say yes, I
can, you know, listen to them, but then based on like a police
officer, I guess I give them more credibility.

MR. FRAZIER:  Well, that is correct.  What I am
saying is, you as a juror are entitled, the Judge has told
you, you as a juror are entitled to take anything at all about
the background of a witness in determining whether you believe
that witness or not, so as you find out things about the
witness, you can use that in determining whether they are
believable or not.

JUROR:  Okay.

MR. FRAZIER:  It's just that at the beginning, like
a race, all witnesses start out the same.  Because one witness
may have done some pretty serious acts of violence and killed
people before, is that witness automatically going to be
discounted?

JUROR:  No.

MR. FRAZIER:  I am not going to be able to listen to
that witness's testimony?

JUROR:  No.  I will listen.

MR. FRAZIER:  Can you evaluate them just like you

1  would any other witness?

2       JUROR:  Yes.

3       THE COURT:  Mr. Womack, any questions?

4       MR. WOMACK:  No, Your Honor.

5       THE COURT:  Thank you, ma'am.

6       MR. FRAZIER:  The next one being number 16.

7       THE COURT:  Hold on.  Let me make sure we don't have

8  any mistakes along the way.  Does anybody want to make an

9  objection on 15?

10       MR. WOMACK:  No challenge.

11       THE COURT:  Anybody want to make a motion on number

12  16?

13       MR. FRAZIER:  Yes.  The government does, for the

14  same reason.

15       THE COURT:  Mr. Cochran.

16       Hello, sir.  How are you?  Mr. Cochran, I am going

17  to visit with you a little bit about witnesses.  So there are

18  going to be a number of different types of witnesses here in

19  this case.  Some witnesses might have a past criminal history

20  and that is going to get disclosed, and if you are selected as

21  a juror, you are going to get to judge the credibility or

22  believability of that witness and take into account their past

23  convictions.

24       Another type of witness may be a codefendant in this

25  case or a coconspirator in this case, an alleged one, and you

1  will get to judge the credibility and believability of that

2  witness.

3         JUROR:  Yes.

4         THE COURT:  It will come out that they may be

5  testifying under the hopes of a better sentence.  You know,

6  you will hear all of that as a juror.

7         My question to you is, if that type of evidence

8  comes in, either people with past criminal histories or people

9  who are codefendants or coconspirators in this case, if that

10  evidence comes in, that testimony, can you weigh that

11  testimony or are you going to absolutely say:  No, I am not

12  going to --

13         JUROR:  Yes.  To be honest with the defense, I

14  personally have had experience with my brother about, I don't

15  know, 20 years ago.  He worked at a Midas shop.  He was

16  getting ready to go to college, a smart young man.  Two guys

17  come in and shot him.  They didn't have to shoot him.  Shot

18  him twice and killed him.  My brother-in-law put holes -- took

19  his shirt off to put in the holes to keep him from bleeding.

20  So that would affect me, having to do with criminals.

21         Second would be that a friend of mine, Rocky Rios, a

22  police officer, used to be my next-door neighbor, and he was

23  killed by a guy taking his gun from him and shooting him, so I

24  don't think I would be able to, you know, to give you an

25  honest, a fair --

1          MR. WOMACK:  You may have the wrong impression.

2          JUROR:  Okay.

3          MR. WOMACK:  The defense is not calling -- as a

4    witness.  If the government would call, if they choose to, and

5    there is no indication that he and Mr. Villarreal were going

6    around killing people --

7          JUROR:  I understand.

8          MR. WOMACK:  -- but this particular witness, we

9    expect, he has killed people in Mexico --

10         JUROR:  That might bother me.

11         MR. WOMACK:  And on behalf of an organization --

12         JUROR:  Yes.

13         MR. WOMACK:  And so it won't be -- he is not going

14   to be saying me and Villarreal went out and killed people.

15         JUROR:  I understand that.

16         MR. WOMACK:  That's why the Judge said -- about a

17   coconspirator in that regard.  But it would be disclosed to

18   the members, to the jury that he does have, not a conviction,

19   but that he actually has done these things --

20         JUROR:  That would bother me.

21         MR. WOMACK:  And so what we are trying to determine

22   is, when this witness comes in, like the government said, and

23   everybody starts out even, when he comes in and takes an oath,

24   you won't know that he is a murderer until he says so.

25         So you will see a guy come into court and sit down.

1    And then during his testimony, I will expect it to be brought

2    out what his past is and things he has done, and then when he

3    is finished delivering, the Judge will tell you:  Here are all

4    of the things you can consider in whether you believe a

5    witness.

6         And it will be a long list.  He may have additional

7    things, but he will say it includes all of these things here.

8    And then I expect the Judge will also say:  And by the way,

9    those witnesses who have a criminal past or who have deals

10   with the government, you are going to look at them especially

11   carefully.

12        The Judge will also tell you that you could believe

13   their testimony beyond a reasonable doubt, like you could

14   anybody.  So if you sat as a juror in this case, will you be

15   able to do that?

16        Will you be able to listen to the testimony of every

17   witness and, if you believe it, be able to act on that belief?

18   Or are you going to say:  Well, just because he murdered

19   people, I won't listen to him --

20        JUROR:  It would be hard for me to -- knowing he did

21   that, I wouldn't be able to give you a fair assessment of

22   that, honestly.

23        MR. WOMACK:  What if his testimony was supported by

24   other testimony?  It may be documents, physical things.  It

25   may be the testimony of other people that you find believable

1    that don't have that kind of record.

2              JUROR:  I would weigh --

3              MR. WOMACK:  Would you be able to weigh it?  Would

4    you be able to weigh his testimony, and knowing you haven't

5    heard everything he is going to testify about, other than he

6    is going to say:  Well, I killed before.

7              JUROR:  That would bother me.  That bothers me.

8              THE COURT:  Thank you.  Appreciate it.

9              MR. WOMACK:  I really want him as a juror, but I

10   guess we can't --

11             THE COURT:  Well, frankly, it cuts both ways.  With

12   his past association, his neighbor being shot at, I mean, he

13   made it pretty clear he couldn't even be fair to the

14   defendant.  So number 16 is stricken.

15             MR. FRAZIER:  The last one, Judge, on that row for

16   us would be the next one, number 17.

17             THE COURT:  What is your position on 17?  Mr.

18   Convery, does he like you or not?

19             (Laughter.)

20             MR. CONVERY:  As an officer of the Court, I think he

21   does.

22             THE COURT:  What is your --

23             MR. CONVERY:  I think he was a little bit -- he may

24   or may not be confused about -- he asked questions about --

25             THE COURT:  Well, that is true.

```
1              MR. WOMACK:  He was confused on the scientific
2     evidence, as far as the --
3              THE COURT:  Mr. Hewitt.
4              Hi.  How are you, sir?  Okay.  So a couple of things
5     came up, I think, during your questions.  One is scientific
6     evidence and the other one was witnesses.
7              JUROR:  Right.
8              THE COURT:  So with witnesses, I mean, there may be
9     a number of different type of witnesses.  Some may have
10    criminal histories.  Others might be coconspirators or
11    codefendants in this case.
12             Can you listen to their testimony, judge the
13    believability and credibility of that, or is it a no go right
14    from the start?
15             JUROR:  It is a no go right from the start because
16    of my history with it.  I was in an organization for 17 years.
17    I have seen many snitches and stuff like that.  I have done
18    that, and I just can't -- I cannot go past that.
19             THE COURT:  Thank you, sir.
20             MR. FRAZIER:  Thank you very much.  Appreciate it.
21             MR. CONVERY:  I need to teach you how to answer that
22    question.
23             (Laughter.)
24             THE COURT:  Number 17 is stricken.  Anybody have any
25    motion on 18, 19 or 20?
```

```
 1              MR. FRAZIER:  Not from the United States.

 2              THE COURT:  Mr. Womack?

 3              Eighteen wanted to see me; is that --

 4              COURTROOM DEPUTY:  Yes, sir.

 5              THE COURT:  Ms. Martin.

 6              Hi, ma'am.  How are you?

 7              JUROR:  Hi.

 8              THE COURT:  You wanted to see me?

 9              JUROR:  Well, I didn't -- the question didn't come

10     up.  I didn't know if it was important that my husband is in

11     the drug business and we have been in the drug business for 46

12     years.

13              THE COURT:  Which drug business are we talking

14     about?

15              JUROR:  The legal drug business.

16              THE COURT:  Okay.

17              JUROR:  He is a pharmacist.  But also, he is a COO

18     for a pharmaceutical company.

19              THE COURT:  Okay.

20              JUROR:  And I didn't know if that was important or

21     not.

22              THE COURT:  And so, this is not going to have a

23     tie-in to legal drugs or anything like that?

24              MR. FRAZIER:  No pharmacy --

25              JUROR:  I just wanted to know.
```

1          THE COURT:  Thank you, ma'am.

2          Okay.  Anybody on 18, 19 or 20?

3          MR. FRAZIER:  No, sir.

4          THE COURT:  Mr. Womack?

5          MR. WOMACK:  No, Your Honor.

6          THE COURT:  Anything on 21, 22, 23, 24, 25?

7          MR. FRAZIER:  The government would move to challenge

8     number 24 for the same reasons regarding the witness testimony

9     for someone having convictions.

10          THE COURT:  I will call her up.

11          Ms. Mulcahy.

12          Hi, ma'am.  How are you?  Did I get the name halfway

13    right?

14          JUROR:  Yes.

15          THE COURT:  Okay.  Good.  Ms. Mulcahy, there are

16    going to be a number of different types of witnesses in this

17    case.

18          JUROR:  Uh-huh.

19          THE COURT:  But the ones that I am more concerned

20    about are two types.  Some are going to have some past

21    criminal history and that is going to get disclosed and the

22    jurors will weigh the believability and the credibility of

23    those people's testimony.

24          The other type of witness may be codefendants or

25    coconspirators in this alleged case, and you will hear about

1   what their alleged role was.  You will hear whether or not

2   they pled guilty or not.  You will hear whether or not they

3   have any agreements to testify, that they hoped to secure more

4   favorable sentences.  You will hear all of that.

5              JUROR:  Uh-huh.

6              THE COURT:  My question to you is, can you judge the

7   credibility and believability of those witnesses or are they a

8   no go right from the start?

9              JUROR:  To me, if they have been convicted of a

10  crime, they have no credibility with me.

11             THE COURT:  Any questions?

12             MR. FRAZIER:  No, sir.

13             THE COURT:  Mr. Womack?

14             MR. WOMACK:  So, for example, you know, counsel --

15             THE REPORTER:  A little closer.

16             MR. WOMACK:  If a witness has either prior

17  convictions or prior bad acts and he admits to, yes, I have

18  done some bad things, the Judge will tell you that you have to

19  weigh their testimony more carefully than other witnesses

20  perhaps.

21             JUROR:  Uh-huh.

22             MR. WOMACK:  But you could believe their testimony

23  beyond a reasonable doubt, and if you do, you actually could

24  convict based on that.

25             JUROR:  Uh-huh.

1    MR. WOMACK:  And you have not seen them or heard

2    them yet.

3        JUROR:  Uh-huh.

4    MR. WOMACK:  So they may come in and you look them

5    right in the eye and they may testify very clearly.  You may

6    find that every factor that goes into credibility is in their

7    favor, but they have done bad things in the past.  And we are

8    asking you to predict the future.

9        If such a witness comes in and you know, you learn

10   during cross-examination or direct examination or any

11   examination that they have done some bad things, but

12   nonetheless, if you find their testimony believable, if you

13   are convinced by it, then the Court would expect you to listen

14   to them and consider the testimony, if you find it to be

15   credible.

16       JUROR:  Uh-huh.

17   MR. WOMACK:  Will you be able to do that?  Or is it,

18   well, as soon as I have heard they have committed crimes

19   before, I am just shutting them out?

20       JUROR:  To me, it is black and white.  If you have

21   committed a crime, you have zero credibility with me.

22   MR. WOMACK:  Thank you, ma'am.

23   MR. FRAZIER:  Thank you.

24   MR. WOMACK:  No objection.

25   THE COURT:  She is stricken for cause.

1          MR. WOMACK:  What number is that?

2          THE COURT:  That is 24.

3          Anybody have a motion on 25?

4          MR. FRAZIER:  No, sir.

5          THE COURT:  Mr. Womack?

6          MR. WOMACK:  Twenty-five, Your Honor?  I don't think

7    we ever heard from --

8          THE COURT:  Any motions on 26?

9          MR. FRAZIER:  No, sir.

10          THE COURT:  Mr. Womack?  She said her nephew had a

11    drug problem but she could still hear this case.

12          MR. WOMACK:  No problem.

13          THE COURT:  Number 27?

14          MR. FRAZIER:  Yes, Your Honor.  The government moves

15    to challenge for cause Ms. Najera because of the same reasons

16    as Ms. Mulcahy stated and Ms. Finley earlier.

17          THE COURT:  Mr. Womack, any --

18          MR. WOMACK:  She is the one that is a staff attorney

19    in the Court of Appeals?

20          THE COURT:  Right.

21          MR. WOMACK:  She said a number of things -- her

22    husband is a defense attorney and former assistant DA,

23    apparently.

24          THE COURT:  Do you want me to bring her up?

25          MR. WOMACK:  If you will bring her up, Your Honor.

1          THE COURT:  Ms. Najera.

2          Hi.  How are you?

3          JUROR:  Good.

4          THE COURT:  Ms. Najera, so you are an attorney and

5    you know this.  There are going to be two -- at least for what

6    I want to talk to you about, there are two different types of

7    witnesses that may come up.  One might have criminal history.

8    Of course, that is going to be disclosed in impeachment, if

9    the government doesn't bring it out.  And the second type of

10   witness may be a codefendant or a coconspirator.

11         JUROR:  Uh-huh.

12         THE COURT:  And so, you know, they are, of course,

13   hoping for a more lenient sentencing.  All of that is going to

14   get disclosed.  The jurors judge the believability and the

15   credibility of the witnesses.  Can you judge the believability

16   and credibility of those type of witnesses?  Or are they a no

17   go?

18         JUROR:  Well, you don't have the accomplice witness

19   rule here?

20         MR. WOMACK:  No.

21         JUROR:  Yes.  I have a huge problem with that.  I am

22   going to have to have other evidence affirmatively linking --

23         MR. CONVERY:  It is different.

24         JUROR:  Yes.

25         MR. WOMACK:  In federal court --

```
 1          MR. CONVERY:  I anticipate that a part of it is,

 2   Judge, the instructions cover that, that there has to be like,

 3   for instance, whether or not there has to be some

 4   corroboration.

 5          JUROR:  Well, yes.

 6          MR. WOMACK:  It is a state rule.  It is not a

 7   federal rule.

 8          JUROR:  I understand, but philosophically, I believe

 9   in it.

10          MR. WOMACK:  Well, if the judge tells you --

11          JUROR:  I can't do it.

12          THE COURT:  That's all I need to hear.

13          JUROR:  Yes.

14          THE COURT:  Thank you, ma'am.

15          And number 27 is stricken for cause.

16          Anything on 28?  Any motion by the government?

17          MR. FRAZIER:  May I have just a moment, Your Honor?

18   Yes, Your Honor.  Number 28 for the same reason.

19          THE COURT:  Ms. ------.

20          Hi, ma'am.  How are you?

21          JUROR:  I am good.  How are you?

22          THE COURT:  I want to visit with you about

23   witnesses.

24          JUROR:  Yes.

25          THE COURT:  There are going to be a number of
```

different types of witnesses in this case.  One type of

witness would have previous criminal history, and that will

get disclosed.  There will be impeachment or the government

might just voluntarily disclose the past criminal history of

the witness.

Another type of witness might be either codefendants

or coconspirators in this alleged case, and there is likely

the possibility that it will get brought up that they are

testifying because they want more favorable sentences and

things of that nature.

My question to you is, can you listen to the

testimony of those type of witnesses, judge the credibility

and believability of them and make a decision?  Or is there a

type of testimony, you know, that you just can't even hear it

because of their background?

JUROR:  Well, I have to admit, honestly, I feel like

a criminal is -- they are criminals, so to me, they are kind

of liars, so it would be hard for me to listen to that kind of

testimony and make a fair judgment, because I would just

consider what they are saying as probably a lie.

THE COURT:  Mr. Shearer, any questions?

MR. FRAZIER:  So --

THE COURT:  Mr. Shearer.  Goll, I apologize.  Your

colleague is in my mind for another case.

MR. WOMACK:  Do you want me to get him so he can ask

the questions?

MR. FRAZIER:  No.  That's okay.  I will take care of it.

On this particular issue, ma'am, what we were talking about earlier, if the witness you have in front of you is someone who has convictions for crimes, they have done acts of violence, including murder --

JUROR:  Uh-huh.

MR. FRAZIER:  -- but at the end of the day, is that witness automatically going to be -- are you automatically not going to listen to that witness's testimony based on the fact that they have got that type of baggage, so to speak, in their background?

JUROR:  It would be very hard to listen to their testimony, yes, sir.

MR. FRAZIER:  Okay.  All right.  Thank you.

THE COURT:  Mr. Womack.

MR. WOMACK:  If this person testifies, I expect that His Honor will tell you, you will have to treat that testimony with a lot of caution.

JUROR:  Right.

MR. WOMACK:  But in weighing their testimony, if you find they are to be believable, you could convict someone solely on that, but you need to be cautious in listening to their testimony.

1          JUROR:  Uh-huh.

2          MR. WOMACK:  And be more cautious with their

3  testimony than others with different backgrounds.  Are you

4  able to do that?  Are you able to listen to the testimony and,

5  for example, if you find that they are very clear, very

6  truthful, they appear to be very truthful, would you be able

7  to listen to their testimony, despite the fact they have done

8  bad things in the past?

9          JUROR:  I could try, but I couldn't guarantee that I

10  could --

11          MR. WOMACK:  We don't even know yet --

12          JUROR:  Right.  I know, yes, that's true.  I don't

13  know.

14          MR. WOMACK:  It could be -- but just standing here

15  in a vacuum, you know, His Honor is going to tell you a number

16  of things to consider --

17          JUROR:  Sure.

18          MR. WOMACK:  -- in deciding whether to believe

19  someone, common sense type stuff, and you may have other

20  things -- he will give you a list of them.  But he will tell

21  you that any witnesses that have a background or a deal with

22  the government or whatever, he will tell you for those

23  witnesses you need to be especially cautious.

24          JUROR:  Okay.

25          MR. WOMACK:  But if you believe their testimony, you

1  can believe their testimony the same as any other witness.

2  Are you able to do that and follow the instruction or are you

3  going to disregard that instruction and say, "I am sorry, Your

4  Honor" --

5            JUROR:  Well, I would never disregard the Judge's,

6  you know, recommendations.

7            MR. WOMACK:  It's not a recommendation.  He is going

8  to give you the law.

9            JUROR:  Okay.  Yes.  No.  I would listen to the

10  Judge for sure.

11            MR. WOMACK:  Okay.  Does that mean that you will

12  consider the credibility of witnesses with a criminal

13  background, if you believe it, then, and if you find that they

14  were credible you would believe them?  Would you be able to do

15  that?

16            JUROR:  I will try.

17            THE COURT:  Thank you, Ms. ------.

18            JUROR:  You're welcome.

19            THE COURT:  This was a close call, but you did a

20  good job of rehabilitation.  You are going to have to use a

21  discretionary on her if you are going to do anything on her.

22  That is denied.

23            Anything on number 29?

24            MR. FRAZIER:  No, sir.

25            THE COURT:  Mr. Womack?

1          You know, Mr. Frazier, the other thing I keep

2     staring at -- how old is that picture?

3          MR. FRAZIER:  A long time, Judge.  Let me turn it

4     around.  That picture is over 100 pounds ago.

5          THE COURT:  Mr. Womack, anything on 29?

6          So I look at that, and it is like -- I don't know

7     why I am thinking Shearer when I look at that photo.

8          MR. FRAZIER:  He doesn't look anything like that.

9          THE COURT:  No, he doesn't.  It is not good that I

10    have Mr. Shearer on my mind.  You can tell him that.

11         MR. FRAZIER:  I will do that, Judge.

12         THE COURT:  Number 30, anybody, any motion on 30?

13         MR. FRAZIER:  No, sir.

14         MR. WOMACK:  Yes, Your Honor.  We do have a

15    challenge on 30.  She said --

16         THE COURT:  Yes.  I recall that testimony.  That is

17    granted.  Thirty is stricken.

18         MR. FRAZIER:  Your Honor, can we try to at least

19    ask --

20         THE COURT:  No.  She was very clear on that one.

21         MR. FRAZIER:  I mean, I thought if we could at

22    least --

23         MR. WOMACK:  She thought the law was too flexible.

24         MR. FRAZIER:  She did.  She made reference --

25         THE COURT:  No.  I have heard -- I have it in my

1    notes.  I am clear on that one.

2            Anything on 31?

3            MR. FRAZIER:  Yes, Your Honor.  I believe the

4    government is challenging for the same reasons as the others,

5    Ms. Mulcahy --

6            THE COURT:  How far do we have to go?  Let's see.  I

7    still need to go through these people.

8            Mr. Orr.

9            Mr. Orr, how are you, sir?

10            JUROR:  Fine, sir.

11            THE COURT:  Mr. Orr, there are going to be a number

12    of different types of witnesses in this case.  I am interested

13    in two types right now.  Some are going to have some past

14    criminal history that is going to get disclosed.  The other

15    type of witness may be a codefendant or a coconspirator in

16    this alleged case.

17            And if they have past criminal history, that is

18    going to get disclosed.  The jury will get to evaluate that.

19    If a codefendant or a coconspirator in this case, if they pled

20    guilty, that would come out.  If they are hoping for a more

21    favorable sentencing, treatment, that will come out.  The jury

22    gets to evaluate and weigh all of that in deciding the

23    believability and credibility of their testimony.

24            My question to you is, can you listen to such a

25    witness or is it a no go right from the start?

1          JUROR:  Probably a no go right from the start.  I

2    just have a lot of feelings for that kind of stuff,

3    trustworthiness of certain things and stuff, so --

4          THE COURT:  Mr. Shearer, any questions?  Goll, I am

5    doing it again.  Sorry.

6          MR. FRAZIER:  I will use that picture right there,

7    Judge.

8          Mr. Orr, how are you doing today?

9          JUROR:  Good.

10          MR. FRAZIER:  I just have a couple of -- when you

11    say it's a no go from the start, I don't want to put words in

12    your mouth.  Basically, if a witness were to testify and that

13    witness has criminal convictions, acts of violence in the

14    background, things of that nature, you would not give that

15    witness the same starting line as you would someone else?  Do

16    you remember the analogy I gave earlier?

17          JUROR:  Right.

18          MR. FRAZIER:  All the witnesses start the same.

19    Would that witness in your mind automatically not -- you could

20    not consider that witness's testimony simply because of that

21    baggage, for want of a better word?

22          JUROR:  I am not sure how -- I am not positive.  I

23    don't think I would -- probably not.

24          MR. FRAZIER:  That's why we are asking.

25          JUROR:  Probably not.

MR. WOMACK:  What we are talking about here, as you heard, all of the instructions on the law will come from the Judge.

JUROR:  Uh-huh.

MR. WOMACK:  We may differ on it.  We may agree.  It doesn't matter --

JUROR:  Yes.

MR. WOMACK:  The Judge is going to give you instructions on credibility of witnesses, things to look at, a list of things that you can consider in addition to other things you may have.

He is going to tell you that you should weigh the credibility of every witness, regardless of background, every witness.  You don't necessarily believe police officers.  You don't necessarily disbelieve anyone else.  You will weigh the credibility.  You personally will decide the credibility of other witnesses.

I expect the Judge will also tell you that if we have people who testify, like we have here, that they have done bad things, have deals with the government, whatever it might be, he is going to tell you that you have to weigh their testimony with extra caution, but he will tell you that you can find their testimony to be very credible and, in fact, you could convict someone if you believed them beyond a reasonable doubt, if you believed the testimony of that witness.  The

1    mere fact they have a conviction or whatever may not override

2    the fact that you believe them.

3        JUROR:  Right.

4        MR. WOMACK:  You may find that they are credible

5    despite their background, but you just have to be extra

6    careful.  So if they have a background or these kind of deals

7    with the government, he is not saying you have to believe them

8    and he is not saying you don't believe them.  He is saying you

9    have to decide on your own, in your own heart, do I believe

10   this person despite the background?  Will you be able to

11   follow that instruction or not?

12       JUROR:  My own personal belief?

13       MR. WOMACK:  Yes.  You haven't heard any of them.

14   The Judge will tell you to consider the testimony of every

15   witness, but you will decide who to believe and not to

16   believe.  But he is going to tell you that just because he has

17   a conviction doesn't mean you can't believe them.  You may

18   choose not to, but you can believe them.  You could believe

19   them beyond a reasonable doubt if you find them to be a

20   credible witness.

21       That's what the government asked you, from the

22   start, when they come in -- of course, when they first come

23   in, you won't know if they have done anything.  You will learn

24   that during the examination, perhaps, I am pretty sure, but

25   you will decide whether you believe their testimony, and the

 1    Judge will tell you, you know, you will make your own decision

 2    whether you believe them or not.

 3              But he will tell you, you can certainly -- if you

 4    don't -- you can consider against them the fact they had deals

 5    with the government or they have been criminals or whatever,

 6    but will you follow the Court's instructions and weigh their

 7    testimony using all of the factors?  As opposed to saying,

 8    "Well, I don't care what they say"?

 9              We are just trying to find out, as you stand here

10    now, are you telling us -- or are you telling us that without

11    knowing any more, you might find it hard to believe but you

12    will give them a chance and you will listen to them?

13              JUROR:  I am not sure.  Honestly, I don't know.  I

14    could maybe give him a chance, but honestly, I don't know if I

15    could --

16              MR. WOMACK:  You haven't heard them yet.

17              JUROR:  Well, I just have my own beliefs of

18    different --

19              THE COURT:  Thank you, Mr. Orr.

20              MR. WOMACK:  Thank you.

21              MR. FRAZIER:  Thank you.  Appreciate it, sir.

22              THE COURT:  That was 31.  He is stricken for cause.

23              MR. FRAZIER:  May I have just a moment to talk to

24    cocounsel for a moment?

25              THE COURT:  Mr. Frazier, are you ready?  We need to

1    hurry this up, because I want to let the remainder go.

2              Anybody have a motion on number 32?

3              MR. FRAZIER:  No, sir.

4              THE COURT:  Mr. Womack?

5              MR. WOMACK:  I don't believe we heard from him.

6              THE COURT:  He mentioned his stepson had a drug

7    problem.  That was the only time we heard from him.  No

8    motions?

9              MR. FRAZIER:  None from the government, no, sir.

10             MR. WOMACK:  No.

11             THE COURT:  Number 33?

12             MR. FRAZIER:  No, sir.

13             THE COURT:  Mr. Womack?

14             MR. WOMACK:  No, Your Honor.

15             THE COURT:  Number 34?

16             MR. FRAZIER:  No, sir.  No motions.

17             THE COURT:  Mr. Womack?

18             MR. WOMACK:  Did he --

19             THE COURT:  I don't have a single thing on 34.

20             (Conferring with co-counsel.)

21             THE COURT:  Nothing on 34.

22             Number 35?

23             MR. FRAZIER:  Nothing from the government, Your

24    Honor.

25             THE COURT:  Mr. Womack?

1              MR. WOMACK:  No.

2              THE COURT:  Number 36?

3              MR. FRAZIER:  No.  Nothing from the government, Your

4    Honor.

5              MR. WOMACK:  Nothing, Your Honor.

6              THE COURT:  Number 37?

7              MR. FRAZIER:  Nothing from the government.

8              THE COURT:  Mr. Womack?

9              MR. WOMACK:  No, Your Honor.

10             THE COURT:  Number 38?

11             MR. FRAZIER:  Nothing from the government.

12             THE COURT:  Mr. Womack?

13             MR. WOMACK:  Thirty-five years ago --

14             (Conferring with co-counsel.)

15             THE COURT:  Do you want me to bring her up?

16             MR. WOMACK:  If you would, Your Honor.

17             THE COURT:  Ms. ------, number 38.

18             Hi, Ms -----.  How are you?

19             JUROR:  Just fine.

20             THE COURT:  Ms. ------ -- yes, get closer to the

21   mike.

22             JUROR:  Yes.

23             THE COURT:  You're civilian SAPD?

24             JUROR:  Yes, sir.

25             THE COURT:  So you have seen and heard some things?

1          JUROR:  Sure.

2          THE COURT:  Now, this case, can you listen to the

3     facts and evidence in this case and make a fair and impartial

4     determination and verdict just based on this case and leave

5     work behind you?

6          JUROR:  Oh, yes.  Absolutely.  I work strictly with

7     statistics.

8          MR. WOMACK:  Let's say you vote for an acquittal.

9     Would you be be embarrassed to go back to work and say:  I

10    acquitted --

11         JUROR:  No.

12         MR. WOMACK:  I believe you.

13         THE COURT:  Thank you, Ms. ------.

14         MR. WOMACK:  No challenge, Your Honor.

15         THE COURT:  Any challenge on 39?

16         MR. FRAZIER:  No, sir.  None from the government.

17         MR. WOMACK:  We would like to question her.

18         THE COURT:  Ms. -----.

19         Hi.  How are you, ma'am?  Ms. -----, so your husband

20    is a police officer?

21         JUROR:  Uh-huh.

22         THE COURT:  Can you hear the evidence in this case,

23    judge the facts in this case and render a verdict and then go

24    home and say to your husband, "We let this guy go and I voted

25    to acquit him"?

1          JUROR:  I think I can just listen to the facts and

2    just be okay with that, yes.

3          THE COURT:  And so it wouldn't be any problem doing

4    that?

5          JUROR:  No, I don't think so.

6          THE COURT:  Mr. Womack?

7          MR. WOMACK:  Just the fact that your husband is a

8    police officer and works in law enforcement, do you think it

9    would make you favor one side over the other?

10         JUROR:  I don't think so.

11         MR. WOMACK:  Okay.

12         THE COURT:  Thank you, ma'am.

13         MR. WOMACK:  Can you assure us --

14         JUROR:  I can assure you --

15         THE COURT:  Thank you.

16         Okay.  So let's make sure our lists are all the

17    same.  I have stricken -- let's make sure our lists are the

18    same.  I have stricken 2, 7, 10, 11, 16, 17, 24.

19         MR. WOMACK:  Sixteen --

20         THE COURT:  Sixteen, 17, 24, 27, 30 and 31.

21         MR. FRAZIER:  Yes, sir.  That is correct.

22         MR. WOMACK:  Thirty and 31?

23         THE COURT:  Thirty and 31.  One, two, three, four,

24    five, six, seven, eight nine -- we struck ten people.  So

25    let's see if I get this right.  We will select 12.  The

1  defendant will have 11 strikes.  The government will have

2  seven, and that will take us up to 39.  But since I can't be

3  equal about this, you can go all the way up to 40 -- determine

4  how you want to do it, but I don't think we are going to hit

5  number 40.

6          But, again, I don't care how you all do it.  The

7  defendant has 11 strikes and the government has seven, and we

8  will see what we end up with.  I am not sure we are going to

9  have alternates.  We will just have to play that by ear.

10          MR. WOMACK:  Your Honor -- if we could have 15

11  minutes to talk to him and to go through the challenges real

12  quick.  I don't speak Spanish.

13          THE COURT:  Well, there is no need to go through the

14  challenges.  The challenges have been done.

15          MR. WOMACK:  Well, okay.

16          THE COURT:  If you are talking about the jury

17  selection, yes.  If you want --

18          MR. WOMACK:  Maybe they could take a break.

19          THE COURT:  Okay.  I will let them go and just give

20  them a little break, but I want to get them back in so we can

21  dismiss who I don't need as soon as I can.

22          MR. WOMACK:  Yes, sir.

23          THE COURT:  Thank you.

24          MR. FRAZIER:  Thank you.

25          MR. WOMACK:  Thank you.

1          (End of bench conference.)

2          THE COURT:  Ladies and gentlemen, I apologize for

3     the delay, but what I have been trying to do is make sure we

4     go through this morning's proceedings as quickly as possible

5     and not break and then have you all return from lunch.  And so

6     we have just a little bit more work to do, about 10 or 15

7     minutes.

8          I am going to allow you to take a little break.  If

9     you would like to step out to the rotunda, go to the rest

10    rooms, if you need to, or -- I encourage you not to step back

11    out because you will have to go back through security.

12          In this next 10 or 15 minutes, while you are

13    mingling in the rotunda, there may be witnesses, there may be

14    others in the area.  Please do not talk to anyone else who is

15    not wearing a badge, so do not talk to anyone else who is not

16    wearing a badge and then don't talk about this case at all,

17    because -- we haven't even heard any evidence, and so do not

18    discuss this case.  Do not discuss the lawyers.  Don't discuss

19    me.  And so don't talk about anything here.  Talk about the

20    weather, vacation plans.

21          Remember where you are sitting.  Return to that spot

22    and come back right at 12:15, and we will try to get through

23    this as quickly as possible.

24          (Venire panel leaves courtroom.)

25          THE COURT:  Why don't you all sit down.  You are

1    trying to figure out where to go?

2             MR. WOMACK:  Yes, sir.  Is there a room here on the

3    first floor?

4             MR. CONVERY:  There is a clerk's office, attorney

5    workspace.

6             THE COURT:  Yes, but the defendant is not going to

7    be able to.

8             MR. FRAZIER:  Judge, could we leave the courtroom

9    and they stay --

10            THE COURT:  I was going to say, why don't you all

11   stay here and either you all go there to the jury deliberation

12   room -- you have 15 minutes to turn in a list.

13            MR. FRAZIER:  Yes, sir.

14            THE COURT:  And then flip your chairs around along

15   the way.  I will see you back.

16            (Brief recess.)

17            THE COURT:  Thank you.  Please be seated.

18            Ms. Greenup, if you will read the names of the

19   impaneled jurors, please.

20            COURTROOM DEPUTY:  As I call your name, if you will

21   please step forward.

22            ------ ------.

23            ------ ------.

24            ------ ------.

25            ------ ------.

```
1                ------ ------.

2                ------ ------.

3                ------ ------.

4                ------ ------.

5                ------ ------.

6                ------ ------.

7                ------ ------.

8                ------ ------.

9                ------ ------.
```

10                And ------ ------.

11                THE COURT:  We had two alternates.

12                We will move you around.  Everybody just slide over

13       one real quick and we will fix that after lunch.

14                Is the government satisfied?

15                MR. FRAZIER:  We are, Your Honor.

16                THE COURT:  Is the defense satisfied?

17                MR. WOMACK:  Your Honor, I think there is one

18       mistake.  If I could look at the list real quick.

19                That is correct, Your Honor.  We are satisfied.

20                THE COURT:  Thank you.

21                Ms. Greenup, if you will swear in the impaneled

22       jurors, please.

23                COURTROOM DEPUTY:  If you will raise your right

24       hands, please.

25                (Oath administered to the jury.)

1            THE COURT:  Thank you.

2            Is the jury clerk --

3            COURTROOM DEPUTY:  She is downstairs.

4            THE COURT:  We are not picking anymore?

5            COURTROOM DEPUTY:  No, sir.

6            THE COURT:  So for the rest of you who were not

7    selected, I want to again express my thanks to you for

8    responding to jury service.  Oftentimes, we get individuals

9    who do not respond to jury service, and maybe it is my past

10   military connection; I get quite upset by that that people

11   can't just spare a few days in performance of their civic

12   duties.  And so I have the fortunate or unfortunate

13   distinction of giving show cause orders to those individuals

14   to determine why they didn't show up and then also fine them

15   appropriately if they failed without good cause.

16           So thank you for being here.  Thank you for saving

17   me the burden of having to bring you back in here and figure

18   out what happened.

19           I don't believe we are going to be selecting any

20   more jurors for this week.  You are unfortunately still on

21   call for the remainder of the month, but if you will go back

22   downstairs to the jury clerk's office, return your badges and

23   buttons, and then if anyone needs an excuse slip, you can get

24   one from the jury clerk.

25           Otherwise, you are excused here.  You are welcome to

come back as a spectator, but we don't need your services any

longer today.

Thank you so much for being here.  You all are

excused.

(Venire panel leaves courtroom.)

THE COURT:  And you all may take a seat.  Thank you.

So, ladies and gentlemen of the jury, for those of

you who have now been selected, you have been sworn in as the

jury in this case.  It is already pushing 12:30, and I know

most of you had an early day.

So what we are going to do next, I am going to

excuse you all.  The courtroom security officers are going to

show you where the jury deliberation room is.  They are going

to explain to you how to get in and get out of that room, how

to come back after lunch and how to reenter the building, and

so they will give you an explanation of all of that.  They

will also give you an idea of what is around here that is

quick and nearby for you to grab a bite to eat.

And so I am going to give us a one-hour-and-15-

minute break until 1:45, and we will start up promptly at

1:45.

Now, to get here at 1:45 or to start court at

1:45 means we all have to get here a couple of minutes earlier

than that to get through the building and get through

security, make sure we are all here, because there is one

1   thing:  If one of us is late, we are all late because I can't

2   start without everybody being present.

3         The second thing, you can use your cellphones, tell

4   your loved ones or your work supervisors that you have been

5   selected for a jury.  Please do not describe to them anything

6   else about this case.

7         Of course, you have not yet received any evidence in

8   this case and there is really nothing to talk about, so it

9   would be strictly, you know, conjecture at this point.  And I

10   am not so much worried about what you might say.  I am more

11   worried about somebody else telling you things that you don't

12   need to be considering in this case, because all of the

13   evidence that you will hear will come from the witness stand

14   in this case or from the documents that I have admitted into

15   evidence, and so that is all you need to concern yourself

16   with.

17         If you start getting information from outside

18   sources, that could cause a mistrial and no one wants that to

19   occur.  So please don't do any outside research.  Don't talk

20   to anyone else other than telling them you have been selected

21   as a juror in a case that will last about a week and no more

22   discussions than that.

23         We will see you right back.  Don't talk with each

24   other about this case yet because, again, you have not heard

25   any evidence.  So get to know each other if you go together

for lunch.  You know, find out, you know, personal stuff, but nothing about this case.

Jury deliberations will take place after you have heard all of the evidence in this case.  We will see you back in about an hour or so.  Have a good lunch.

All rise for the jury.

(Jury leaves courtroom.)

THE COURT:  Please be seated.

I arbitrarily selected 25 minutes for opening.  Is that too much time, too little time?  What is the government's position?

MR. STURGIS:  Your Honor, I believe that will be more than enough time, from the government's standpoint.

MR. WOMACK:  It will be as well.

THE COURT:  Twenty-five minutes each for opening, and then after that, we will hear evidence in the case.  Do we need to take up anything before we break for lunch?

MR. FRAZIER:  Not from the government, no, sir.

MR. WOMACK:  No.

THE COURT:  Let's try to get here a couple of minutes before 1:45.  We start promptly at 1:45.

(Lunch recess.)

THE COURT:  Thank you.  Please be seated.

We are still missing a couple of jurors.  We are evidently missing the defendant.

1          MR. WOMACK:  Mr. Villarreal as well.

2          THE COURT:  Can you call upstairs and figure out

3   where Mr. Villarreal is?

4          MR. WOMACK:  Your Honor, if you would like to, the

5   government has presented us with a stipulation of expected

6   testimony of two lab experts.  I expect us to do that.  Those

7   are the exhibits we talked about this morning.

8          MR. STURGIS:  For the record, Your Honor --

9          MR. WOMACK:  If you would like, while we are waiting

10  for jurors that are adrift, we can go ahead and go over that,

11  as soon as Mr. Villarreal gets in.

12          THE COURT:  Okay.

13          MR. STURGIS:  And for the record, Your Honor, that

14  is Exhibits 38 and 39.

15          THE COURT:  And is the stipulation written, or what

16  is it?

17          MR. STURGIS:  It is written, Your Honor.

18          THE COURT:  Okay.  So while we are doing

19  housekeeping and while we are waiting here --

20          COURTROOM SECURITY OFFICER:  They are on their way,

21  sir.

22          THE COURT:  I'm sorry, sir?

23          COURT SECURITY OFFICER:  Mr. Villarreal is on his

24  way.

25          THE COURT:  Okay.  Does anybody wish to invoke the

1    rule?

2              MR. STURGIS:  The government would, Your Honor.

3              MR. WOMACK:  Yes, Your Honor.

4              THE COURT:  Both sides do.  So the rule has been

5    invoked.  Any witnesses in the courtroom will have to excuse

6    themselves and wait in the rotunda until you are called.  Do

7    not talk with anybody else about this case with the exception

8    of the lawyers.

9              I am going have to rely on you all because I don't

10   know any of the witnesses, so if you see me make a motion

11   towards the door, that means someone has come in that I don't

12   seem to recognize, and if you both will look in that direction

13   to make sure that no witnesses inadvertently come into the

14   courtroom.

15             The other housekeeping matter is, with your

16   permission, I am going to visit with the jury, I am told two

17   issues have arisen.  Three issues.  One is, one of the jurors

18   is nursing and in regards to breaks to take care of that.

19             The second is -- we will be able to fix that fairly

20   easily.  The second issue is, one juror is claiming that he is

21   a business owner now and that this week is going to cause him

22   problems, and so I wish he had said something beforehand, but

23   I am going to visit with him outside of your presence and

24   figure out what that is all about.  If it still turns out to

25   be a problem, I will bring him and you all up to the bench and

1  we will figure this out.

2         And the other problem that surfaces, one of the

3  other jurors is claiming childcare issues, and so I am going

4  to visit with her about what time she thinks she needs to

5  break and we will figure that part out as well.

6         Are all of the jurors back at least?

7         COURT SECURITY OFFICER:  Yes, sir.

8         MR. WOMACK:  Judge, so what is your normal course

9  of, you know, starting at certain time, taking breaks?

10        THE COURT:  So we will always start at 9:00, because

11 we have out-of-town jurors, so I don't want to force them to

12 get up too early.  We would start at 9:00.  I normally break

13 about 5:00, 5:30ish, but that is all sort of dependent upon

14 the witnesses' testimony; if it looks like it is going to wrap

15 up, I prefer to try to finish it and conclude it, and so I am

16 not hard and fast that we will leave right at 5:00 or 5:30,

17 but now depending on what this juror might tell me, that might

18 dictate otherwise.  But that is my normal practice.

19        Okay.  So the defendant is back in the courtroom.

20        MR. WOMACK:  Sir, if we could have about five

21 minutes to read this form to him, the stipulation.

22        THE COURT:  That's fine.  Why don't you all do that.

23 I will visit with the jurors real quick and figure out what

24 the issues are there and then we can regroup.

25        MR. STURGIS:  Your Honor --

1          THE COURT:  Yes.

2          MR. STURGIS:  -- before we leave the bench, may the

3  case agent be excluded from the rule?

4          MR. WOMACK:  We have no objection to that.

5          THE COURT:  And he is excluded.

6          MR. STURGIS:  Thank you.

7          (Brief recess.)

8          THE COURT:  While we are waiting for the jury, I

9  think we have got the issues all taken care of.  We may have

10  to be cognizant of leaving at 5:00, just because of childcare

11  issues that two of them now have, so -- and then another one

12  works a night shift, and so I am going to be respectful of

13  their requests to try to finish up at 5:00.

14          MR. WOMACK:  And, sir, we have signed the

15  stipulation.

16          MR. FRAZIER:  And just for the record, Judge, if I

17  could offer into evidence at this time Government's Exhibits

18  No. 38 and 39, to replace the two exhibits that were not

19  admitted earlier, the lab reports.  I will tender these to

20  your courtroom --

21          THE COURT:  Any objection to the new 38 and 39?

22          MR. WOMACK:  No, Your Honor.

23          THE COURT:  Those are admitted.

24          MR. FRAZIER:  Thank you, Judge.

25          (Jury enters courtroom.)

1          THE COURT:  Please be seated.

2          Members of the jury, now that you have been sworn, I

3   am going give you some preliminary instructions to guide you

4   in the participation of this trial.  It will be your duty to

5   find from the evidence what the facts are.  You alone will be

6   the judges of the facts.  You will then have to apply those

7   facts to the law as the Court gives it to you.  You must

8   follow that law whether you agree with it or not.

9          Perform these duties fairly.  Do not let any bias,

10  sympathy or prejudice that you may feel towards one side or

11  the other influence your decision in any way.  Nothing the

12  Court may say or do during the course of this trial is

13  intended to indicate or should be taken by you as indicating

14  what your verdict should be.

15         The evidence.  The evidence from which you will find

16  the facts will consist of the testimony of witnesses,

17  documents and other items received into the record as exhibits

18  and any facts that the lawyers agree to or stipulate to or

19  that the Court may instruct you to find.

20         Certain things are not evidence and must not be

21  considered by you.  I will list them for you now.

22         One.  Statements, arguments and questions by lawyers

23  are not evidence.

24         Two.  Objections to questions are not evidence.

25  Lawyers have an obligation to their clients to make objections

when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, then you must follow that instruction.

Three. Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.

Four. Anything you may have seen, heard or read outside of the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact, such as the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you may consider both kinds of evidence. It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. I will give you some guidelines for

1    determining the credibility of witnesses at the end of the

2    case.

3          Rules for criminal cases.  As you know, this is a

4    criminal case.  There are three basic rules about a criminal

5    case that you must keep in mind.

6          First, the defendant is presumed innocent until

7    proven guilty.  The indictment brought by the government

8    against the defendant is only an accusation, nothing more.  It

9    is not proof of guilt or anything else.  The defendant

10   therefore starts out with a clean slate.

11         Second, the burden of proof is on the government

12   until the very end of the case.  The defendant has no burden

13   to prove his innocence or to present any evidence or to

14   testify.  Since the defendant has the right to remain silent,

15   the law prohibits you from arriving at your verdict by

16   considering that the defendant may not have testified.

17         Third, the government must prove that the

18   defendant's guilt is beyond a reasonable doubt.  I will give

19   you further instructions on this point later, but bear in mind

20   that in this respect a criminal case is different from a civil

21   case.

22         In this case, the defendant is charged with, one,

23   conspiracy to distribute at least five kilograms of cocaine.

24   That is Count 1 of the indictment.  And two, conspiracy to

25   launder monetary instruments.

1    I will give you detailed instructions on the law at

2    the end of the case and those instructions will control your

3    deliberations and decision, but in order to help you follow

4    the evidence I will now give you a brief summary of the

5    elements of the offense that the government must prove beyond

6    a reasonable doubt.

7    In order to prove Count 1 of the indictment,

8    conspiracy to distribute at least five kilograms of cocaine,

9    the government must prove beyond a reasonable doubt that, one,

10   two or more persons, directly or indirectly, reached an

11   agreement to possess with intent to distribute a controlled

12   substance.

13   Two.  That the defendant knew of the unlawful

14   purpose of the agreement.

15   Three.  That the defendant joined in the agreement

16   willfully, that is, with the intent to further its unlawful

17   purpose.

18   Four.  That the overall scope of the conspiracy

19   involved at least five kilograms of a mixture and substance

20   containing a detectable amount of cocaine.

21   And, five, that the defendant knew or reasonably

22   should have known that the scope of the conspiracy involved at

23   least five kilograms of a mixture and substance containing a

24   detectable amount of cocaine.

25   In order to prove Count 6 of the indictment,

conspiracy to launder monetary instruments, the government

must prove beyond a reasonable doubt, one, that the defendant

and at least one other person made an agreement to commit the

crime of money laundering as charged in the indictment; and,

two, that the defendant knew the unlawful purpose of the

agreement and joined in it willfully, that is, with the intent

to further the unlawful purpose.

Now, a few words about your conduct as jurors.

During the course of the trial, do not speak with any

witnesses or with the defendant or with any of the lawyers in

the case.  Please do not talk with them about any subject at

all.

You may be unaware of the identity of everyone

connected with the case.  Therefore, in order to avoid even

the appearance of impropriety, do not engage in any

conversation with anyone in or about the courtroom or

courthouse.

It is best that you remain in the jury room during

breaks in the trial and do not linger in the hall.  In

addition, during the course of the trial, do not talk about

the trial with anyone else, not your family, not your friends,

not the people with whom you work.

Also, do not discuss this case among yourselves

until I have instructed you on the law and you have gone to

the jury room to make your decision at the end of the trial.

1    Otherwise, without realizing it, you may start forming

2    opinions before the trial is over.

3            It is important that you wait until all the evidence

4    is received and you have heard my instructions on the rules of

5    law before you deliberate among yourselves.  You, as jurors,

6    must decide this case based solely on the evidence presented

7    here within the four walls of this courtroom.

8            This means that during the trial, you must not

9    conduct any independent research about this case, the matters

10   in this case, and the individuals or corporations or -- and

11   the individuals or entities involved in this case.  In other

12   words, you should not consult dictionaries or reference

13   materials, search the Internet, websites or blogs or use any

14   other electronic tools to obtain information about this case

15   or help you decide the case.

16           Please do not try to find out any information from

17   any sources outside the confines of this courthouse.  I know

18   that many of you use cellphones, the Internet and other forms

19   of technology.  You also must not talk to anyone at any time

20   about this case or use any of these tools to communicate

21   electronically with anyone about this case.  This includes

22   your family and friends.

23           You may not communicate with anyone about this case

24   through any means, including your cellphone, e-mail,

25   Blackberry, iPhone, text messaging, Snapchat, Twitter or

1    through any blog or website, including Facebook, Google,

2    Myspace, Linkedin or Youtube.

3         You may not use any similar technology of social

4    media, even if I have not specifically mentioned it here.  I

5    expect you will inform me as soon as you become aware of

6    another juror's violation of these instructions.

7         A juror who violates these restrictions jeopardizes

8    the fairness of these proceedings and a mistrial could result

9    and would require the entire process to start over.

10        I am going to deviate from the script here and say

11   two matters.  One is, I want you to continue wearing your

12   juror buttons at all times while about the courthouse.  That

13   will let everyone know here that you are a juror and they

14   should not be having conversations with you.

15        This building was the 1968 World's Fair building and

16   it was never meant to be a courthouse.  And so, unavoidably,

17   you are just going to run into people going in and out of this

18   building.  And so if you will continue to wear that button at

19   all times, that will let everybody know to keep their distance

20   from you.

21        It could be a completely innocent conversation.  You

22   might be talk about how hot it is starting to get for the

23   summer, but sort of put your mind in the mindset of the other

24   side.

25        If they saw you talking with someone, they are

1    probably wondering:  What are they talking about?  What is

2    going on?  So not only have you sworn to be fair, we want to

3    make sure that the impartial -- or the partiality of you all

4    as jurors is not questioned.  So please don't talk to anyone

5    else other than amongst yourselves.

6          The Internet.  Now, the other thing I want to say

7    is, I have had instances of past cases where jurors have

8    engaged in misconduct.  Please do not do any independent

9    research.  This is no time to all of a sudden start typing in

10   phrases or words or names that you have heard in this case and

11   start trying to find out on your own.

12         One thing that is great about being a juror, there

13   is no homework required.  Okay?  Everything you need to know

14   about this case you will hear from the witness stand or you

15   will receive from the evidence that I have admitted in this

16   trial.

17         Do not do any type of independent homework because

18   that will just cause a mistrial of this case and everybody's

19   attendant time and effort and resources would have been

20   wasted, and then you are going to leave me with the

21   uncomfortable position of having to figure out whether I need

22   to sanction you for violating my court order.  Please don't

23   put me in that predicament.  We all don't want to be there.

24         I am now going to give you a road map to help you

25   follow what will happen over the entire course of this trial.

1     First, the government will make an opening

2 statement, which simply is an outline to help you understand

3 the evidence as it is admitted.  Next, the defendant's

4 attorney may but does not have to make an opening statement.

5 Opening statements are neither evidence nor arguments.  The

6 government will then present its witnesses and the counsel for

7 the defendant may cross-examine them.

8     Following the government's case, the defendant may,

9 if he wishes, present witnesses whom the government may

10 cross-examine.  If the defendant decides to present evidence,

11 then the government may introduce what is called rebuttal

12 evidence.

13     After all the evidence is in, the attorneys will

14 present their closing arguments to summarize and interpret the

15 evidence for you and the Court will instruct you on the law.

16 After that, you will retire to deliberate on your verdict.

17     The last thing I want to say off the script is about

18 note taking.  I don't believe this case is going to be overly

19 complicated, but there are going to be a number of witnesses

20 and there are going to be a number of exhibits.  If you want

21 to keep notes, you may.  I will caution you about your note

22 taking, though.

23     Sometimes we get so involved in our note taking,

24 whether head to the pad, that you sometimes forget what your

25 main job is, which is to judge the credibility and

1    believability of the witnesses, and so I will caution you

2    about excessive note taking and getting too wrapped up in the

3    note taking.

4           But if you think it will be of some assistance to

5    you, one of the courtroom security officers can get you a

6    notepad that you can leave here at the end of the day.  You

7    will not take that home, and if you think it will be helpful

8    to you, you may take notes.

9           I will give you further instructions on how you are

10    to use your notes at the end of this case and what the effect

11    of your note taking may be, but if you want a notepad, just

12    let one of these court security officers know and they will

13    get a pad for you.

14           And with that, we turn to opening statements.

15           Counsel.

16           MR. STURGIS:  May it please the Court, Counsel.

17           Good afternoon, ladies and gentlemen.  This is what

18    is called opening statements.  This is my chance or my

19    opportunity to give you a slight overview of the evidence that

20    I anticipate will come in in the next several days.

21           I anticipate over the next several days that you

22    will hear about the defendant Reymundo Villarreal-Arelis's

23    involvement in a large-scale drug trafficking and money

24    laundering organization.

25           I anticipate that you will hear for the better part

1   of the last 20 years that the defendant, Mr. Villarreal, and

2   his brothers and other family members, who were collectively

3   known as Los Piojos, were heavily involved in the

4   transportation, distribution of thousands of kilograms of

5   marijuana, thousands of kilograms of cocaine, and the

6   laundering of millions and millions of dollars in drug

7   proceeds.

8           I anticipate that you will hear that how in the

9   nineties the Villarreals became involved in the transportation

10  of marijuana and how that began to escalate in the 2000s into

11  the transportation and distribution of large amounts of

12  cocaine.

13          As we can all imagine, this generally generates

14  millions of dollars of drug proceeds.  I anticipate that you

15  will hear how those drug proceeds were spent and how they were

16  used.  But to understand this, you have to understand that

17  this case is truly about a family business.

18          The Villarreal brothers, which included Reymundo and

19  several of his other brothers, along with nephews, were

20  involved in the transportation and distribution of these

21  narcotics.  Each served a role and each held a purpose in

22  order to make this successful.

23          You will hear that over the years, the last better

24  part of 20 years, that these individuals were responsible for

25  the transportation and smuggling of many, many kilograms of

cocaine from Mexico into the United States and that those
narcotics were distributed in order to make the money.

          The reason that these individuals were successful
with this for so long is that they had a unique -- or they had
an ownership of a unique piece of property that is situated
along the Rio Grande River.

          It is in an area that is close to a place called
Valadeces, Mexico, which is down just to the west of McAllen,
Texas, and that they had access to the river directly from
that property in which it made it very easy for them to
smuggle the cocaine and marijuana into the United States,
where those narcotics were then taken to various locations and
stashed.

          After they were stashed and the transportation was
present and ready to go to move that cocaine or the marijuana
up northward, it would then be transported to Houston, Texas,
sometimes San Antonio, Texas, various destinations and then
sold.

          You will hear from the witnesses how much money it
took to wire this cocaine, acquire the marijuana, how much
money was generated from the sale of this cocaine and
marijuana.

          You also will hear how the drug proceeds were used
not only to purchase things.  You will hear a lot about horses
in this case and high-dollar horses that the defendant -- that

1   the defendant and his brothers and other relatives purchased,

2   but you will hear about properties and vehicles.  You will

3   hear about how this money was spent.

4           You will hear, as the Judge stated earlier, that

5   there are -- well, there are two types of evidence.  There is

6   direct evidence and circumstantial evidence.  I anticipate

7   that you will hear from witnesses who are direct -- or

8   witnesses that will provide direct evidence, who will come

9   into this courtroom and tell you:  I dealt with the defendant.

10  I know the defendant and I know what he did.

11          And those witnesses will tell you what those

12  individuals did.

13          You will also get circumstantial evidence.  You will

14  have the opportunity to view many documents.  Some of those

15  documents include bank statements.  Some of those documents

16  include the purchasing of horses, the purchasing of

17  properties, so you will get both types of evidence presented

18  to you.

19          You will hear from these witnesses that as the

20  nineties moved on and the Villarreals began to be successful

21  in the narcotics trafficking world that they then moved into

22  large-scale cocaine trafficking.  You will hear from

23  individuals who will tell you they sold the cocaine directly

24  to the Villarreals in Mexico and that the Villarreals then

25  moved the cocaine into the various destinations in the United

1    States.

2            You will hear the witnesses tell you how much they

3    sold the cocaine to the Villarreals for.  You will also hear

4    from those witnesses that the Villarreals, aside from just

5    doing their own cocaine, were also in the transportation

6    industry.

7            They essentially were UPS, if you will, for the

8    narcotics traffickers, that they made money by transporting

9    other people's cocaine into the United States.

10           So at the end of the trial, I think you will have a

11   full-blown view of the Villarreals, including Reymundo

12   Villarreal's role in this organization.  I tend -- I believe

13   that you will hear how the Villarreals, aside from just using

14   this money to buy things, such as horses and vehicles and

15   properties, you will hear from people that are in the drug

16   trafficking industry, if you will.

17           You will hear how -- they will tell you that:  This

18   is how it works.  They are going to tell you that after you

19   sell the cocaine and you make your money, you then take some

20   of that money back and that you then put it in the bank, in

21   essence; not the real bank, but to keep it there, because what

22   are you going to do?  You are going to reinvest it in other

23   loads of cocaine.

24           The old phrase is, it takes money to make money.

25   Well, that is what these witnesses are going to tell you.

1    Once you become successful, then you take some of that money

2    that you made and you reinvest it in the next load, maybe a

3    bigger load, and it just continues to cycle.

4         You will hear how that money is used to promote the

5    drug trafficking industry.  If they were not successful, there

6    is no money coming back, and thus it is harder to buy another

7    load of cocaine to move into the United States.  It is just a

8    cycle, and it takes money to make money.

9         Finally, I anticipate that you will hear from the

10   witnesses that once you start making money, you most likely

11   don't want anybody to know what you are doing to make the

12   money.

13        We will have witnesses describe to you how this

14   money was used to purchase various things, such as horses and

15   properties, and the witnesses will tell you that in the

16   industry, you do not put that property or those assets into

17   your name.

18        You are going to hear how you do certain things to

19   make sure that law enforcement cannot find out about this.

20   You will hear about structuring, structuring from the

21   witnesses.  They will tell you that, in essence, it comes in

22   several forms, but probably what you will hear most about is

23   taking cash, cash that is generated from the sale of these

24   drugs, and you will hear how they take the cash -- and some of

25   you may have already heard this -- not deposit more than

1    $10,000 at a time.

2         You will hear from the witnesses how they were

3    instructed by the Villarreals:  Do not deposit more than

4    $10,000 at a time.  And that is structuring, doing it so that

5    you can conceal the ownership of that property.

6         You will hear how you put it in nominee names, how

7    you take these assets and you will put it in other people's

8    name so that it makes it much more difficult to determine who

9    truly owns that property.

10         You will hear in this case from the witnesses that

11    the Villarreals, including Reymundo Villarreal, had many

12    horses.  These are high-dollar -- some of these are very

13    high-dollar horses.  You will hear how they were bought with

14    cash and how they were -- how the payments were structured.

15    You will hear how these horses, the ownership was put in other

16    people's names.

17         You will hear the same about property as well.  In

18    the end, ladies and gentlemen, I think after you get a

19    full-blown picture, you will learn, in short, that Reymundo

20    Villarreal and his brothers, collectively known as Los Piojos,

21    have been involved in the large-scale trafficking of

22    narcotics.

23         You will learn how they were successful.  You will

24    learn what they did to be successful and you will learn what

25    they did with the profits that they reaped from this venture.

1    In the end, I anticipate that after hearing all the evidence

2    that you will find Reymundo Villarreal guilty of both counts.

3         Thank you.

4         THE COURT:  Thank you.

5         Mr. Womack.

6         MR. WOMACK:  Thank you, Your Honor.  Your Honor,

7    government counsel.

8         Ladies and gentlemen, I already introduced myself

9    and my co-counsel, Mr. Villarreal.  I want to tell you, I am a

10   retired lieutenant colonel of the Marines.  I was an infantry

11   officer and later a judge advocate.

12        About halfway through my 20-year career in the

13   Marine Corps, I learned that my hearing was going bad.  I

14   don't need a hearing aid yet, but my hearing is a little bit

15   worse than normal, so one of the consequences is, I will tend

16   to talk loud.

17        Some people consider that rude.  I am not being rude

18   to you.  It is just because I don't hear as well perhaps as

19   you do, I will tend to talk louder.

20        The other thing is, I may have to ask that a witness

21   repeat something.  I am not doing it for dramatic effect, I

22   promise you, and I won't do it very often, but only if I can't

23   hear something.

24        I want to talk to you real quick about this case.

25   And as Mr. Sturgis just said, the government has charged that

Los Piojos is a drug trafficking organization.  Some of you speak Spanish, and you know that Los Piojos means fleas.  You are going to learn during the testimony of the witnesses that in this small town in northern Mexico near the Rio Grande, the Villarreal family lived, several generations.

Reymundo Villarreal, his parents, his parents lived there, he and all of his brothers, and there are a lot of them, his son, his nephews, a lot of them, their wives and then their own children.

There are a lot of Villarreals in that small town. Everywhere you went, there was a Villarreal, so they were called "Los Piojos" because they were so common in the area. Nothing sinister about it, and you will hear that from the government also.

What else are we going to hear?  You are going to hear -- or you are going to see that the government basically charged everybody named Villarreal from the generation of Reymundo and his brothers on down, again, nephews, even a wife and a number of people.

But they cast their net too large.  This is a classic example of the government alleging guilt by association.  If one, two, three, four, six or seven Villarreals are involved in drug trafficking, and they were, the government assumption was, then all of them must have been, including Reymundo.

          So watch for evidence of Reymundo Villarreal, this
gentleman here, being involved in anything illegal.  You are
going to hear of a number of Reymundo Villarreals.  One that I
think you will hear about is his father, not involved in drug
trafficking at all.

          You will hear about Reymundo, R-e-y-m-u-n-d-o, who
sits here in court, and we will tell you he is not involved in
drug trafficking.  You will hear about his son Raymundo, Jr.
And he spells his R-a-y-m-u-n-d-o, like his grandfather.  And
he got involved in money laundering, it looks like, and did
some things with structuring and what have you.

          Let's talk about the family.

          THE INTERPRETER:  The interpreter would kindly
request that you speak louder or use the microphone, Counsel,
please.

          MR. WOMACK:  I will gladly talk louder.

          THE INTERPRETER:  Thank you.

          MR. WOMACK:  Reymundo, our Reymundo Villarreal, has
a third grade education.  He lived on a farm.  He didn't need
a college degree, high school degree.  He works.  He has
worked all of his life.  And when he married his beautiful
wife Yadira, they had children, Raymundo, Jr.  He has
daughters.

          And although he did not have much education, he knew
how important it could be if you are going to better yourself

and not work as hard as he does.  So his family built a home,

a modest middle-class home in the McAllen area in America, and

you are going to hear that his wife and the children live

there.

That way, they could go to American schools.  But

Reymundo lived in Mexico on the farm.  You will find out that

his routine was that he would go to -- he would come to

America, usually on a Friday, have dinner with his family,

spend the night.  The next day, he goes back to the farm.

Why?  Farming is a seven-day-a-week job much of the year.  But

he would come to America and visit his family hopefully once a

week.

You are going to hear that his brothers and nephews

had the trappings of success, which the government claims

comes from drug trafficking.  I think they will be showing you

pictures of their magnificent homes, and maybe pictures of

their Range Rovers and Cadillacs and what have you.

They lived really well and they all lived in

America.  But Reymundo drove a Ford ranch truck, a nice truck,

but a Ford pickup.  You will have -- you will get to see a

picture of his home in Mexico and his home in America.  He

didn't live like his brothers, because he didn't have this

wealth that they had.

He worked for his money and he stayed away from

them.  Oh, he would see them when they would go visit their

1   parents.  They would honor their parents, but he wasn't a part

2   of that part of that family business, if you will.

3          Now, it is easy to say that, but as we mentioned,

4   the government has the burden of proof in this case.  When

5   they are presenting their case, look at the evidence.  See

6   what evidence they bring you that you find credible, that you

7   find believable.

8          They have already apologized for the fact that they

9   won't have any kind of forensic evidence.  Look if they have

10  any fingerprints, any fingerprints on anything illegal, even

11  one that would match Reymundo Villarreal.  Look for DNA

12  evidence.

13         Look for paragraphs of him with piles of drugs or

14  piles of money or doing anything illegal, phone conversations,

15  texts, anything.  See if what they have, other than the fact

16  that he is a Villarreal-Arelis, which he is, that his brothers

17  and some of his nephews, even his own son, got involved in

18  things in America that they shouldn't have done, but is there

19  any evidence that points to Reymundo Villarreal?  Look for

20  that.

21         His Honor told you, you can take notes.  If you see

22  anything like that, it is important, so write it down.  If you

23  see anything that points to Reymundo Villarreal-Arelis being

24  involved, make special notice of that.

25         We all have a hand.  The fingers on our hand are

1    connected forever and forever, unless we have some kind of

2    emergency where something is amputated; our fingers are always

3    a part of our hand.  Like them or not, they are always a part

4    of that hand.

5          But just like brothers in the Villarreal family,

6    they can all operate independently.  One doesn't have to move

7    when the others do.  If some of your fingers were doing

8    something that if they shouldn't, you couldn't really blame

9    every finger, unless you were telling them to operate the

10    same.

11          Reymundo Villarreal was a member of this large

12    family, but look for any evidence at all that he did anything

13    illegal.  We all have heard of the passage that we are not our

14    brother's keeper.  Reymundo Villarreal is not his brother's

15    keeper either.

16          Thank you.

17          THE COURT:  Thank you.  And with that, your first

18    witness.

19          MR. FRAZIER:  We will call Jesus Enrique

20    Rejon-Aguilar, Your Honor.

21          THE COURT:  Is he in the hallway or where?

22          MR. FRAZIER:  He is with the Marshal Service.

23          THE COURT:  Do the marshals have a list of your

24    witnesses?

25          MR. FRAZIER:  Yes, they do.  I verified that at

1   lunch.

2          COURTROOM DEPUTY:  Could you raise your right hand,

3   please.

4          You do solemnly swear that the testimony which you

5   may give in the case -- do you understand?

6          THE COURT:  He needs a translation.

7          (Oath administered to the witness

8          (through the interpreter.

9          THE WITNESS:  I do swear.

10                    *-*-*-*-*-*-*-*

11                 DIRECT EXAMINATION

12  BY MR. FRAZIER:

13  Q.  Good afternoon, sir.  Would you please introduce yourself

14  to the ladies and gentlemen of the jury.

15         MR. WOMACK:  Your Honor, if I can, we need to make

16  it so that Mr. Villarreal can also hear the testimony.  I

17  think if the interpreter wears the microphone.  Oh, I am

18  sorry.  We have two interpreters.  I didn't realize that.

19         THE INTERPRETER:  I will try and speak up loudly, if

20  that will work.

21         MR. WOMACK:  Well, only if you are speaking in

22  Spanish.

23         THE INTERPRETER:  The witness will speak in Spanish

24  and I will speak in English.

25         MR. WOMACK:  Which does us no good, Your Honor.

1          THE INTERPRETER:  I am sorry, Your Honor, that we

2   are not clear on the procedures here in San Antonio.  I can

3   interpret simultaneously, so that the defendant hears

4   everything, unless madam interpreter would prefer to do

5   consecutive.  Whatever you would like.

6          THE INTERPRETER:  We do consecutive here.  We don't

7   do simultaneous, so --

8          THE INTERPRETER:  Okay.  All questions will go --

9   English questions, there will be a pause, and then it will go

10  into Spanish, and they will be out loud and the defendant will

11  be able to hear.

12         MR. WOMACK:  Thank you.

13         THE INTERPRETER:  The defendant will be happy to

14  hear what the witness says from his mouth in Spanish.

15         MR. WOMACK:  That would be great, yes.

16         THE INTERPRETER:  Because he will have the

17  microphone here.

18         MR. WOMACK:  That's great.  That's perfect.

19         THE INTERPRETER:  Okay.  May the interpreter

20  instruct the witness, Your Honor?

21         THE COURT:  Yes.

22  BY MR. FRAZIER:

23  Q.  Would you please introduce yourself to the ladies and

24  gentlemen of the jury.

25  A.  Good afternoon, Your Honor.  Good afternoon, members of

1    the jury.  Good afternoon to all those present here.  My name

2    is Jesus Enrique Rejon-Aguilar.

3    Q.  Do you have a nickname, sir?

4    A.  Yes, sir.

5    Q.  What is that?

6    A.  Mamito Z-7 Caballero.

7    Q.  And where are you from, sir?

8    A.  Sabancuy, Campeche, Mexico.

9    Q.  And how old a man are you, sir?

10   A.  Forty-one years old.

11   Q.  When you were a young man or a young adult, did you join

12   the Mexican military?

13   A.  That's true.

14   Q.  And what did you do with -- when you were in the Mexican

15   military, what role did you play or what unit were you in?

16   A.  I incorporated myself into the Special Forces.

17   Q.  And how long were you a member of the Special Forces

18   before you left the military?

19   A.  For six years.

20   Q.  And during a portion of that time that you were in the

21   Special Forces, did you serve as a police officer in a

22   particular region of Mexico?

23   A.  That is true.

24   Q.  Where was that?

25   A.  In Tamaulipas and Coahuila.

1  Q.  And how long were you a police officer?

2  A.  Approximately two years.

3  Q.  After your term as a police officer, did you remain with

4  the Mexican Special Forces?

5  A.  They reincorporated and I disattached myself.

6  Q.  What did you do after you disattached yourself from the

7  military?

8  A.  I got into drug trafficking.

9  Q.  And who -- how did you get involved in drug trafficking?

10  A.  Through a friend.  I involved myself with the El Gulfo

11  Cartel in drug trafficking.

12  Q.  All right.  And when you became a drug trafficker with the

13  Gulf Cartel, did you meet the leadership or become involved

14  with the leadership of the Gulf Cartel?

15  A.  I am sorry.  I did not understand the question.

16  Q.  Who was the friend that you -- that got you involved in

17  narcotics trafficking with the Gulf?

18  A.  Arturo Guzman de Cena.

19  Q.  And at some point, did you become involved -- were you

20  recruited to do anything in particular for the Gulf Cartel?

21  A.  That's true.

22  Q.  And what was that?  If you would tell the jury, please,

23  sir.

24  A.  I was involved in being the guard for Cardenas Guillen and

25  also for guarding the shipments.

1    Q.  All right.

2    A.  The drug loads.

3          MR. FRAZIER:  Twenty-three, please.

4    BY MR. FRAZIER:

5    Q.  I am about to show you a picture, sir, and see if -- that

6    screen that is in front of you, sir, if you could look at that

7    picture and I will ask you if you can identify who that is a

8    picture of.

9    A.  Cardenas Guillen, that's true.  He is the leader of the

10   Gulf Cartel.

11   Q.  And when was it you were recruited to be a bodyguard and

12   to control the drug shipment routes?

13   A.  1999.

14   Q.  And did Mr. Cardenas Guillen, did he recruit other members

15   that were former military, members that had been in the

16   military to help him, to assist him?

17   A.  That's true.

18   Q.  How many others did he recruit?

19   A.  In all, it was 12.

20   Q.  And of those 12 that were recruited by Osiel Cardenas to

21   work with the Gulf Cartel, did they get a name?  Were they

22   given a name?

23   A.  That's true.

24   Q.  And what was the name, sir?

25   A.  Zetas.

1    Q.  So were you one of the original members of the Zetas?

2    A.  That's true.

3    Q.  And you, I believe you indicated earlier that you go by or

4    one of your nicknames is Z-7; is that correct?

5    A.  That's true.

6    Q.  Where did the numbers come from?  How were numbers

7    assigned to the Zeta membership?

8    A.  As we were arriving.

9    Q.  As you were arriving.  Thank you.  Now, after you joined

10    the Zetas or, rather, after the Zetas joined with the Gulf

11    Cartel, can you describe for the jury what you did for the

12    Gulf?  You indicated that you were a bodyguard and protected

13    drug routes.  Could you tell the jury some of your jobs?

14    A.  In charge of the plazas.

15    Q.  Yes.

16    A.  And also the accountant for the company, as to the plazas.

17    Q.  All right.  Let me ask you first of all, because the jury

18    may not understand, what is a plaza?

19    A.  A plaza is an area which corresponds to the city or to the

20    area of the city that corresponds to that city.

21    Q.  And when you were in charge of the plazas, what did that

22    mean?

23    A.  I was the responsible one.  I was in charge.

24    Q.  In charge of what?  So the jury understands.

25    A.  Everything that had to do with drug traffic.  Everything

1   that had to do with drug trafficking.  Everything had to be

2   reported.

3   Q.  All right.  Now, you also indicated when you answered the

4   question earlier that you -- that the things that were done

5   were done for the company.  Who is "the company"?  If you

6   could describe that for the jury, please, sir.

7   A.  The organization, that is the company.  The organization

8   that everybody integrates.

9   Q.  That would include the Gulf and the Zetas?

10  A.  That's true.

11  Q.  And when you were responsible for the plazas initially,

12  how many plazas were you responsible for?

13  A.  The plaza of Miguel Aleman, which -- from the city of Diaz

14  Ardaz to the city of Guerrero.

15  Q.  And did you also serve as an operator for the company?

16  A.  That's true.

17  Q.  Tell the jury what an operator is.

18  A.  In charge of the introduction of drugs into the area, to

19  send it in, to have -- or to send it, for it to be in good

20  condition, to make sure that we have all of the equipment,

21  everything necessary, weapons, personnel.

22  Q.  And, sir, what drugs are we talking about that the company

23  was moving?

24  A.  Cocaine, marijuana and crystal methamphetamine.

25  Q.  And can you give the jury some idea of the quantities, the

1  sizes, the amounts of the cocaine and marijuana that the

2  company was moving?

3  A.  It all depended on the fluidity of where it was obtained.

4  For example, Guatemala, it could be five tons.  It could be

5  ten.  It could be 15.

6  Q.  Of either marijuana or cocaine?

7  A.  Marijuana, cocaine would be much more.  I don't know.

8  Fifty, 60 tons.  50 or 60 tons of marijuana.

9  Q.  Now, eventually, within the Gulf and Zeta company, did you

10  rise through the ranks?  Were you promoted?  Did you get

11  greater responsibility over time?

12  A.  That's true.

13  Q.  Can you tell the jury what those new responsibilities were

14  as you worked your way through the company?

15  A.  We had all of the accounting -- or I had all of the

16  accounting of all of the states that we controlled, which were

17  parts of Tamaulipas, Coahuila, Zacatecas, San Luis Potosi,

18  Veracruz, Tabasco, Campeche, Quintanaro, part of Oaxaca, and

19  part of Durango.

20  Q.  Were there rival cartels that you or members of the

21  company dealt with?

22  A.  Yes.  That is true.

23  Q.  Who was the main rival?

24  A.  The Sinaloa Cartel.

25  Q.  And did the company and the Sinaloa Cartel fight battles

1   for control of various routes or regions in Mexico?

2   A.  That's true.

3   Q.  And where were most of these battles fought?

4   A.  In the different states that they controlled.

5   Q.  Did that include the area of Nuevo Laredo?

6   A.  That's true.

7   Q.  So at this point when you are -- when did you reach the

8   status where you were responsible for all of the accounts in

9   the states of Mexico?  Approximately what year was that?

10  A.  Approximately in 2007.

11  Q.  Now, as a part of your duties, as a part of your job, did

12  you and other members of the Zetas or the Gulf engage in acts

13  of violence?

14  A.  That's true.

15  Q.  Would that include kidnapping and torture of members of

16  your own cartel and that of other cartels?

17  A.  That's true.

18  Q.  And have you murdered people, killed people on orders from

19  your -- from people above you as a cartel member?

20  A.  That's true.

21  Q.  How many?

22  A.  Approximately 20.

23  Q.  And have you yourself issued orders for the execution of

24  members of either other cartels or your own cartel?

25  A.  That's true.

1    Q.  And the orders that you gave to kill others, did that come

2    from someone above you?

3    A.  That's true.

4    Q.  Approximately how many people did you order the execution

5    of?

6    A.  About ten people.

7    Q.  And if you had failed to carry out those orders, either

8    the ones you personally killed or the ones that you

9    received -- that you passed on, what would have happened to

10   you?

11   A.  They would have killed me.

12   Q.  At the point that you reached the level of supervising all

13   of the states, what would be the equivalent military rank that

14   you had within the Zetas and the Gulf Cartel?

15   A.  General.

16   Q.  Now, looking at the picture of Osiel Cardenas that you

17   identified earlier, did he at some point get arrested by

18   Mexican police?

19   A.  That's true.

20   Q.  Do you remember when that was?

21   A.  Approximately in 2002.

22   Q.  At some point, were you part of a plan to break him out of

23   prison?

24   A.  That's true.

25   Q.  Did the -- did you actually break him out of prison?

1    A.  No.

2    Q.  What happened?

3    A.  When the operative was about to occur, the pilot did not

4    arrive.  It was a pilot who was contracted by the Arellanos.

5    Q.  So it did not occur?  The breakout did not occur?

6    A.  That's true.

7    Q.  Now, have you also killed other men in battle with rival

8    cartels?

9    A.  That's true.

10   Q.  Do you know how many?

11   A.  I don't have any idea.

12   Q.  All right.  Now, when were you -- were you eventually

13   arrested?

14   A.  That's true.

15   Q.  When did that happen?

16   A.  2011.

17   Q.  And were you extradited then to the United States?

18   A.  That's true.

19   Q.  There are charges pending here against you?

20   A.  That's true.

21   Q.  And where were those charges pending?

22   A.  In the District of Columbia.

23   Q.  And did you enter a plea to those charges?

24   A.  That's true.

25   Q.  And what did you plead guilty to?

DIRECT - JESUS ENRIQUE REJON-AGUILAR

1    A.   Conspiracy to bring in five kilos of cocaine and one ton

2    of marijuana.

3    Q.   And have you been sentenced on those charges yet?

4    A.   No.

5    Q.   Do you have any charges pending in Mexico on you?

6    A.   That's true.

7    Q.   And what are those charges?

8    A.   Organized crime.

9    Q.   Was it narcotics trafficking?  Was the organized crime

10   narcotics trafficking?

11   A.   That's true.

12   Q.   Okay.  And at some point after your plea of guilty, did

13   you enter into a cooperation agreement with the prosecutors or

14   the U.S. Attorney's Office or whatever it was within the

15   District of Columbia?

16   A.   The only agreement I have is to tell the truth.

17   Q.   Right.  But you have an agreement with the prosecutors

18   there to cooperate and to testify truthfully?

19   A.   Yes.  To tell the truth.

20   Q.   How many times have you testified previously, sir?

21   A.   Three times.

22   Q.   And where were those located at?  Where did you testify?

23   A.   Once in Washington, D.C. and twice in Austin.

24   Q.   And have any promises been made to you by any prosecutors

25   concerning your sentence?

1    A.  No, sir.

2    Q.  And do you hope that your cooperation will help you with

3    your case that is pending in Washington before a federal

4    judge?

5    A.  That's true.

6    Q.  Now, sir, did you ever use drugs, cocaine, marijuana, any

7    type of controlled substances?

8    A.  Cocaine.

9    Q.  How long did you use cocaine?

10   A.  For five years.

11   Q.  Now, during your time with the Zetas and the Gulf Cartel,

12   did you come to know a group known as Los Piojos?

13   A.  That's true.

14   Q.  When did you first come to learn of Los Piojos?

15   A.  In '97.

16   Q.  And how was that?

17   A.  I was a member of the judicial police and they were

18   trafficking.

19   Q.  And where was that at?  Where were you a member of the

20   judicial police at?

21   A.  I was in charge in the city of Diaz Ordaz.

22   Q.  And what type of trafficking were you investigating them

23   for?

24   A.  Marijuana trafficking.

25   Q.  Okay.  Do you know what type of quantities of marijuana

1   were being trafficked by them?

2   A.  According to the information, it was more than one ton.

3   Q.  Were you ever able to do anything, to catch any members of

4   the smuggling group?

5   A.  No, sir.

6   Q.  Were there particular members of Los Piojos that you were

7   focusing on in your investigation?

8   A.  That's true.

9   Q.  Which ones?

10  A.  Gilberto Villarreal.

11  Q.  Any other?

12  A.  And Francisco Villarreal.

13  Q.  I will show you some pictures up on your monitor.  Look at

14  the pictures, coming up here in just a second.  The first one

15  will be picture number 2.

16          Do you recognize that person?

17  A.  That's true.

18  Q.  Who is that?

19  A.  Gilberto Villarreal.

20  Q.  And Government's Exhibit No. 3, which is about to come up,

21  I will ask you to look at that.  Do you recognize that person?

22  A.  That's true.

23  Q.  Who is that?

24  A.  Francisco Villarreal.

25  Q.  Now, at that time, were those the only two members of the

1    Villarreal family you knew that you were investigating?

2    A.  That's true.

3    Q.  When you left the military, did you -- was it because you

4    separated from service or did you just leave?  In other words,

5    were you a deserter or did you get out of the military, you

6    know, regularly?

7    A.  I deserted.

8    Q.  Now, where did the name "Zeta" come from?

9    A.  Osiel Cardenas Guillen, well, he used to say that we were

10   his shoes, zapatos, so he needed shoes to walk with and we

11   were his shoes.

12   Q.  Okay.  And that's where the letter Z or Zeta --

13   A.  That's true.

14   Q.  When you started working for the cartel, did you meet

15   members of the Villarreal family again?

16   A.  That's true.

17   Q.  And who did you meet again when you were with the Gulf?

18   A.  I met Gilberto Villarreal, Pancho or Francisco Villarreal,

19   Juan, Mundo, Luis and two others who have already -- who had

20   already passed away.

21   Q.  And where did you meet them at?  When was that?

22              THE INTERPRETER:  I am sorry?

23   BY MR. FRAZIER:

24   Q.  Where did you meet them at and when was that?

25   A.  It was at a ranch that I had met them, a ranch that I was

1   able to go to.

2   Q.  Was it their ranch?

3   A.  That's true.

4   Q.  Please explain to the jury the circumstances of how you

5   got to know them and how you got to their ranch.

6   A.  In Mexico, I had a confrontation with the Special Forces,

7   the military there, and they blocked all my exits.  It was

8   through Samuel Flores Borrego, Metro Tres.  It was with his

9   help that I was able to get out of there.

10  Q.  Okay.  Did anyone else help Samuel Borrego Flores help

11  you?

12  A.  Yes.  The Villarreals helped me to get out of there.

13  Q.  All right.  And how did they help get you out of there?

14  A.  They knew all the pathways, even to get to their own

15  ranch.

16  Q.  All right.  And who were the Villarreals that helped you

17  escape that situation?

18  A.  At that time, I saw Juan, Gilberto and I saw Luis.

19  Q.  Okay.  And so --

20          MR. FRAZIER:  I am sorry.  Number 4.  Excuse me.  4.

21          Do you see --

22          I am sorry.  Are you ready, ma'am?  Are you ready?

23  BY MR. FRAZIER:

24  Q.  Do you recognize the photograph, Number 4?

25  A.  Yes.

1  Q.  And who is that?

2  A.  Juan Villarreal.

3  Q.  All right.  Do you recognize that person?

4  A.  Yes.

5  Q.  Who is that?

6  A.  I know him as Nune, but I don't know his name.

7  Q.  What is his relationship to the brothers that you

8  identified earlier?

9  A.  I know that he is their nephew, but I don't know whose son

10  he is.

11  Q.  All right.  After you -- did you arrive at their ranch?

12  A.  Yes.

13  Q.  Then when you got to the ranch, did you come to know other

14  members of the Villarreal family?

15  A.  Yes.

16  Q.  And who were those individuals?

17  A.  I met Reymundo Villarreal, yes.

18  Q.  Do you see Reymundo Villarreal here in the courtroom

19  today?

20  A.  Yes.

21  Q.  Would you please point him out for the jury?

22  A.  Yes.  He is the man over there with the purple shirt.

23  Q.  Okay.  Starting over here, number one and number two,

24  number three, number four --

25  A.  The second one.

1    Q.  All right.

2            MR. FRAZIER:  May the record reflect that the

3    witness has identified the defendant?

4            THE COURT:  So noted.

5            MR. FRAZIER:  Thank you.

6            And bring up picture number 1, please.

7    BY MR. FRAZIER:

8    Q.  Is that another photograph of the defendant?  Is that a

9    photograph of the defendant?

10   A.  Yes.

11   Q.  Thank you.  Now, how much time did you spend at the ranch,

12   their ranch?

13   A.  Three months, approximately.

14   Q.  And when was this?  What year?

15   A.  2004, approximately.

16   Q.  And did you know or did you have any knowledge of the

17   Villarreal family, the Piojos moving or trafficking cocaine

18   and marijuana for the company?

19   A.  Yes.

20   Q.  When did you come to know that they were transporting

21   drugs for the company?

22   A.  In 2003, approximately, through Samuel Flores Borrego.

23           MR. FRAZIER:  Would you pull up picture 24, please.

24   BY MR. FRAZIER:

25   Q.  Do you recognize that photograph?

1    A.  Yes.

2    Q.  Who is that?

3    A.  Samuel Flores Borrego.

4    Q.  And could you tell the jury, please, how much cocaine

5    and/or marijuana the Villarreal brothers or the Piojos were

6    moving for the company?  Cocaine or marijuana.

7             MR. WOMACK:  Your Honor, we object, only -- to lay a

8    foundation for how he would know this, other than just being

9    told that by --

10            THE COURT:  Ask the predicate question.

11            MR. FRAZIER:  Sure.

12   BY MR. FRAZIER:

13   Q.  Were you responsible for the cocaine and marijuana that

14   was being moved by the company, by the Villarreals?

15   A.  My responsibility was to know what was being moved.

16   Q.  And did you know if they were -- what was being moved and

17   who was moving it?

18   A.  Yes.

19   Q.  So could you tell the ladies and gentlemen of the jury how

20   much cocaine and marijuana the Piojos were moving for the

21   company?

22            MR. WOMACK:  Again, Your Honor, it would appear that

23   his source of information is Borrego.

24            THE COURT:  That's not the way I understood it.

25   That is overruled.

1    BY MR. FRAZIER:

2    Q.  You can answer the question.

3            THE INTERPRETER:  Counsel, would you repeat the

4    question, please.

5            MR. FRAZIER:  Sure.

6    BY MR. FRAZIER:

7    Q.  How much marijuana and cocaine were the Piojos moving for

8    the company?

9    A.  Okay.  For cocaine, it was between 300 to 500 kilos of

10   cocaine, and that was the cocaine that belonged to Osiel

11   Cardenas and also Costilla Sanchez.

12           MR. FRAZIER:  Twenty-five, please.  I am sorry.

13   That's not correct.  Twenty-five.  Try 26.

14   BY MR. FRAZIER:

15   Q.  Yes.  Twenty-six, do you recognize that picture, sir?

16   A.  Yes.

17   Q.  Who is that?

18   A.  Jorge Costilla Sanchez.

19   Q.  And what is -- what was Costilla Sanchez and Osiel

20   Cardenas' relationship in the drug business?

21   A.  They ended up being in charge of the Gulf Cartel.

22   Q.  All right.  So on the kilos that you mentioned of between

23   300 and 500 kilograms, how often would those deliveries occur?

24   A.  Sometimes every two weeks.

25   Q.  How was the cocaine -- where was the cocaine delivered to

1    the Piojos?

2    A.  To a house that they had there in Valadez.

3    Q.  How was the cocaine transported there?

4    A.  In some Avalanche pickup trucks.

5    Q.  All right.  When the cocaine arrived, were you present?

6    A.  Yes.  On some occasions, I was present.

7    Q.  But you were responsible for it whether you were present

8    or not; is that correct?

9    A.  Yes.

10   Q.  Okay.  And on those occasions you were present, can you

11   tell the jury who of the Piojos were present to receive the

12   deliveries of cocaine?

13   A.  Reymundo Villarreal, Juan Villarreal, Luis Villarreal,

14   Francisco Villarreal, Gilberto Villarreal.  Nune was there.

15   And then also some of the people that I didn't know.

16   Q.  Okay.  Now, what did the Villarreal family, the brothers

17   you just identified and the nephew, what did they do when the

18   cocaine was brought to the house?

19   A.  Some bags would be opened up so that they could see what

20   it was.

21   Q.  And who opened the bags to see what it was?

22   A.  Sometimes Samuel Flores Borrego would open them up and

23   some other times some of the workers.

24   Q.  What about any members of the Piojos?

25   A.  I saw some of them unload the bags.

1   Q.  All right.  Did you ever see the defendant you identified

2   earlier, Reymundo Villarreal, unloading bags?

3   A.  Yes.

4   Q.  On how many occasions?

5   A.  I don't know.  About two, three occasions.

6   Q.  All right.  And did you see other family members, the

7   brothers and the nephew that you previously identified,

8   Gilberto, Pancho or Francisco, Nune and Juan, did you see them

9   also participate in unloading bags of cocaine on different

10  occasions?

11  A.  Yes.

12  Q.  And on the bags that you -- that were unloaded from the

13  Avalanches that you observed the defendant here before the

14  Court, Reymundo Villarreal-Arelis, unload, approximately how

15  many kilograms of cocaine were in each bag?

16  A.  Well, the bags contained between 25 and 30 kilos.

17  Q.  Of cocaine?

18  A.  Yes.

19  Q.  And did you see Mr. Reymundo Villarreal-Arelis open any of

20  the bags?

21  A.  No.

22  Q.  What did they do with the bags when they were unloaded?

23  A.  They would arrange them so that they could be stored in a

24  place that only they knew about.

25  Q.  And the "they" in this instance, are you referring to

DIRECT - JESUS ENRIQUE REJON-AGUILAR

1  Reymundo Villarreal, the defendant before the Court, and his

2  brothers and nephew?

3  A.  Yes.

4  Q.  And did they also have workers present that unloaded bags

5  of cocaine at their direction?

6  A.  Yes.

7  Q.  And did you see the brothers, including Reymundo

8  Villarreal, give directions to these workers regarding the

9  loading and unloading of the bags of cocaine?

10  A.  No, sir.

11  Q.  But did they unload -- did they unload the bags and move

12  them wherever the Piojos -- whatever place they had for them

13  to store the cocaine?

14  A.  Yes.

15  Q.  So we are clear, Reymundo Villarreal-Arelis that we are

16  referring to that did these things that you saw, unload the

17  bags containing 25 to 30 kilos, is it the defendant before the

18  Court here today, the one you identified earlier?

19  A.  Yes.

20  Q.  Do you know his son, Raymundo, Jr.?

21  A.  Yes, but he was very small.

22  Q.  Okay.  He wasn't the one unloading bags of cocaine at that

23  time?

24  A.  No, sir.

25  Q.  Likewise, do you know Mr. Reymundo Villarreal-Arelis's

1  father, Reymundo Villarreal-Gutierrez?

2  A.  Yes.

3  Q.  Was he unloading bags of cocaine?

4  A.  No, sir.

5  Q.  How long did this go on?  You indicated it was between 300

6  and 500 kilos every two weeks.  Can you describe when it began

7  and when it ended?

8  A.  Well, approximately, I don't know, around 2004, up until

9  the company broke up.

10  Q.  And that was in 2010?

11  A.  Yes.

12  Q.  And how much was the company -- how much was Piojos

13  paying?  Were they buying the cocaine or were they simply

14  moving it for the company?

15  A.  The one that we would get, that was the one that was

16  transported over here from Mexico.

17  Q.  Okay.  How much per kilogram were the Piojos being paid to

18  transport the cocaine?

19  A.  Well, the one that belonged to Osiel and Costilla, they

20  didn't charge anything.

21  Q.  And why was that?

22  A.  Well, there was really no reason to charge for that, since

23  they were making more money in other things.

24  Q.  And what were the other things they were making more money

25  in?

1  A.  Well, like when it was sold at a better price than what

2  they were buying at.  Or when they were authorized to become a

3  part of the corporation for the purchase of cocaine.

4  Q.  Okay.  And did that happen at some point where they became

5  authorized?

6  A.  Yes.

7  Q.  When did that happen?

8  A.  Approximately 2007.  Some time around 2006.

9  Q.  And what happened at that point, then, with the Piojos?

10  Were they able then to acquire the cocaine and sell it

11  themselves?  Or what was the arrangement with the company that

12  they had at that time?

13  A.  Yes.  They would buy and sell.

14  Q.  Okay.  And how much were they getting it for from the

15  company when they were authorized?

16  A.  Well, whatever the price that was set at the time.  It

17  could be, you know, 11,000, 12,000, 11.

18  Q.  Per kilo?

19  A.  Yes.

20  Q.  Now, in addition to that arrangement, did you have your

21  own arrangement with the Piojos regarding the sale of cocaine,

22  the purchase of cocaine by them and them smuggling some

23  cocaine for you?

24  A.  Yes.

25  Q.  Okay.  Tell me about that.  What was that arrangement that

1    you had with them?  I will ask you the arrangement first.  How

2    much cocaine were they moving for you?

3              THE INTERPRETER:  Could you repeat the question?

4    BY MR. FRAZIER:

5    Q.  How much cocaine were they transporting for you?

6    A.  I don't understand the question.

7    Q.  Okay.  Were you -- at some point, did the Piojos help --

8    Beto or Gilberto and his brothers, were they obtaining cocaine

9    from you?

10   A.  Yes.

11   Q.  How much?

12   A.  Well, I would sell them somewhere around 250 kilos, 300,

13   200 kilos.

14   Q.  How much were you selling it to them for?

15   A.  Well, when I started selling, it was at 11,000 a kilo.

16   Q.  And how often were they buying kilograms from you?

17   A.  Based on how quick they could sell it.  Maybe every 20

18   days, maybe every two weeks, maybe once a month.  Just

19   depending on how often -- or how quick they could sell it.

20   Q.  And how long -- when did that begin?

21   A.  2004, approximately.

22   Q.  And continued until when?

23   A.  Up until 2007, when El Hummer was captured.

24   Q.  Now, the cocaine you were selling to the Piojos, was it

25   just your cocaine or were you in a partnership with someone

1  else with that cocaine that you were selling?

2  A.  Well, when I started selling, it was in partnership with

3  Osiel Cardenas Guillen.

4  Q.  And when you were selling the cocaine to the Piojos, who

5  were involved?  Which of the brothers did you deal with?  Who

6  was involved in purchasing your cocaine?

7  A.  With Gilberto Villarreal.

8  Q.  Was that the only brother you dealt with at that time?

9  A.  With Francisco and Nune.

10  Q.  And I forgot to ask you something earlier, so forgive me.

11  I am going to back up.  When the company was selling

12  cocaine -- or was using the Villarreals to transport the

13  cocaine for them, did the brothers have additional

14  responsibilities other than just unloading the bags from the

15  Avalanche?

16  A.  They would cross it.

17  Q.  All right.  And what would they have to do to cross it?

18  A.  They would cross it through the river over into the United

19  States.

20  Q.  Okay.  Well, getting it from the farmhouse or the house to

21  getting it to the United States, would there have to be

22  security provided to make sure that the routes were safe so

23  the drugs could cross?

24  A.  Yes.

25  Q.  And did the brothers provide that security?

1  A.  Yes.

2  Q.  Which of the brothers would provide that security and --

3  or name the people who provided that security from the

4  farmhouse to the river.

5  A.   Luis Villarreal, Reymundo Villarreal, Nune, Francisco

6  Villarreal, Juan Villarreal.

7  Q.  And the Reymundo Villarreal that you just named, is that

8  the same Reymundo Villarreal that you identified here in court

9  today?

10  A.  Yes.

11  Q.  And did he provide that function of providing security on

12  more than one occasion?

13  A.  Yes.

14  Q.  A number of occasions?

15  A.  Yes.

16  Q.  Now, you indicated just a few moments ago -- we will go

17  back to where you were a few moments ago.  You indicated that

18  your dealings with the Piojos in selling your cocaine

19  continued up until the time Hummer was arrested?

20  A.  Yes.

21  Q.  And what happened after Hummer was arrested?

22  A.  I couldn't sell them anymore.

23  Q.  You couldn't sell to the Piojos anymore?

24  A.  No.

25  Q.  And when was that that Hummer was arrested; do you recall?

1    A.  Approximately 2007, 2008.

2    Q.  Now, you have indicated that the Villarreal family, the

3    brothers have ranches or farms in Mexico; is that correct?

4    A.  Yes.

5    Q.  The drug proceeds that they acquired, did they put that in

6    their property in Mexico?

7    A.  Yes.

8    Q.  And how did they do that?

9    A.  They laundered money.

10   Q.  Okay.  And how do they launder money?

11   A.  Through the crops and the cattle that they have.

12   Q.  Okay.  And meaning they would acquire those things with

13   the drug money?

14         MR. WOMACK:  Objection, Your Honor.  Again, a

15   predicate; how would this witness possibly know?

16         THE COURT:  That's sustained.  Why don't you ask the

17   predicate --

18   BY MR. FRAZIER:

19   Q.  How do you know these things regarding the drug money and

20   the Piojos putting the money into their farms?

21   A.  Through the brother, Gilberto Villarreal.

22   Q.  And are you familiar with a particular farm program in

23   Mexico?  The name escapes me, but it is a farm program in

24   Mexico that would provide seed that they made application for.

25   A.  I know of a program in Mexico.

DIRECT - JESUS ENRIQUE REJON-AGUILAR

1    Q.  Pro Campo?

2    A.  Yes.  PROCAMPO or "SANART" or something like that.

3    Q.  All right.  How did the Villarreal family use that program

4    that Mexico has to launder money in the farming operation?

5            MR. WOMACK:  Again, Your Honor, there needs to be a

6    predicate for how he would know that.

7            MR. FRAZIER:  He is going to answer the question,

8    Judge, as to how he knows that.

9            THE COURT:  Go ahead.

10   BY MR. FRAZIER:

11   Q.  Go ahead.

12           THE INTERPRETER:  Can you repeat the question,

13   Counsel, please?

14           MR. FRAZIER:  Sure.

15   BY MR. FRAZIER:

16   Q.  Do you know -- I will ask it this way.  Let me rephrase

17   it.  Do you know if the Villarreal family laundered drug

18   proceeds using that program, PROCAMPO program that the Mexican

19   government has for farmers in Mexico?

20   A.  Yes.

21   Q.  How do you know that?

22   A.  Well, Gilberto Villarreal told me, because the actual

23   amount of the loan is very minimal, but the investment

24   required to acquire the land is very high.

25   Q.  And where does that investment come from?

DIRECT – JESUS ENRIQUE REJON–AGUILAR

1          MR. WOMACK:  Objection, Your Honor, again, how he

2    would know how much is being invested in real estate.

3          THE COURT:  We will get to that in the second

4    question.

5          MR. FRAZIER:  So is he allowed to answer this

6    question first?

7          THE COURT:  Yes.

8    BY MR. FRAZIER:

9    Q.  You can proceed to that answer that question.  I will

10   repeat it, if I can remember it.  The amount of money, the

11   investment, how do you know -- do you know what that

12   investment was and how much it was?

13   A.  No.

14         THE COURT:  Next question.

15   BY MR. FRAZIER:

16   Q.  And do you know where the money came from?

17         MR. WOMACK:  He doesn't know how much money there

18   was.

19         MR. FRAZIER:  Not how much.  Where?

20         MR. WOMACK:  It's hearsay.

21         THE COURT:  That is overruled.

22   BY MR. FRAZIER:

23   Q.  You can answer where, if you know, where the money came

24   from that Gilberto made the investment.

25         THE COURT:  Wait a minute before he answers.  So the

1  question is based on, how do you know?  So based on personal

2  knowledge, how do you know this?

3          THE WITNESS:  Because Gilberto Villarreal told me.

4  BY MR. FRAZIER:

5  Q.  Okay.  Thank you.  And I don't know if we heard the

6  translation.  What was his answer?  What was your answer, sir,

7  regarding the source of the money?

8  A.  That part of it was from drug trafficking.

9  Q.  Now, did -- and at this time that we are talking about --

10  oh.  I forgot to ask one other question.  I apologize.  In

11  fact, let me back up.

12          After Hummer was arrested, why couldn't you sell to

13  the Villarreal family anymore?

14  A.  Because someone else was left in charge of the Miguel

15  Aleman and Reynosa turf.

16  Q.  Someone -- after Hummer was arrested, someone else was

17  left in charge; is that -- am I understanding correctly?

18  A.  Yes.

19  Q.  But they, meaning the Villarreal family, were they still

20  at that time moving the company's cocaine?

21  A.  Yes.

22  Q.  Now, once they were approved, were they allowed to buy

23  cocaine from the company?

24  A.  Yes.

25  Q.  Okay.  And in addition -- so do you know how much they

1    were buying from the company?

2    A.  300, 400 kilos.

3    Q.  Okay.  And was that cocaine -- and we are talking about

4    cocaine, correct?

5    A.  Yes.

6    Q.  And so I am clear on this, this is separate from the

7    coke -- is this a separate part, a separate transaction of

8    cocaine from the cocaine that they are moving for the company

9    in the Avalanches that you say they are not charging them to

10   cross?

11   A.  Yes.

12   Q.  Okay.  And when did that start?

13   A.  Like in 2006, approximately.

14   Q.  And continued until when?

15         THE INTERPRETER:  Counsel, may I have the witness

16   repeat his answer?

17         MR. FRAZIER:  Yes, ma'am.

18         THE WITNESS:  It was until, up until the company

19   broke up in 2010.

20   BY MR. FRAZIER:

21   Q.  Okay.  Now, did you or -- and other members of the Piojos

22   spend money on American quarter horses?

23   A.  Yes.

24         THE COURT:  Mr. Frazier, let me stop you here.  It

25   looks like you are going into another line.

1          MR. FRAZIER:  Yes, sir.

2          THE COURT:  We have been going at it almost two

3     hours.  Let's go ahead and take a quick, little break for the

4     jury of about ten minutes.

5          All rise.

6          (Brief recess.)

7          THE COURT:  Please be seated.

8          Mr. Frazier.

9          MR. FRAZIER:  Thank you, Judge.

10    BY MR. FRAZIER:

11    Q.  Before the break, I think I asked you about horses.  Did

12    you and other members of the company purchase American quarter

13    horses?

14    A.  That's true.

15    Q.  And did the Piojos, the brothers and the nephew, who you

16    identified earlier, did they likewise buy American quarter

17    horses?

18    A.  That's true.

19    Q.  At this time, were all the groups working together?  When

20    I say "all the groups," I mean the Gulf, the Zetas and the

21    Villarreal brothers and their nephew?

22    A.  I don't understand the question.

23    Q.  When -- well, and probably because it wasn't very clear,

24    so let me rephrase it.  In drug trafficking, were the

25    Piojos -- were the Villarreal brothers and their nephew, the

1    Gulf and Zetas all working together?

2    A.  That's true.

3    Q.  Likewise, when obtaining horses, did the groups sometimes

4    work together to get American quarter horses?

5    A.  You could say that.

6    Q.  And what I mean by that is, did you sometimes use the same

7    horse buyers?

8    A.  That's true.

9    Q.  And so let me ask you about, when you purchased American

10   quarter horses, did you buy them yourself or how did you get

11   them?

12   A.  Other people would buy them for me.

13   Q.  Why couldn't you buy them for yourself?

14   A.  Because I could not prove up the money.

15   Q.  Meaning that you couldn't prove the money was legitimate?

16   A.  That's true.

17   Q.  So where did the money come from if it was not legitimate?

18   A.  From the drug trafficking.

19   Q.  And so you would have other people buy your horses for you

20   then?

21   A.  That's true.

22   Q.  Who were some of the people you used to buy horses for

23   you?

24   A.  It would be Ramiro Villarreal, someone they called La

25   Pili, Carlos Nain, Raul Cantu and others whom I don't remember

1  their names.

2  Q.  I am showing you Government's Exhibit No. 10.  Do you

3  recognize that picture?

4  A.  Yes.

5  Q.  Who is that?

6  A.  La Pili.

7          MR. FRAZIER:  Twenty, please.

8  BY MR. FRAZIER:

9  Q.  Do you recognize that picture?

10  A.  Yes.

11  Q.  And Government's Exhibit No. 20 is a picture of who?

12  A.  Ramiro Villarreal.

13  Q.  Now, were those horse buyers -- the person you identified

14  as Pili and Ramiro Villarreal, would they buy the horses and

15  leave them in their names, as if they were the owners?

16  A.  I don't know.

17  Q.  Okay.  But who was the true owner of the horse?

18  A.  I would pay for it.

19  Q.  But the horse would be placed in someone else's name?

20  A.  That's true.

21  Q.  You just don't know who that person was?

22  A.  That's true.

23  Q.  Who decides who that person is going to be?

24  A.  Whoever buys.

25  Q.  Meaning either Pili or Ramiro Villarreal?

1    A.  That's true.

2    Q.  Okay.  Do you know if the Villarreal brothers and their

3    nephew used Ramon -- or Pili and Ramon Villarreal to buy

4    horses for them?

5    A.  That's true.

6    Q.  I meant to say Ramiro Villarreal.  I apologize.  When the

7    Villarreal brothers and their nephew bought horses, did they

8    do so -- did they buy their horses together as a group, if you

9    know?

10   A.  That's true.  That's how it was.  They would buy it as a

11   group.

12   Q.  Okay.  And if they bought their horses as a group, do you

13   know, were any of those horses in Mexico?  In other words --

14   let me back up.  I apologize.  Where were the horses

15   purchased?  Not only your horses but the ones for the

16   Villarreal brothers and the nephew, where were they normally

17   purchased at?

18   A.  At the auctions in the United States.

19   Q.  All right.  And sometimes were those horses then moved to

20   Mexico after they were purchased?

21   A.  That's true.

22   Q.  All right.  Can you give the jury some idea about the

23   dollar value of these horses?  I know it is going to be a big

24   range, but if you could give the jury some idea of how much

25   money you spent or you know was spent on acquiring American

1  quarter horses for you or for the Villarreals.

2  A.  It depends.  Whatever they went for.  We went up to,

3  spending up to $3 million for a horse.

4          THE INTERPRETER:  I am sorry.  The interpreter made

5  a mistake.  It was for buying the horses.

6  BY MR. FRAZIER:

7  Q.  Buying the horses total?

8  A.  It might be four or five.

9  Q.  Now, are you familiar with a horse, one horse in

10  particular named, called Make It Anywhere?

11  A.  Yes.

12  Q.  Okay.  And how are you familiar with that horse?

13  A.  It was given to me by Hummer.

14  Q.  Did the Piojos or one of the Villarreal -- or the

15  Villarreal brothers, did they own that horse at one point?

16  A.  That's true.

17  Q.  Tell us about that and how you or Hummer came into

18  possession of that horse.

19  A.  Supposedly, there was -- it was confiscated from Hummer,

20  because there was a load of cocaine that wasn't reported and

21  it was taken from Hummer.

22  Q.  Who had the load of cocaine that wasn't reported?

23  A.  The Villarreals.

24  Q.  Okay.  And as a result, they had a load of cocaine that

25  wasn't authorized to be in your area or in the area where it

1  was at?

2  A.  That's true.  It hadn't been reported.

3  Q.  And if it hadn't been reported, what happened?  Was there

4  a consequence to that?

5  A.  That's true.

6  Q.  What is the consequence?

7  A.  Gilberto Villarreal was kidnapped.

8  Q.  Okay.  And Gilberto Villarreal was -- why was he

9  kidnapped?

10 A.  Well, he was the responsible one.  Well, he is responsible

11 for the family.

12 Q.  Meaning, was he the leader?

13 A.  That's true.

14 Q.  And did he have that horse in his possession -- or not in

15 his possession, but did he own that horse or have that horse

16 at the time he was kidnapped?

17 A.  That's true.

18 Q.  And who took it from him?

19 A.  "Hummer" or "Hoomer" took it from him.

20 Q.  And is that when Hummer gave the horse to you?

21 A.  That's true.

22 Q.  And how long did you have the horse?

23 A.  Some months.

24 Q.  All right.  What happened to the horse?  What happened?

25 A.  I gave it to Heriberto Lazcano Lazcan.

1  Q.  And who is he?  Who was he?

2  A.  The Zeta leaders.

3  Q.  And what did he do with the horse; do you know?

4  A.  I don't know.

5  Q.  Was Beto released, Gilberto Villarreal released?

6  A.  That's true.

7  Q.  And did he have to pay some penalty or something for

8  having the unauthorized load?

9  A.  Yes.  He paid for the -- a penalty.

10  Q.  And how much was that; do you know?

11  A.  I don't know.

12  Q.  And did he continue -- after that, did he continue working

13  with the company?

14  A.  That's true.

15  Q.  When I say "working with the company," I mean moving and

16  trafficking cocaine.

17  A.  That's true.

18  Q.  Sir, if you put a horse in your name, if you bought a

19  horse and you decided you wanted to put it in your own name,

20  would that work?  Would that be a good idea?

21  A.  No.

22  Q.  Why?

23  A.  It will be confiscated from me.

24  Q.  Confiscated like by law enforcement?

25  A.  That's right.

1  Q.  I am going back up to something I failed to ask you about

2  earlier.  Did you at one time have a discussion with Gilberto

3  Villarreal about you wanting to sell cocaine to his brothers

4  as well?

5  A.  That's true.

6        MR. WOMACK:  Again, Your Honor, objection as to

7  hearsay and nonconfrontation.

8        THE COURT:  You need to set the predicate first.

9  BY MR. FRAZIER:

10  Q.  What was the purpose --

11        MR. FRAZIER:  I apologize, Judge.  I will.

12  BY MR. FRAZIER:

13  Q.  In this particular conversation, what were you and

14  Gilberto Villarreal talking about when it came to selling

15  cocaine, or you selling cocaine to him?

16  A.  I was telling him that why doesn't he tell his brothers

17  that I can sell them cocaine, that I have enough.  That

18  whatever he bought, everyone was in on it.

19  Q.  I am sorry.  So who said that?  I missed that part.

20        MR. WOMACK:  Objection, Your Honor.  Hearsay.

21        THE COURT:  That's overruled.

22  BY MR. FRAZIER:

23  Q.  Who gave that answer, the one --

24  A.  Gilberto Villarreal.

25  Q.  Said that whatever I bought, we are all in on it; is that

1  correct?

2  A.  Yes.  All the brothers were in.

3  Q.  And do you know what the roles of the other brothers were

4  in the organization, in the Piojos organization?

5  A.  Well, Betito would mention that Gilberto Villarreal would

6  take care of the pathways.  Others would go down to the river.

7  But they were all in the same.

8  Q.  All right.  When you say "the others would go down to the

9  river," who are you referring to?

10  A.  The ones who would take care of taking things down to the

11  river, the Rio Grande, or whatever you want to call it.

12  Q.  I am talking about the other brothers.  Which other

13  brothers would do that?

14  A.  He wouldn't tell me individually.  He would just say some

15  would take care of the roadway and others would take care of

16  the way down to the river.

17  Q.  And when you say "take care of the roadway," what do you

18  mean?

19  A.  To be on watch, that the government would not arrive.

20  Q.  And we are on the Mexican side.  We are talking about the

21  Mexican military or Mexican government arriving?

22  A.  That's true.

23  Q.  And then what would they do at the river?

24  A.  They would cross it over here to the United States.

25  Q.  And the "they" -- so I want to make sure we are very clear

1   on this.  Are the "they" that we are talking about in this

2   instance the brothers and nephew of Gilberto Villarreal-

3   Arelis?

4   A.  That's true.

5   Q.  Including the defendant here before the Court, Reymundo

6   Villarreal?

7           MR. WOMACK:  Objection.  He already said he doesn't

8   know who the people are.

9           THE COURT:  That is overruled.  But if you mean it

10  is leading, it is leading.  That is sustained.

11          MR. FRAZIER:  I will rephrase that question, Judge.

12  BY MR. FRAZIER:

13  Q.  When you say -- would that include all of the brothers you

14  identified here in court today?

15  A.  That's true.

16  Q.  And the nephew that you identified earlier?

17  A.  That's true.

18          MR. FRAZIER:  If you could pull up Number 1.

19  BY MR. FRAZIER:

20  Q.  Did it include that brother that you identified

21  previously?

22  A.  That's true.

23  Q.  Number 2.  I am sorry.  That is Gilberto.  Go to Number 3.

24  Did it include that brother, Government's Exhibit -- I am

25  showing you Government's Exhibit No. 3.  Did it include that

1    brother as well?

2    A.  That's right.

3    Q.  Go to Government's Exhibit No. 4.  Did it include that

4    brother that you identified previously as well?

5    A.  That's right.

6    Q.  And Government's Exhibit No. 5, did it include that person

7    you identified as the nephew earlier?

8    A.  That's right.

9            MR. FRAZIER:  Pass the witness.

10           THE COURT:  Mr. Womack.

11           MR. WOMACK:  Thank you, Your Honor.

12                    *-*-*-*-*-*-*-*

13                    CROSS EXAMINATION

14   BY MR. WOMACK:

15   Q.  Good afternoon, Mr. Rejon.

16   A.  Good afternoon, sir.

17   Q.  I am Guy Womack.  I represent Reymundo Villarreal in this

18   case.  How old were you when you joined the Mexican army?

19   A.  Fifteen, going on 16.

20   Q.  And you could actually join the army at 15 or 16?

21   A.  In Mexico, yes.  Even younger.

22   Q.  Okay.  Did you have to have your parents sign for you to

23   join that young or not?

24   A.  That's true.

25   Q.  So before you joined the Mexican army, you met with your

1    parents.  You said:  I would like to be a soldier in the

2    Mexican army.  It is an honorable thing.  And your parents

3    agreed to sign for you?

4    A.  That's true.

5    Q.  And did you go to a form of boot camp or indoctrination?

6    A.  That's right.

7    Q.  And when you graduated from that, you were now a soldier

8    in the Mexican army?

9    A.  That's true.

10   Q.  You had a graduation parade?

11   A.  That's true.

12   Q.  And your family was very proud and they were watching

13   that?

14   A.  They did not watch me.

15   Q.  Okay.  At some point during this process, you took an oath

16   and pledged your allegiance to the United States of Mexico,

17   the United Mexican States?

18   A.  That's true.

19   Q.  And then you went to a school to be trained in your

20   particular specialty?

21   A.  That's true.

22   Q.  And then you were given different duty assignments around

23   Mexico?

24   A.  That's right.

25   Q.  And at some point, you applied for the program to be in

CROSS – JESUS ENRIQUE REJON–AGUILAR

1  the Special Forces, correct?

2  A.  That's true.

3  Q.  This was a much more exciting specialty to be in?

4  A.  That's true.

5  Q.  How long were you in the army before you got accepted into

6  the Special Forces?

7  A.  About two and a half years.

8  Q.  And throughout your army career, were you promoted from

9  time to time?

10  A.  What do you mean, "promotions"?

11  Q.  You picked up rank?  You became a higher ranking soldier?

12  A.  That's true.

13  Q.  How many times were you promoted during your army career?

14  A.  Twice.

15  Q.  Okay.  And what was your highest rank that you held before

16  leaving the service?

17  A.  Special Forces corporal.

18  Q.  Okay.  On the occasions that you were promoted, do you

19  recall taking an oath again, renewing your oath to your

20  country?

21  A.  That's true.

22  Q.  And with each promotion, you would get higher pay,

23  correct?

24  A.  That's true.

25  Q.  And you would have more and more responsibility because of

1   your higher rank?

2   A.  That's true.

3   Q.  Now, you told us at some point you deserted the army?

4   A.  True.

5   Q.  And that is when you joined Los Zetas?

6   A.  That's true.

7   Q.  And you were one of the original group that formed that

8   company?

9   A.  That's true.

10  Q.  What was the -- well, just prior to deserting the army,

11  had your Special Forces unit been sent to northeast Mexico

12  near the Texas border?

13  A.  Yes.  To the state of Tamaulipas, that's right.

14  Q.  And the reason you were sent there was to do counter drug

15  operations?

16  A.  That's true.

17  Q.  And once there, you were persuaded to desert your army

18  unit and help and join -- help in forming Los Zetas?

19  A.  I did not understand that question.

20  Q.  While your unit was in that region, in Tamaulipas, you

21  deserted the army to join Los Zetas?

22  A.  I deserted when they incorporated me into the city of

23  Mexico and then I incorporated myself into the Zetas.

24  Q.  Okay.  And the incentive to join Los Zetas was money?

25  A.  In a manner of speaking, yes.

1   Q.  So you deserted your country and the army for money?

2   A.  I didn't desert just for money.  It wasn't the money.  It

3   was because when I incorporated into the Mexico City group,

4   there was a general there that did not respect us because we

5   had been the police, and he processed many, many people of the

6   Special Forces.

7   Q.  But you deserted because you felt disrespected by --

8           THE INTERPRETER:  The interpreter asks for a

9   clarification from the witness.

10          THE WITNESS:  He prosecuted many of the Special

11  Forces.

12  BY MR. WOMACK:

13  Q.  But you had not been prosecuted?

14  A.  That's true.

15  Q.  You deserted because you felt disrespected?

16  A.  In a way, yes.

17  Q.  And then you joined Los Zetas because you were going to be

18  paid to do that?

19          THE INTERPRETER:  Because you would be paid for

20  that?

21  BY MR. WOMACK:

22  Q.  Because you would be paid to work for them?

23  A.  That's true.

24  Q.  At the time you left the army, what was your salary?

25  A.  About 5,000 pesos every two weeks.

1  Q.  So about 10,000 pesos a month?

2  A.  That's true.

3  Q.  And what was your beginning pay with Los Zetas?

4  A.  It varied.  At first, it was $1,000 or it was $2,000.  It

5  depended.

6  Q.  $1,000 or $2,000 over what period of time?

7  A.  One or two years.

8  Q.  No.  Would you get $1,000 a month, $1,000 a week, $1,000 a

9  day?

10  A.  By week.

11  Q.  By week?

12       THE INTERPRETER:  Weekly.  I am sorry.

13  BY MR. WOMACK:

14  Q.  So it was a pay raise to go to Los Zetas?

15  A.  That's true.

16  Q.  And over time, you impressed the leadership of Los Zetas

17  that they could count on you?

18  A.  That's true.

19  Q.  And you would carry out their orders and their wishes

20  whenever they gave you an order?

21  A.  That's true.

22  Q.  And your pay from Los Zetas went up greatly, didn't it?

23  A.  No, sir.

24  Q.  How long were you a member of Los Zetas?

25  A.  From '99 until 2011, when they captured me.

1  Q.  At the time they captured you, you had $2 or $3 million

2  put away, didn't you?

3  A.  That's true.

4  Q.  And in addition to the $2 or $3 million you put aside --

5  and these are U.S. dollars, correct?

6  A.  That's true.

7  Q.  In addition to the millions of dollars that you had put

8  aside, you also had bought quite a few quarter horses

9  yourself?

10 A.  That's true.

11 Q.  How many horses do you think you bought during your career

12 with Los Zetas?

13 A.  I don't know.  More than 200.

14 Q.  As you rose in rank within Los Zetas, part of your

15 responsibilities were combat, correct?

16        THE INTERPRETER:  The interpreter understood

17 "combat"?

18        MR. WOMACK:  Was combat, correct.

19        THE WITNESS:  That's true.

20 BY MR. WOMACK:

21 Q.  You have told us that some of the battles that you fought

22 were against the Sinaloa cartel?

23 A.  That's true.

24 Q.  You also had battles against Mexican military forces?

25 A.  That's true.

1    Q.  And federal police forces?

2    A.  That's true.

3    Q.  Local police departments?

4    A.  That's true.

5    Q.  Prosecutors and government agents?

6    A.  That's true.

7    Q.  Judges?

8    A.  No, sir.

9    Q.  How about reporters?  Journalists?

10   A.  No.

11   Q.  Among the people that you killed, of these 20 people or so

12   you personally killed, some were women and children?

13   A.  No, sir.

14   Q.  They were women?

15   A.  No, sir.

16   Q.  Do you remember testifying in Austin and said that you did

17   kill women?

18   A.  No, sir.

19   Q.  If I were to show you your transcript from that trial, do

20   you think you would recognize your words?

21   A.  Yes.  If I said it, yes.

22   Q.  Do you recall that you were arrested in July of 2011?

23   A.  July of 2011, yes.

24   Q.  And do you recall that it was a few months after an

25   incident in Mexico where two American Immigration and Customs

1  Enforcement agents were shot by Zetas during an attack?

2  A.  Yes.

3  Q.  It was February 15 of 2011.  One of the agents was Special

4  Agent Jaime Zapata.  He was -- he is an American agent who was

5  killed in the attack.  And the second agent, Victor Avila, was

6  wounded in the attack.

7  A.  One, I do recognize his name, but the other I do not.

8  Q.  Do you recognize the name "Zapata"?

9  A.  That's true.

10  Q.  And these agents were in an American vehicle that had

11  embassy license plates?

12  A.  That's what was reported.

13  Q.  And it was reported that it was Zetas that did that

14  attack?

15  A.  That's true.

16  Q.  And it caused a lot more attention on Los Zetas there in

17  Mexico because of that, correct?

18  A.  That's true.

19  Q.  And then a few months later, you were arrested, along with

20  other Zetas?

21  A.  No, sir.  I was arrested by myself.

22  Q.  You were in an apartment in Mexico?

23  A.  That's true.

24  Q.  But you know that other Zetas were also arrested in

25  connection with that attack?

1          THE INTERPRETER:  The interpreter didn't hear.

2    "With that tact"?

3          MR. WOMACK:  With that attack on those U.S. agents?

4          THE INTERPRETER:  Attack.

5          THE WITNESS:  No, sir.  I was not arrested due to

6    the attack on the American agents.

7    BY MR. WOMACK:

8    Q.  You were accused of ordering that attack, weren't you?

9    A.  No, sir.  I was arrested because I had an extradition

10   order from the United States.

11   Q.  And you recall that you confessed on television to being a

12   part of that attack?

13   A.  No, sir.

14   Q.  Do you recall testifying in Austin, Texas in a federal

15   courtroom like this and saying that when you were arrested,

16   the Mexican police held you blindfolded for about five days?

17   A.  That's true.

18   Q.  And then shortly before you were put on television,

19   Mexican police officers or agents talked to you?

20   A.  That's true.

21   Q.  And you stated on videotape or on television that you were

22   involved in that attack?

23   A.  No, sir.  I did not declare that or state that.

24   Q.  And then in your testimony in Austin, you denied having

25   been a part of the attack but said that you were forced to

1    make that statement?

2    A.  That I recall, I did not say that, sir.

3            MR. WOMACK:  Your Honor, if I can approach the

4    witness.

5            THE COURT:  Yes.

6    BY MR. WOMACK:

7    Q.  Mr. Rejon, I am going to show you a document.  For

8    identification purposes, I have marked it as Defendant's

9    Exhibit 1.  It is a multi-page document.  It has 92 pages.

10   The front page bears the date April 29, 2013.  And it says:

11   Transcript of trial on the merits, testimony of Jesus Enrique

12   Rejon-Aguilar before the Honorable Sam Sparks.

13           Do you recall testifying in that trial?  The

14   defendants who were there included Jose Trevino Morales,

15   Francisco Antonio Colorado Cesar, Fernando Solis Garcia, us

16   receive owe Maldonado Buitron, and Jesus Maldonado Buitron.

17   Do you recall testifying in that trial?

18   A.  That's true.

19   Q.  I will direct your attention to page 60.  At the top of

20   the page, it says:  And how many days were you blindfolded?

21           Your answer was:  The entire time --

22           MR. FRAZIER:  Judge, I am going to object.  This is

23   improper impeachment.

24           THE COURT:  It is improper impeachment.

25

1   BY MR. WOMACK:

2   Q.  Is it true that you testified -- well, I'll tell you what.

3   Let's do this.  If you will just read this entire page to him.

4           THE INTERPRETER:  May the interpreter have a minute,

5   Your Honor?

6           MR. WOMACK:  I am going to ask him if he remembers

7   the testimony.

8           THE COURT:  Let's try to shortcut this.  I mean, the

9   question that was pending for impeachment purposes is whether

10  he admitted on TV or video to participating or being somewhat

11  involved in the killing of the Immigration officers.  And

12  where is that in that deposition?

13          MR. WOMACK:  Yes, Your Honor.  The page he is

14  reading --

15          THE COURT:  I will tell you what.  Let me see it.

16          MR. WOMACK:  -- is going to explain that.

17          THE COURT:  Let me see document.

18          MR. WOMACK:  It is page 60, Your Honor.

19          THE COURT:  Stop there, Counsel.  Next question.

20          MR. WOMACK:  If I could retrieve the exhibit, Your

21  Honor.

22          THE COURT:  Yes.

23  BY MR. WOMACK:

24  Q.  Mr. Rejon, when you testified in that court, you admitted

25  that you made a statement on television and that you were

1  coerced into making that statement?

2  A.  That's true.

3  Q.  And the method used by the Mexican authorities to make you

4  make this false statement was they blindfolded you?

5       MR. FRAZIER:  Judge, I am going to object now to the

6  relevance of the line of questioning.

7       THE COURT:  What is the relevance?

8       MR. WOMACK:  Well, your Honor, I am going to bring

9  up the point that -- we are going to get into the fact of him

10  torturing people and killing people, but when he himself were

11  blindfolded, he made statements that he now says were not even

12  true.

13       THE COURT:  The context of the statements are about

14  the drug trafficking.  It is nothing about the Immigration

15  officers being killed.  That was the purpose of your

16  impeachment attempt, so --

17       MR. WOMACK:  And now, Your Honor, in addition to

18  that, I want to show --

19       THE COURT:  So if you getting off the impeachment

20  attempt and now going to a different line of questions, I will

21  let you proceed.

22       MR. WOMACK:  Yes, sir.  Yes, sir.

23       THE COURT:  That's overruled.

24       MR. WOMACK:  Off of the Immigration, yes.

25

1    BY MR. WOMACK:

2    Q.  So after being blindfolded for five days or so by Mexican

3    authorities, you made a statement on television that you say

4    was not true?

5    A.  That's true.  That statement that I gave is not true.  I

6    had to make it up to get out of that scheme.

7    Q.  In other words --

8    A.  I want to make it clear that in that statement -- and I

9    did not accept any assassination accusation.  If not, I would

10   have been processed in Mexico for murder, assassination.

11   Q.  And when you were questioned by Mexican authorities and

12   you made this false declaration about drug trafficking, you

13   made that confession because they had coerced you by making

14   you wear a blindfold?

15   A.  They blindfolded me and they hit me until they were tired

16   of hitting me.

17   Q.  But they didn't hit you in the face, did they?

18   A.  No.

19   Q.  And so because they had blindfolded you and hit you, you

20   made a false statement on television?

21   A.  That's true.

22   Q.  And in talking to the Mexican authorities while you were

23   in custody, you denied killing anyone, correct?

24   A.  That's true.

25   Q.  Although you had killed at least 20 people yourself?

1    A.   That's true.

2    Q.   And the first time you confessed to committing murders was

3    here in the United States?

4    A.   That's true.

5    Q.   One of the first things you were asked by the government

6    was what nicknames you have?

7    A.   That's true.

8    Q.   You also have a nickname "Brujo"?

9    A.   That's true.

10   Q.   And that means "the witch"?

11   A.   Witch, Brujo, yes.

12   Q.   It means having magical powers or something like that?

13   A.   No, sir.

14   Q.   What does it mean?

15        MR. FRAZIER:  Judge, I am going to object.  A lot of

16   the questions -- I don't know how this goes to bias, interest

17   or motive.  If he is trying to impeach, it doesn't fit any

18   grounds for impeachment.

19        THE COURT:  What is the relevance?

20        MR. WOMACK:  Your Honor, under government

21   questioning, he talked of nicknames but he omitted this one.

22        THE COURT:  I will allow it.

23        MR. FRAZIER:  Okay.

24        THE WITNESS:  It is a religious name.

25

1  BY MR. WOMACK:

2  Q.  A religious name?

3  A.  Because of my religion, they call me "Brujo."

4  Q.  With regards to the murders that you committed in Mexico,

5  you testified that you killed men and that some women were

6  killed?  And some women were killed?

7  A.  No, sir.

8       MR. WOMACK:  Your Honor, again, if I can show him my

9  transcript.

10       This is the same transcript we were talking about

11  earlier.  And I will turn to page 82, and I will direct your

12  attention to lines 5 through 13.

13       If you will read those to him.

14       MR. FRAZIER:  Judge, I am going make the same

15  objection we made earlier.

16       THE COURT:  That is improper impeachment.  Next

17  question.

18  BY MR. WOMACK:

19  Q.  Having had your testimony read to you here in court, does

20  it refresh your recollection of what you said in that trial in

21  Austin, Texas?

22       MR. FRAZIER:  Judge, I don't think his recollection

23  needs to be refreshed as to the subject matter of --

24       MR. WOMACK:  He is denying saying it, Your Honor.

25       THE COURT:  No.  It is consistent, Counsel.  That is

1    sustained.  Next line of questions.

2    BY MR. WOMACK:

3    Q.  Some of the people that you killed, you tortured them

4    first?

5    A.  Yes.

6    Q.  And then you gave orders to other Zetas to kill and

7    torture people?

8    A.  That's true.

9    Q.  And by your loyalty to the Zetas, you were ultimately at

10   the rank equivalent of an American -- or a military general,

11   correct?

12   A.  That's true.

13   Q.  And when you were arrested in July of 2011, your $2 or

14   $3 million was in a safe concealed somewhere?

15   A.  That's true.

16   Q.  And as far as you know, it is still there?

17   A.  As far as I know; hopefully, it is still there.

18   Q.  You never have been charged with murder in Mexico, to your

19   knowledge?

20   A.  That's true.

21   Q.  And you certainly have not been charged with murder in the

22   United States?

23   A.  That's true.

24   Q.  Because the murders were committed in Mexico?

25   A.  That's true.

CROSS – JESUS ENRIQUE REJON-AGUILAR

1  Q.  Your hope is that you will be given a reduced sentence for

2  your crimes, this drug conviction and get out of prison

3  sooner, correct?

4  A.  That's true.

5  Q.  Your freedom is worth more to you than money, isn't it?

6  A.  That's true.

7  Q.  And if you can get out of prison early enough, you can

8  enjoy spending your millions of dollars in that Mexican safe?

9  A.  If they can be found, perhaps.

10  Q.  Now, when you pled guilty in Washington, D.C., they had

11  you fill out a statement of facts?  It was basically a summary

12  of what you were confessing to having done.  Do you recall

13  that?

14  A.  I don't understand that question.

15  Q.  Okay.  Do you remember that you signed what is called a

16  plea agreement?

17  A.  I don't understand your terms, but -- your words, but I do

18  remember signing a document.

19  Q.  Okay.  And there were actually two documents, weren't

20  there?

21  A.  Well, yes.  I did sign some documents.

22  Q.  One document stated the terms of your agreement with the

23  United States about you pleading guilty and hoping to get some

24  kind of credit?

25  A.  Signed for a reduction?

1  Q.  You signed something saying that you would get an

2  immediate reduction for pleading guilty, and that if you

3  continued to help the government, if they believed you helped

4  them, they could ask for that sentencing court to reduce -- to

5  give you a lower sentence based on your cooperation?

6  A.  That depends on the judge.  If the judge says you can

7  reduce it, yes, but if he doesn't, I can't do anything.

8  Q.  But my question is, you recall signing that document?

9  A.  No.  An agreement where they are going to reduce my time,

10  no.

11  Q.  No.  It was an agreement that set forth that you might get

12  a reduction based on your cooperation with the government?

13  A.  I don't recall.  It was so long ago, I don't recall.

14  Q.  Do you recall that you signed a document --

15  A.  Yes, I do recall.

16  Q.  -- that set forth the factual basis for your plea?

17  A.  That's true.

18  Q.  And in that factual basis, you didn't mention the name

19  Villarreal --

20         MR. FRAZIER:  Judge, I am going to object.  A

21  factual basis to support a guilty plea?  Is he trying to

22  impeach a witness without even asking him the question first?

23         THE COURT:  Yes.  There is no question for which

24  impeachment is proper.

25

1 BY MR. WOMACK:

2 Q. At the time you pled guilty, you did not confess to any

3 involvement with the Villarreals, did you?

4      MR. FRAZIER: Judge, I am going to object. We don't

5 even know if what he pled guilty to was his involvement with

6 the Villarreals. It could have been a completely separate

7 offense.

8      THE COURT: And it is past 5:00. I have already

9 promised some of the jurors that we would end at 5:00. I was

10 trying to finish up this witness, but it appears that we are

11 not going to be able to do that.

12      So, ladies and gentlemen, we are going to break for

13 the day. Let me give you some parting instructions. First of

14 all, when we leave the courtroom today, if you go back to the

15 jury deliberation room, the courtroom security officers will

16 give you further instructions about how to enter the building

17 tomorrow.

18      We will start court promptly at 9:00 o'clock.

19 Please arrive earlier than that so we can start right at 9:00.

20 We are going to bring in lunches for you every day so we can

21 try to make up some time this week. So lunches will be

22 provided to you approximately at 12:00 o'clock. So if you

23 will arrive a little before 9:00, you can fill out the lunch

24 sheet and express your preferences, so please allow for a

25 little bit of time to do that as well.

           1              We will take a slight morning break somewhere about

           2     10:30ish and then we will break for lunch.  It will be a very

           3     short lunch, 30 minutes.  You will eat in the jury

           4     deliberation room.  The lunch will be brought to you, and then

           5     we will kick right back up.  And so you can count on lunches

           6     there.  And then we will take a short afternoon break,

           7     somewhere about 2:30, 3:00ish for a little break, and then end

           8     somewhere about in the 5:00 o'clock range, if possible.  So

           9     that is what you can count on happening every day throughout

          10     this trial.

          11              Again, I leave you with the following instructions

          12     and, frankly, it is an order.  You shall not do any

          13     independent homework.  Do not get on the computer or any of

          14     your personal devices, your cellphone.  Don't do any research

          15     whatsoever on any of the names or phrases that you heard in

          16     this case.

          17              There is no research necessary or no homework

          18     necessary by you all as jurors.  Everything you need to know

          19     will come from the witness stand and from the evidence that we

          20     admit into the record here, so there is no need to do anything

          21     outside of the record.  That will only get you in trouble.

          22              And also, do not blog, same-time messages, Facebook

          23     posts anything about this case.  It is amazing what jurors do

          24     nowadays.  You are not to do anything on social media or

          25     anywhere else, e-mails.  You are not to communicate with

1    anybody by any means about this case.  Do I have to make it

2    more clear?  Does everybody understand?  Everybody?  Good.  I

3    didn't see everybody shaking their head yes.  Okay.  Everybody

4    is yes.

5             The only job you have to do is go safely home today

6    and arrive safely tomorrow.  Given the traffic conditions,

7    hopefully, the summer will ease up on us and so your commute

8    in and your commute out will be a little calmer.

9             Good evening to you all.

10            (Jury leaves courtroom.)

11            THE COURT:  Please be seated.

12            Okay.  So where we left off for tomorrow.  We have a

13   fight over the last question.

14            Counsel, I mean, you have to ask him, "Do you

15   remember making a statement?  Did you say this statement?"  If

16   they deny making the statement, then you can show the

17   transcript where they said directly the contrary.  I mean,

18   that is how impeachment is done.  That's not how it is being

19   done here today.

20            So I am not going to make any rulings on this

21   question.  You will ask a new question tomorrow and then we

22   will see how it comes out and whether it is objectionable.

23            Do we have anything else further for me today?

24            MR. FRAZIER:  Other than to inform the Court that

25   given that we have been able to preadmit the majority of our

1    exhibits, we have been able to eliminate a number of witnesses

2    off the witness list.

3         THE COURT:  So thank you for bringing that up.  So

4    before you all leave today, please provide to the defense the

5    names of the jurors -- pardon me -- the names of the witnesses

6    you expect that will be heard tomorrow, so they are prepared

7    for that.

8         MR. FRAZIER:  Yes, sir.  I will.

9         THE COURT:  Anything else?

10        MR. FRAZIER:  No, sir.

11        MR. STURGIS:  Judge, one other thing real quick.  I

12   believe on the exhibit list that was tendered by the

13   government, Number 25 and 26 were flip-flopped.  What is

14   listed as Number 25 should be Number 26, and vice versa.

15        THE COURT:  Twenty-five and 26 are in reverse order?

16        MR. STURGIS:  Yes, Your Honor.

17        THE COURT:  Noted.  Anything else?

18        MR. FRAZIER:  No, sir.

19        MR. STURGIS:  Nothing else.

20        THE COURT:  Government.  Anything from the

21   defendant?

22        MR. WOMACK:  No, Your Honor.

23        THE COURT:  We will see you tomorrow right before

24   9:00.

25        MR. FRAZIER:  Yes, sir.

1                          *-*-*-*-*-*-*-*

2    UNITED STATES DISTRICT COURT )

3    WESTERN DISTRICT OF TEXAS    )

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that the transcript fees and format comply

7    with those prescribed by the Court and the Judicial Conference

8    of the United States.

9    Date signed: April 2, 2018.

10

11                          /s/ Karl H. Myers

12                          _____
                            **KARL H. MYERS, CSR, RMR, CRR**
                            Official Court Reporter
13                          655 East Durango Blvd., Suite 315
                            San Antonio, Texas 78206
14                          (210) 244-5037

15

16

17

18

19

20

21

22

23

24

25